# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

KATHARINE KANE and
CHARLES KANE,

      Plaintiffs,

   v.

UNISON AGREEMENT CORPORATION;
UNISON INVESTMENT
MANAGEMENT, LLC; and
REAL ESTATE EQUITY EXCHANGE,
INC. d/b/a UNISON, UNISON
AGREEMENT CORP. and UNISON
INVESTMENT MANAGEMENT LLC

      Defendants.

---

## CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND

---

## <u>INTRODUCTION</u>

1.     Owning a home is a cornerstone of the proverbial American dream. Purchasing a home is often a result of years of savings and hard work and is a source of significant pride and financial stability. For many, their home is a primary source of generational wealth that will be passed on to their children and family members.

2.     The equity one builds in a home over time is often a person's largest asset, and an important piece of their overall economic wellbeing. Over time, many homeowners will access the equity in their home to assist with other financial obligations, such as supplementing

retirement, education, home improvements, or long-term care costs for themselves or a loved one.

3.    Today, the home equity market is valued at approximately $35 trillion dollars and is the largest asset class in the United States. The equity built over time traditionally belongs to the homeowner. But, in recent years, institutional and high-net-worth investors have been seeking a piece of that pie for themselves in ways that are increasingly deceptive and unfair to homeowners.

4.    Enter Unison. Unison was founded in the early 2000s to give investors access to the home equity market, without those investors actually having to own or sell the homes themselves to reap profits. To do this, Unison created a product that it claims is an "option" investment contract. Under the contract, Unison provides homeowners an upfront payment of cash in exchange for a stake in the home's future value. In other words, homeowners can tap into a portion of their equity now by promising an even larger amount of their equity to Unison in the future.

5.    To entice homeowners to use Unison, the Company markets its product in Colorado as a "simple" "loan alternative" that creates "no debt," carries "no interest," and requires no monthly payments. Unison also tells homeowners that the Company is their "partner" in the transaction "fair and square" and that Unison will share in the ups and downs of the home's future value.

6.    The problem is that none of these statements are true.

7.    Unison's product *is* a loan. It does create debt, and the homeowner will almost certainly be required to repay every penny they receive, plus interest in the form of a significant

lump sum ballon payment at the conclusion of the term. The payment amount is often so exorbitant that homeowners must sell their home in order to pay, with many walking away from the sale with little to show for the equity they worked hard to amass over time.

8.    Unison is also not a partner by any stretch of the imagination, and the arrangement rarely, if ever, ends up "fair and square" for the homeowner. Instead, Unison deploys a variety of mechanisms to ensure that it maximizes its return, at the homeowner's expense. This includes discounting the original value of the home, requiring the homeowner to pay all costs and fees throughout the term of the agreement, controlling the appraisal process, and controlling the ending value of the home.

9.    Unsuspecting homeowners who enter into Unison agreements have no way of knowing the realities of the product or its economic implications. This is because by labeling its product an "option contract," Unison bypasses the laws governing consumer credit and mortgage products. Those laws would require Unison to disclose the true cost of its product to homeowners before they entered into the agreement. Unison also engages in a variety of practices during marketing, signing, and servicing of the agreement that keep homeowners in the dark when it comes to the true nature of the Unison product, in violation of the Colorado Consumer Protection Act.

10.    The Unison transaction is reflected in a web of interlocking agreements spanning multiple documents, which contain confusing cross-references and approximately a dozen different formulas for calculating repayment. To understand the repayment formulas, homeowners must consult a slew of definitions that are scattered throughout the governing

3

documents. Only a notary attends the closing, so there is no Unison representative to answer any questions the homeowner may have when signing.

11.     Throughout the term of the agreement Unison sends quarterly statements that continue to emphasize Unison's purported role as a "financial partner." The quarterly statements also include confusing repayment estimates that do not provide a specific dollar amount for the estimated repayment. Instead, the quarterly statements provide the homeowner a range of potential repayment amounts, with the lowest estimate coming in at six figures less than the higher estimate at times. These quarterly statements keep consumers confused and unaware of the true financial impacts of the agreement while continually touting deceptive statements about the agreement's terms and Unison's role.

12.     By the time homeowners start to piece together the truth of the Unison product they are already locked into the agreement, and their home is encumbered by a deed of trust. At this point, the only way out is to find a significant amount of cash, often in the six figures, to buy out Unison, or sell their home. Homeowners who have spent years working hard, saving, and building equity are left holding the bag, while Unison and its investors reap annualized profits of over 20%.

13.     Katharine and Charles Kane (the Kanes)[1] are homeowners in Colorado who, regrettably, entered into a Unison agreement. After receiving a Unison flyer in the mail, the Kanes entered into an agreement based on Unison's promise of "interest free" money. They used

---

[1] This Complaint refers to Katharine ("Kate") and Charles ("Chuck") Kane collectively as "the Kanes" or "Plaintiffs." To avoid confusion, it individually refers to them as "Kate" and "Chuck."

4

the initial advance from Unison to remodel their kitchen, in hopes that it would increase their home's future value when they were ready to downsize and retire.

14.     As the Kanes enter their seventies, the time for downsizing and retirement is near. While they love their home, its size and layout have become increasingly difficult to navigate as they age. Chuck in particular has trouble with the stairs. The cost of maintaining the home is also becoming harder to shoulder and would be nearly impossible upon retirement.

15.     But, despite their years of hard work and over two decades of building equity in their home, the Kanes are all but trapped by the Unison agreement. As of March 31, 2026, Unison estimates the Kanes will owe up to $278,618 to terminate the contract, when they were advanced just over $87,000 after fees at the start of their agreement. For now, they can either remain in their home, despite the increasing physical difficulty of doing so and the mounting maintenance costs, or they can sell their home now and terminate the Unison agreement – although they would walk away unable to purchase another home and with very little money for savings.

16.     Worse yet, even if the Kanes choose to stay put for now, at some point the Unison agreement will terminate. If the Kanes still remain in their home at the end of the 30-year term, they will be forced to find a staggering amount of money to buy out Unison or sell their home and relocate when they are in their 90s, with limited money to do so.

17.     While the Kanes struggle to figure out their financial future, business is booming for Unison. It has over 10,000 agreements with homeowners, in properties cumulatively valued at $8.1 billion dollars, including with hundreds of homeowners in Colorado. Unison's practices

in Colorado are ongoing, with several agreements entered into by unwitting residents just this year.

18.     The Kanes bring this action on behalf of themselves and all other similarly situated Colorado residents who have entered into Unison Agreements relating to property located in Colorado. The Kanes seek to hold Unison liable for its violations of the Colorado Consumer Protection Act, the Colorado Uniform Consumer Credit Code, and the Colorado Mortgage Lending Laws and/or Reverse Mortgage Laws.

## **JURISDICTION AND VENUE**

19.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action in which there are more than 100 class members, the matter in controversy exceeds the sum of $5,000,000, and Defendants are citizens of a different state than that of at least one putative class member.

20.     Alternatively, the Court has jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

21.     This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202 and Federal Rule of Civil Procedure 57. There exists an actual controversy regarding the validity of contracts issued by Defendants, and the relief requested herein is necessary to declare the parties' contractual rights and duties and obligations under those contracts.

22.     This Court has personal jurisdiction over Defendants because Defendants have transacted business in the State of Colorado by offering and providing their home equity products in Colorado since at least 2018.

23. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and this action involves real property situated in this District.

## PARTIES

24. Kate and Chuck Kane are citizens of Colorado and reside in Centennial, Colorado, located in Arapahoe County. Kate is 69 years old and Chuck is 70 years old.

25. Defendant, Unison Agreement Corp. ("UAC"):

    a. is a Delaware Corporation registered as a Foreign Corporation with the Colorado Secretary of State with a principal place of business at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111;

    b. is not licensed or registered as a mortgage company, mortgage lender, and/or mortgage loan originator with the Nationwide Mortgage Licensing System or the Division of Real Estate for its Unison Agreement "option" product, C.R.S. §§ 12-10-704, 705;

    c. originated the transactions at issue in this Complaint;

    d. and is a wholly owned subsidiary of Real Estate Equity Exchange, Inc. (REX).

26. Defendant, Unison Investment Management, LLC (UIM):

    a. is a Delaware corporation and SEC-registered investment advisor with a principal place of business at 4 Embarcadero Center, Suite 710, San Francisco, CA 94111;

    b. UIM provides investment advisory services to pooled investment vehicles (Funds). The Funds invest primarily in Unison homeowner agreements, originated by Unison Agreement Corp. or securities issued by issuers or securitizations of Unison Agreements;

    c. UIM together with its affiliates serve as general partners and investment managers of the Funds. Such affiliates are typically under common control and/or possess substantial identity of personnel and/or equity owners with UIM;

    d.  as of December 31, 2024, UIM had regulatory assets under management of approximately $1,685,557,326; and

    e.  is a wholly owned subsidiary of REX.

27.    Defendant, Real Estate Equity Exchange, Inc. (REX):

    a.  is a Delaware corporation with a principal place of business at 4 Embarcadero Center, Suite 710, San Francisco, CA 94111;

    b.  is the corporate parent of UAC and UIM;

    c.  according to information it provides to consumers, does business under the names "Unison," "Unison Agreement Corp.," and "Unison Investment Management LLC," and establishes and maintains the websites and many materials for UAC and UIM; and

    d.  and is not licensed or registered as a mortgage company, mortgage lender, and/or mortgage loan originator with the Nationwide Mortgage Licensing System or the Division of Real Estate for its Unison Agreement "option" product, C.R.S. §§ 12-10-704, 705.

28.    Upon information and belief, at all relevant times, there has existed a unity of interest and ownership between UAC, UIM, and REX (referred to collectively herein as Defendants or Unison).  As an example of this unity of interest, UIM's Form ADV Part 2A notes that its affiliates (which include UAC and REX) are "typically under common control and/or possess substantial identity of personnel and/or equity owners."

29.    Defendants are joined, by agreement, in a joint venture or common enterprise. They have combined their property, skill, and knowledge for the purpose of carrying out a single business enterprise, namely the origination of and realizing financial gains from the Unison products described herein.

30.    Together, Defendants are a vertically integrated home equity mortgage origination, securitization, and investment advising firm focused on the asset class of owner-occupied residential real estate.

8

31.    The persons dominate, control, and manage Defendants, namely Thomas Sponholtz (CEO of all three entities), Scott Case (CFO of all three entities), and Matthew O'Hara (CIO of UAC and UIM), among others.

32.    Upon information and belief, Defendants use the same offices and employees, including offices located at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111.

33.    Defendants were, and are, the alter egos of one another, such that any liability incurred by one Defendant is chargeable against the other.

34.    Because of their agreement and cooperation in the wrongful acts set forth herein, Defendants are responsible for the acts of one another.

35.    Unison operates in thirty states and Washington D.C., including over 240 metro areas.

**FACTS**

A.    **Unison is Developed to Provide Investors Access to the Multitrillion Dollar Home Equity Market.**

36.    According to Unison's 2024 Home Equity Report, the American home equity market has "reached new heights." As of June 2024, the market totaled $35 trillion.[2] Older adults often have the highest level of home equity—valued at $14 trillion—because they have owned their homes the longest.[3]

37.    Across the country, including in Colorado, homeownership remains one of the most reliable ways to build wealth, primarily through the gradual accumulation of home equity.

---

[2] Jian Tong Chua & Winfield Xu, *2024 Unison Home Equity Report* 1 (Nov. 2024), https://contentimages.o-prod.unison.com/pdf/2024%20Home%20Equity%20Report.pdf (last visited on Mar. 25, 2026).
[3] *Senior Home Equity Stands at $13.95 Trillion, NRMLA* (Mar. 31, 2025), https://www.nrmlaonline.org/about/press-releases/senior-home-equity-stands-at-13-95-trillion (last visited on Mar. 25, 2026).

In Colorado, between 2020 and 2025, the average household equity grew by 48% and reached 218,008 in 2025.[4]

38.    Home equity plays a critical role in homeowners' financial security. Many homeowners access their home equity to supplement their retirement or pay off debts. Others use home equity to pay for significant expenses such as home improvements, education, healthcare costs, or long-term care. Products that allow homeowners to access their equity for these reasons are commonplace and include home equity lines of credit (HELOC), home equity loans (sometimes referred to as a second mortgage), cash-out refinances, and reverse mortgages.

39.    In the early 2000s, Thomas Sponholtz (Sponholtz), the founder and Chief Executive Officer of Unison, got the "big idea" for Unison's home equity product.[5]  The idea came to him while working at Barclays Global Investors and "looking around for large asset classes [he] could add to [his] client's portfolio."[6] Sponholtz noticed that the residential real estate market was largely untapped by institutional investors, despite it being the "largest asset class, both globally and in the U.S." [7]

40.    The absence of institutional investors in the market was driven by the burdens associated with the traditional way of investing in and profiting from residential real estate, which requires purchasing a home and renting it or reselling it. Sponholtz recognized that this

---

[4] *How home equity has changed in every U.S. state since 2020*, CNBC MAKE IT (Aug. 15, 2025), https://www.cnbc.com/2025/08/15/home-equity-changes-for-all-50-states-in-the-last-5-years.html (last visited on Mar. 25, 2025).
[5] Lend Academy, *Podcast 103: Thomas Sponholtz and Jim Riccitelli of Unison*, (June 7, 2017) https://www.heyfuturenexus.com/podcast-103-thomas-sponholtz-jim-riccitelli-unison/ (last visited on Mar. 25, 2026). (Podcast 103).
[6] *Id*.
[7] *Id*.

method of investment is often inefficient and comes with "tremendous amount of administrative cost in maintaining and being a property manager of [] homes."[8]

41.    With his clients and investors in mind, Sponholtz created Unison. Unison gives investors access to the residential real estate asset class—that is, to the equity that individual homeowners have accrued over time—through Unison's "equity sharing" products. In essence, these products are designed to allow Unison to claim a portion of homeowners' equity without taking on any of the concomitant costs, labor, burdens, or obligations of homeownership or real estate management.

42.    At Unison's inception, it offered two products, one for homeowners and one for homebuyers, referred to as the HomeOwner Product and the HomeBuyer Product, respectively.[9] According to Spohnholtz, the products "work the same way so if you understand one, you'll understand both."[10]

43.    The products work by Unison providing homeowners an upfront cash payment (either at time of purchase or during ownership) in exchange for a purported "option" to purchase a substantial percentage of the home in the future.

44.    The homeowner retains obligations during the pendency of the agreement, including all responsibility for the costs, labor, and burdens of homeownership, while Unison and its investors reap the rewards of increased equity without purchasing or maintaining the home themselves.

---

[8] *Podcast 103*, *supra* note 5.
[9] Throughout this Complaint the term "homeowner" is used to describe the individuals who are in Unison contracts, regardless of whether they entered into the HomeBuyer or HomeOwner product.
[10] *Podcast 103*, *supra* note 5.

45.     Further, Unison deploys a variety of mechanisms throughout the transaction to all but guarantee against the risk of any loss for the company, including lowering the starting values of homes on the front end and then inflating the values on the back end to maximize the equity Unison can extract from the homeowner at the conclusion of the transaction. Unison also requires the homeowner to pay all transaction fees at the start of the agreement, and upon a sale of the home.

46.     Unison was launched in 2005. As of today, Unison's website boasts that the "total value of homes [it has] invested in across the country" is $8.8 billion.[11] Unison has agreements with over 10,000 homeowners and a wide geographical presence, operating in "30 states + Washington, D.C."[12] Unison has hundreds of agreements in Colorado alone, and continues to enter into new agreements within the state, including during this calendar this year.

47.     Together, Unison notes, the markets in which it offers its product make up more than 83% of U.S. real estate by value.[13] It is no coincidence that Unison operates in markets that represent the vast majority of the country's real estate value. Unison has a "10-year forecast on every house in America"[14] and uses its "proprietary investment decision engine" to carefully select the markets in which it will operate. The investment decision engine "capture[s] and integrate[s] the most recent market and industry research about real estate, demographic trends, and key economic indicators such as employment and population growth. … With this

---

[11] *Company: About Us*, UNISON, https://www.unison.com/about-us, (last visited on Mar. 25, 2026).
[12] *Id. See also*, *About*, UNISON IM, https://www.unisonim.com/about-us, (last visited on Mar. 25, 2026).
[13] *Id.*
[14] *Podcast 103*, *supra* note 5.

information, Unison seeks to invest in Unison Agreements on properties that it believes have a greater likelihood of appreciation."[15]

48.    Unison's investment decision engine has paid off, at least for Unison and its investors. Notably, Unison describes "institutional investors" and "high net worth individuals" as "typical[]" investors.[16] Over the ten-year period from 2012 to 2022, Unison had a net annualized return of 20.7% for its investors.

49.    Unison touts the "unlimited upside and limited downside"[17] of its product to its investors, highlighting that "residential real estate has historically generated strong returns," and that its portfolios provide "low volatility and high risk-adjusted net returns."[18]

50.    In recent years, Unison has begun securitizing its product. To date, it has securitized over a billion dollars of its agreements in at least three different funds managed by Unison IM, further filling the coffers of Unison investors.

51.    Thus, the truth is that Unison's business model is designed to benefit its high net worth individual and corporate investors, not the homeowners it purports to help.

**B.    The Structure of the Transaction**

52.    At the outset of the Unison transaction, the homeowner is provided with an Offer Package. The Offer Package "consists of the following items: 1. Offer Letter, 2. Section 10 – Summary of Financial Terms and Fees, 3. Conditions of Offer, 4. Important Information Notice, 5. Total Unison Cost Estimate (TUCE), [and] 6. Notice To [Interested Parties] Who Are Not

---

[15] Unison Investment Management, LLC, Firm Brochure 8 (Form ADV Part 2A) (June 23, 2025) https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=982540
[16] *Id*.
[17] *About*, UNISON IM, https://www.unisonim.com/about-us, (last visited on Mar. 25, 2026).
[18] UNISON IM, https://www.unisonim.com, (last visited on Mar. 25, 2026).  *See also About*, UNISON IM, https://www.unisonim.com/about-us, (last visited on Mar. 25, 2026).

Signatories to The Unison HomeOwner Agreement."[19] On information and belief, the Offer

Package is substantially similar for all homeowners who enter into a Unison transaction.

53.    Notably, the Offer Package does *not* include copies of the full agreements to

which the homeowner will ultimately be bound. According to the Offer Package, if homeowners

would "like to read a full copy of the legal agreements that comprise the Unison HomeOwner

Agreement" they can "contact [their] program specialist and [the documents] will be

provided."[20] This language is not bold, underlined, or otherwise emphasized.  However, the date

and time of the Offer Package expiration is underlined and emphasized.

54.    By signing the Offer Package, the homeowner "agrees that [they] are and shall be

responsible to pay the Unison transaction fee,"[21] which can be thousands of dollars.

55.    After signing the Offer Package, Unison arranges for a closing meeting for the

homeowner to sign the underlying agreements. Those agreements include four primary

documents with interlocking and cross-cutting terms and obligations: the HomeOwner Covenant

Agreement, the HomeOwner Option Agreement, the Memorandum of Unison HomeOwner

Agreement, and the Unison HomeOwner Security Instrument (which Unison says "may be a

'Deed of Trust' or 'Mortgage' depending on the state").[22] These four documents are referred to

collectively herein as the "Agreement."[23] On information and belief, these are form documents

that have remained substantially similar throughout Unison's operation in Colorado.

---

[19] Offer Package at 2, attached hereto as **Exhibit A**.
[20] *Id.* at 1.
[21] *Id.* at 2.
[22] *Id.* at 6 (TUCE Page 2 of 10).
[23] The four documents are attached hereto as **Exhibits B – E** respectively.

56.      At the outset of the Agreement, the homeowner receives an initial upfront payment of money, called a "Unison Investment Payment."

57.      In return for this payment, the homeowner grants Unison a percentage share in the future value of the home, called the "Investor Percentage." The Agreement term is set for thirty years, although according to Sponholtz, homeowners typically exit the agreement much earlier, after just ten years.

58.      The homeowner must pay all origination costs and fees associated with the Agreement, including appraisal fees, transaction costs, and any settlement and closing costs (such as title, state taxes, and recording fees).

59.      After the Agreement is signed, Unison records a Deed of Trust to secure its interest in the property and the obligations of the homeowner.

60.      During the term of the Agreement, the homeowner must comply with several obligations imposed by the Agreement, or risk default.  Those obligations include paying all costs for the home, such as insurance and property taxes, and the costs of maintenance and repair. The homeowner also cannot exceed a "maximum debt amount" imposed by Unison, and the homeowner must maintain the home to Unison's standard during the Agreement. Additionally, in nearly all cases, the home must remain owner occupied, and the homeowner is unable to rent the property to a third party according to the terms of Unison's agreement.

61.      If the homeowner falls behind on insurance or property taxes, Unison can obtain forced place insurance and make "Protective Advances" to cover missed payments.  Protective Advances accrue interest at 1.5% per month.[24]

---

[24] **Exhibit B**, Covenant Agreement at ¶ 8.11.

15

62.     At the conclusion of the Agreement, the homeowner must pay Unison an amount called the "Investor Interest," which is determined by a formula that considers the "Ending Value" of the home (as defined by Unison) and the "Investor Percentage" identified at the start of the Agreement, as well as any other unpaid obligations of the homeowner, such as any repair items identified by Unison in a Deferred Maintenance Addendum or any Protective Advances made by Unison. The many ways in which the "Investor Interest" can be calculated are discussed in detail in Section D.

63.     The homeowner must repay Unison in a single lump sum. No prepayments or partial payments are permitted. As a result, many homeowners are unable to pay Unison without first selling their home. If the homeowner initiates a sale to repay Unison, the homeowner must pay all costs associated with the sale, including closings costs and appraisal costs, which could be in the thousands of dollars.

64.     By overseeing property appraisals, avoiding responsibility of the costs of maintenance and repairs, and requiring homeowners to bear all risks and fees, Unison seeks to maximize the portion of a homeowner's equity that it can claim as its own. In other words, its entire business model is to find ways to benefit by claiming a right to the equity that homeowners have built up over time.

**C.      Unison Mislabels its Product an "Option Contract" in an Attempt to Evade Credit, Mortgage, and Consumer Protection Laws.**

65.     Unison claims its product is an "option" contract because, according to Unison, the homeowner only has to pay if Unison decides, upon a triggering event, to exercise its "option" to acquire its interest in the value of the home.

16

66.     By affixing the "option" label to its product, Unison has developed a self-serving regulatory vacuum, where ostensibly no credit or mortgage regulation is necessary or applicable to it.  As of late, however, an increasing number of courts, including one in Colorado, have recognized that Unison's product is more akin to a consumer loan or mortgage product, and that the "option" label merely exalts form over function – and reality.

67.     Consumer loans and mortgage products are complex and come with certain risks and costs for borrowers. To ensure that homeowners are protected and informed when using such products, Colorado has enacted several laws governing consumer credit and mortgage lending activity, including for reverse mortgages. These laws include licensing and disclosure requirements that inform consumers of costs and prevent excessive interest rates or surprise payment amounts. In addition to the specific laws that govern consumer credit and mortgage lending, Colorado's Consumer Protection Act also prohibits unfair and deceptive trade practices related to financial products. Unison's Agreement falls under the purview of these laws.

68.     First, Unison's product meets the definition of a "residential mortgage loan" under Colorado's laws. Unison provides homeowners with an advance of money for personal family, or household use, secures its interests via a deed of trust, and requires payment (that is typically many times more than the initial amount advanced) when the Agreement terminates. These are the elements of a residential mortgage loan under Colorado law.

69.     Indeed, in a recent Position Statement, the Colorado Division of Real Estate made clear that "home equity [investment] contracts" such as Unison's, "can qualify as residential

17

mortgage loan[s], requiring licensure to originate. The expectation of homeowner repayment signals that a home equity contract is a loan."[25]

70.    Unison certainly expects that homeowners will repay Unison something at the end of the Agreement. Unison's entire business model is to enter into Agreements that, at least most of the time, will result in Unison reaping a return. It carefully selects favorable markets in which to offer its product, touts to its investors that the Agreements have "unlimited upside" and only "limited downside," and 20.7% annualized returns over a ten-year period.

71.    The Division of Real Estate's Position Statement further explains that an equity sharing agreement can be a mortgage loan even if the final repayment amount is not known at the outset of the transaction: "While the repayment amount may be speculative (the future payment depends on the home value at the time of the triggering event), these agreements anticipate that the property will accrue additional equity over a specified period of time and ensure that homeowner repayment will, at the very least, cover the initial amount provided to the homeowner."[26] This is precisely how Unison's Agreement functions.

72.    And, although the final payment amount is unknown at time the Agreement is signed, numerous statements made by Unison indicate that the payment obligation at the end of the Agreement is absolute. The Offer Package explains "[i]f you have not sold your Property or otherwise terminated the Unison HomeOwner Agreement by the end of the thirty (30) year Term, you will need to sell the Property or otherwise settle the Unison HomeOwner Agreement by

---

[25] Colo. Dep't of Reg. Agencies, Div. of Real Est., Position Statement, MLO 2.0 – License Requirements for Originating Home Equity Contracts (Jan. 21, 2026), https://dre.colorado.gov/sites/dre/files/documents/Position%20Statement%20Home%20Equity%20Contracts%20%28adopted%202026-01-21%29.pdf.
[26] *Id.*

paying Unison an amount equal to the value of its investment interest in the Property at that time."[27] In the Frequently Asked Question Section, on Unison's website one question reads: "What happens at the end of the agreement?" The response is: "You can use the funds provided by Unison for up to 30 years. After 30 years, you will need to either sell your home or buy us out."[28]

73.    However, Unison fails to abide by any mortgage lending laws. Indeed, its website proclaims: "Equity sharing agreements issued by Unison [] are not offered under mortgage lending licenses. Where offered by Unison [] equity sharing agreements offered are not currently required to be licensed." [29]

74.    Unison's product also falls within the definition of a reverse mortgage under Colorado law because it is a nonrecourse loan, secured by real property, that provides a cash advance to the homeowner, and requires no partial or other payment until the entire loan becomes due. These are the elements of a reverse mortgage under Colorado law. Also similar to reverse mortgage products, payment under Unison's Agreement becomes due upon (a) the sale or transfer of the property by the owner, (b) death of the last surviving owner, (c) expiration of the Agreement term, or (d) a material and uncured event of default by the homeowner, or (e) any other event specified in the Agreement.

75.    Moreover, even if Unison's product somehow escapes regulation as a type of mortgage, it is least a consumer loan subject to Colorado's credit laws because Unison regularly

---

[27] **Exhibit A**, Offer Package at 5 (TUCE Page 1 of 10).
[28] *What happens at the end of the agreement?*, UNISON, https://www.unison.com/faqs/equity-sharing-agreement, (last visited on Mar. 25, 2026).
[29] *State Licenses*, UNISON, https://www.unison.com/licenses, (last visited on Mar. 25, 2026). To the extent Unison Mortgage Corporation is licensed in Colorado, it offers a different product than the one at issue here, and Unison Mortgage Corporation is not a party to this lawsuit.

extends money to Colorado residents for personal, family, or household use, with a finance charge, and secures its debt by an interest in land.

76.    Notably, a similar home equity company called Unlock, a Unison competitor, disclosed that it was subpoenaed by the Colorado Attorney General regarding its activities under the Colorado Consumer Credit Code. On November 1, 2024, Unlock received a letter from the Colorado Attorney General directing it to cease and desist from further origination activities in Colorado. The Unlock product is similar to Unison's product in many regards, including that it purports to be an "option" contract rather than a credit product or mortgage.

77.    Any one of these labels: residential mortgage loan, reverse mortgage, or consumer loan, more accurately describes Unison's product as compared to "option contract." When properly labeled, Unison becomes subject to many state laws and regulations that require it to disclose the true cost and nature of the Agreement to homeowners. But, because it claims itself an "option contract" Unison fails to comply with any of these laws, and instead misrepresents the truth of its product to lure homeowners into the Agreement.

**D.    Unison's Product is Unfair and Deceptive Because it Misleads Homeowners about the Actual Cost of the Agreement.**

78.    Unison's product may be alluring to a homeowner looking to access their equity. After all, homeowners are told by Unison that they can access cash to "live the life you really want" with "no added debt, no interest and no monthly payment."

79.    These statements are false. Unison's product *does* create debt and carries interest.

80.    Additionally, noticeably missing from communications to homeowners is the *amount* of "Investor Interest" the homeowner will be required to pay Unison at the conclusion of the Agreement.

20

81.     Nor does Unison make clear to homeowners the amount of total costs associated with its product, including information on total fees and costs to be paid at initiation, termination, and throughout the transaction.

82.     Unison further misleads homeowners about the total cost of the transaction by representing that its product is "better than a traditional home equity line of credit," but not providing homeowners with proper comparison tools for other traditional equity products that may be better suited for the homeowner.[30]

83.     Unison claims it is not required to disclose information about the total costs of the Agreement because it is not a mortgage or a loan. But Unison's product *is* a loan and those disclosures are required.

84.     Even if the product were not a loan, however, the Agreement is unfair and deceptive because it misleads and confuses homeowners as to the total cost and ultimate payment obligations due.

85.     These practices impart significant harm on Colorado residents.  At the conclusion of the Agreement, homeowners are at risk of losing what is often their largest asset – their home.

86.     This risk is not just theoretical, as the amount due at the end of the Agreement can be in the hundreds of thousands of dollars.[31] Many homeowners will be forced to sell their home to satisfy the payment or face foreclosure.[32]

---

[30] Unison, How it Works – Unison Equity Sharing – Homeowner, YOUTUBE, at 0:39-40 (June 30, 2023), https://www.youtube.com/watch?v=KG7ygY6_sWM, (last visited on Mar. 25, 2026).
[31] *Issue Spotlight: Home Equity Contracts: Market Overview*, CFPB OFFICE OF MORTGAGE MARKETS (Jan. 15, 2025), https://www.consumerfinance.gov/data-research/research-reports/issue-spotlight-home-equity-contracts-market-overview/, (last visited on Mar. 25, 2026).
[32] *Id.*

> **i.    Unison's Product is Unfair and Deceptive Because the Homeowner Cannot Understand or Determine the Final Payment Amount Due Under the Agreement.**

87.    The details and obligations imposed by the Agreement are spread across multiple separate documents that can span up to 100 pages. Those documents include the HomeOwner Covenant Agreement, the HomeOwner Option Agreement, the Memorandum of Unison HomeOwner Agreement, the Unison HomeOwner Security Instrument, the Unison Closing Statement, the Unison Homeowner Agreement Closing Instructions, a Deferred Maintenance Addendum, a Notice and Acknowledgment for Non-Signatories to the Agreement, and various title documents, among others.

88.    These documents contain confusing cross-references, dozens of definitions (many of which also contain cross-references), and several complex mathematical formulas for repayment.

89.    Examination of the various payment formulas embedded in the Agreement highlight how difficult, if not impossible, it is for a homeowner to understand how much they will owe Unison at the conclusion of the Agreement. This is true not only at the time they enter the Agreement, but also throughout the duration of the Agreement.

90.    A homeowner's payment obligation becomes due upon several "Exercise Events." The Agreement outlines four such events, each of which requires the homeowner to pay Unison either directly or out of the proceeds of a sale of the home. The four Exercise Events are: (1) the sale or transfer of the property by the owner, (2) death of the last surviving owner, (3) expiration of the Agreement term, and (4) a material and uncured event of default by the homeowner.

22

91.    The amount due to Unison from the homeowner after an Exercise Event is called the "Investor Interest."

92.    The Agreement's explanation of how the "Investor Interest" is calculated is a prime example of how difficult it is for a homeowner to understand what the final payment obligation will be.

93.    According to the Agreement, the "Investor Interest . . . shall be defined and calculated as the Investor Proceeds, if any, *plus* the Unpaid Owner Obligations, if any."[33] Investor Proceeds "shall be defined and calculated as follows: Ending Agreed Value *multiplied by* Investor Percentage *minus* the Unison Purchase Price Balance."[34]

94.    To decode what this means, the homeowner must understand the definition of "Ending Agreed Value" which the Agreement explains is calculated as "**Base Ending Agreed Value** (as set forth in **Section 10.4** below) *minus any* Remodeling Adjustment\* *plus any* Deferred Maintenance Adjustment."[35] The asterisk explains "If there is a Negative Remodeling Adjustment, the absolute value of that number is added rather than subtracted."[36] The terms "Remodeling Adjustment" and "Deferred Maintenance Adjustment" are defined several pages later, in Schedule A, among more than 80 other definitions over 5 pages in smaller font than the rest of the document.

95.    The homeowner must then move to Section 10.4 to understand the "Base Ending Value," which is a component of the "Ending Agreed Value" formula, and can be calculated *ten different ways*, as described in Sections 10.4(a) – 10.4(j). Each of these different calculations

---

[33] **Exhibit B**, Covenant Agreement at ¶ 10.1(c) (emphasis in original).
[34] *Id.* at ¶ 10.1(a) (emphasis in original).
[35] *Id.* at 10.3, embedded in ¶ 10.2 (emphasis in original).
[36] *Id.*

cross-references other defined terms and formulas, some of which make the ultimate calculation subject to Unison's discretion.

96.     If the homeowner is able to determine the appropriate "Base Ending Value" calculation, they then must plug it into the "Ending Agreed Value" formula. Once they determine the "Ending Agreed Value," they can then, finally, attempt to determine the "Investor Interest," assuming all information needed for the formula is accurate and available (for example, if an appraisal value is needed for any of the formula inputs, but an appraisal has not yet been conducted, the homeowner cannot definitively determine the amount due).

97.     Understandably, any homeowner embarking on this byzantine set of cross-references, definitions, and confusing formulas would have difficulty discerning the amount they must pay Unison at outset, during, or at the conclusion of the Agreement.

98.     Further obscuring the total amount the homeowner will owe is the "Unison Purchase Price Balance" which is subtracted from "Investor Proceeds" to determine the "Investor Interest."

99.     The "Unison Purchase Price Balance" is the amount of the purported "second payment" Unison will pay the homeowner upon an Exercise Event. In reality, this "payment" is merely an offset of the profits Unison takes from the sale of the home (or an offset on the amount paid directly by the homeowner in a buyout). The "Unison Purchase Price Balance" is never actually deposited into a homeowner's account.

100.    But, because the "Unison Purchase Price Balance" amount is prominently displayed, and routinely reaches into the six figures, it can mislead consumers, causing them to

either misunderstand how much they will owe or inducing them to believe they will receive a deposit of a significant sum of money at the conclusion of the Agreement.

101.    Moreover, because the "Unison Purchase Price Balance" is fixed at the time the Agreement is executed (and does not change over time), the offset it provides to Unison's profits will becomes less and less as the home value increases, causing further confusion to homeowners about how this term will impact their final repayment obligation at the outset, during, and at the conclusion of the Agreement.

102.    In addition to the "Exercise Events" there are other events that terminate the Agreement and guarantee Unison express repayment. These events similarly make it difficult for the homeowner to understand the total cost of the product.

103.    First, if the homeowner sells or terminates the contract during the start of the Agreement, or the "Restriction Period" which is either three years (for older Agreements) and five years (for newer Agreements), the homeowner must repay Unison. If the home has declined in value during this period, Unison *will not share* in any decline in value, and the "Base Ending Agreed Value" will be the Effective Sale Price or the Original Agreed Value, *whichever is greater*.[37]

104.    To determine how much the homeowner will owe under this scenario they would need to understand the definition of "Effective Sale Price" and "Original Agreed Value" and then

---

[37] *What is the "restriction period"? Can I sell my home at any time?*, UNISON, https://www.unison.com/faqs/equity-sharing-agreement, (last visited on Mar. 25, 2026); *see also What happens when I decide to sell my home?*, UNISON, https://www.unison.com/faqs/equity-sharing-agreement, (last visited on Mar. 25, 2026); **Exhibit B**, Covenant Agreement at ¶ 10.4(b).

determine which would be greater. Both terms are defined in the long list of definitions found in Schedule A, attached to the Homeowner Covenant Agreement document.[38]

105.    If the homeowner can accurately determine the "Effective Sale Price" and the "Original Agreed Value," and then determine which is greater, they must then plug the greater number into the "Ending Agreed Value" formula. After determining the "Ending Agreed Value," the homeowner can then insert that number into the "Investor Proceeds" formula, discussed in Paragraph 93 in order to decipher the "Investor Interest" amount they must pay Unison.

106.    A homeowner who wants to exit the Agreement after the "Restriction Period," but before an Exercise Event, is also obligated to pay Unison. This is called a "Special Termination," and the amount due is "the greater of" (a) "the Unison Investment Payment plus any Unpaid Owner Obligations", or (b) "the Investor Interest."[39] In quarterly statements sent to homeowners, Unison expressly notes that it will *not* share in any decrease in value of the home in a "Special Termination."[40]

107.    The "Special Termination" event is explained to the homeowner in the Homeowner Option Agreement, but the homeowner must also reference the Homeowner Covenant Agreement for a full understanding of how it operates. The Homeowner Covenant Agreement notes that the "[t]he Investor Proceeds in any Special Termination shall be calculated using an Ending Agreed Value equal to the greater of the Appraised Value of the Property at the time of the Special Termination, or the **Solicited Sale Value**."[41]

---

[38] **Exhibit B**, Covenant Agreement at 36.
[39] *Id.* at ¶ 6.2.
[40] Unison Quarterly Statement at n.1, attached hereto as **Exhibit I**.
[41] **Exhibit B**, Covenant Agreement at ¶ 6.2 (emphasis in original).

108.    To discover what this means in terms of payment, homeowners would have to embark on the same journey as for other payment events. They would have to dive into the definitions in Schedule A to ascertain the definition of "Appraised Value" and "Solicited Sale Value" and then determine which is greater. After calculating these two numbers and determining the greater of the two, the homeowner must then plug the greater number into the "Ending Agreed Value" formula. Once they have that number, they can then move to the "Investor Proceeds" formulas to ultimately determine the "Investor Interest" amount due.

109.    Even more confusing is that Unison uses inconsistent formulas for the "Special Termination" calculation across documents. Contrary to the HomeOwner Covenant Agreement, the "Total Unison Cost Estimate," or the TUCE, included in the Offer Package reflects that the "Unison Investment Payment" (the initial advance to the homeowner) must always be repaid to Unison in a "Special Termination." According to the TUCE, the amount due is "*the greater* of" (a) the "Unison Investment Payment and any Unpaid Owner Obligations" or (b) the "the Unison Investment Payment and any Unpaid Owner Obligations … plus the return on investment Unison would have earned if you had sold your home for the Ending Agreed Value as determined by appraisal."[42] Unlike the Covenant Agreement which only requires repayment of the "Unison Investment Payment" in one of the applicable formulas, the TUCE appears to be structured such that the "Unison Investment Payment," which is typically tens of thousands of dollars is always repaid.

---

[42] **Exhibit A**, Offer Package at 7, ¶ 3 (TUCE Page 3 of 10).

110.    A homeowner is also required to pay Unison upon a default. In this scenario Unison can foreclose and force a sale of the home.[43] Unison can also implement forced place insurance and make "Protective Advances" for missed insurance or tax payments, which accrue interest at 1.5% per month, from the date of demand until paid in full.[44] Unison can also seek additional liquidated damages if the home is foreclosed upon.[45]

111.    If Unison terminates the agreement due to certain default events, the homeowner is required to pay the "Unison Investment Payment," at a minimum, but also may have to pay the amount of the "Investor Interest" that "exceeds the Unison Investment Payment."[46] Further, the "Unison Purchase Price Balance" used in the "Investor Interest" formula is subject to a 10% reduction.[47] As with the other payment conditions, to determine the amount due, the homeowner would have to consult multiple definitions and use multiple formulas. Additionally, in this scenario, the homeowner must also pay attorney's fees and costs incurred by Unison, and the "Unison Purchase Price Balance."

112.    Unison's practice of making the total amount due under the Agreement difficult, if not impossible to ascertain is unfair, deceptive, and misleading. It harms consumers by obscuring and/or misleading them as to the true nature and cost of Unison's product, with grave financial consequences. These practices violate Colorado law.

---

[43] **Exhibit B**, Covenant Agreement at ¶ 7.2.
[44] *Id.* at ¶ 8.11(b).
[45] *Id.* at ¶ 7.2(b).
[46] *Id.* at ¶ 7.3(a).
[47] *Id.* at ¶ 7.3(d).

ii.    **Unison's Product is Unfair and Deceptive Because the Homeowner
Cannot Understand How the Fees and Costs due under the Agreement
Will Impact the Overall Transaction.**

113.    In addition to the final payment due at the conclusion of the Agreement, the
homeowner must shoulder various costs and fees throughout the transaction. These fees end up
costing the homeowner more than just their total dollar amount and increase the amount of
money Unison will be entitled to at the conclusion of the Agreement.

114.    At the outset of the Agreement, Unison typically discounts the actual value of the
home to arrive at the Original Agreed Value of the home. Unison also requires the homeowner to
pay all transaction fees associated with the initiation and origination of the Agreement.

115.    Currently, Unison applies a 5% discount to the value of the home to arrive at the
Original Agreed Value. Unison describes this discount as a "Risk Adjustment" that "helps
account for the uncertainty inherent in the appraisal process. It also allows Unison to deliver your
funds faster and without the added costs of multiple appraisals."[48]

116.    The discount in the Original Agreed Value adversely impacts the advance to the
homeowner at the outset of the transaction and the repayment due to Unison at the end of the
transaction.

117.    This is because both the Unison Investment Payment (the initial advance to the
homeowner) and the Unison Purchase Price Balance (the offset of Unison's profits at the end of
the transaction) are keyed off of the Original Agreed Value.

---

[48] *What is the Risk Adjustment and how does Unison determine my home's starting value?*, UNISON,
https://www.unison.com/faqs/equity-sharing-agreement, (last visited on Mar. 25, 2026)

118.    By reducing the value of the home by 5% (or any other amount) before determining the dollar amount that the homeowner will receive, the homeowner is already receiving a discounted amount of equity at the outset of the Agreement, in return for promising Unison a significant stake in the home's *undiscounted* future value.

119.    This 5% reduction in Original Agreed Value also reduces the total amount of the Unison Purchase Price Balance. Although characterized as a payment due to consumers at the end of the transaction, the Unison Purchase Price Balance in fact serves as an offset to the total amount the homeowner will owe at the end of the Agreement.  Thus, by reducing the Original Agreed Value from which the Unison Purchase Price Balance is derived, Unison reduces the amount by which it will offset its profits and increases the amount Unison will be entitled to demand from homeowners at the conclusion of the Agreement.

120.    The Unison Investment Payment is further reduced by the initiation fees, which include a transaction fee and other costs. Currently, the transaction fee is 3.9%.

121.    At the conclusion of the Agreement, the homeowner is responsible for all costs associated with selling and closing on the home. Again, these costs can total several thousand dollars.

122.    The impact of the fees and costs go beyond their dollar amount. In most scenarios involving the sale of the home, Unison determines the Ending Agreed Value of the home based on the gross proceeds of the sale, meaning the sale price *before* any costs or fees are paid.

123.    This is another mechanism to ensure that Unison has access to the largest dollar amount of "home value" from which it can extract its Investor Interest, while the consumer pays the costs.

30

124.    Notably, the Ending Agreed Value of the home is not discounted. This compounds the effect of the discount to the Original Agreed Value at the outset of the Agreement. By discounting the Original Agreed Value but not the Ending Value, Unison increases the amount of home value to which it claims it is entitled.

125.    The reason the final payment and the costs of the transaction are not easy to decipher is, itself, plain. If homeowners knew that the ultimate cost of the transaction could be hundreds of thousands of dollars, would likely require them to sell their home, and/or could result in foreclosure, they would be much less likely to enter into the Agreement. This would not bode well for Unison's profits or its investors. Obscuring the truth is to Unison's benefit and violates Colorado law.

### iii.    The "Total Unison Cost Estimate" Included in the Offer Package Only Sows Further Confusion for Homeowners Regarding the Total Cost of the Agreement.

126.    Unison includes a Total Unison Cost Estimate or TUCE in its Offer Package. The TUCE, however, does nothing to clarify or explain the payment formulas listed in the Agreement, and, at times, includes information that is inconsistent with the Agreement.

127.    The TUCE also includes confusing charts that include scenarios that are completely at odds with those of the homeowner, making the charts useless for providing an accurate estimate of future repayment.

128.    As a result, homeowners are left no more informed about the total cost before signing or over the course of the Agreement. If anything, they are only further misled and confused about their repayment obligations.

31

129.    First, as described above in Paragraph 109, the TUCE includes a repayment calculation for a "Special Termination" that *differs* from the one in the Agreement. Under the TUCE, a homeowner must *always* repay at least the initial Unison Investment Payment if they want to terminate their Agreement prior to either the conclusion of the 30-year term or an Exercise Event, whereas the Agreement only requires such repayment in one of the two "Special Termination" formulas.

130.    The TUCE includes a chart that purports to estimate the "Annualized Percentage Cost Over the Term for A $50,000 Unison Investment Payment," reproduced below.[49] On information and belief, this is a form chart that appears in all TUCEs.

| Estimated Annualized Percentage Cost Over The Term For A $50,000 Unison Investment Payment | | | | | | |
|---|---|---|---|---|---|---|
| | | Term Assumption (years)* | | | | |
| | | 2 | 5 | 10 | 15 | 30 |
| Annual Home Price Appreciation Assumption | -4.0% | -14.8% | -18.8% | -100.0% | -100.0% | -100.0% |
| | -2.0% | 7.2% | -7.9% | -9.7% | -15.2% | -100.0% |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2.0% | 6.8% | 6.4% | 5.9% | 5.4% | 4.6% |
| | 4.0% | 13.4% | 11.9% | 10.4% | 9.3% | 7.5% |
| | 6.0% | 19.7% | 16.9% | 14.2% | 12.5% | 10.0% |

131.    This chart does nothing to inform homeowners who receive an initial Unison Investment Payment other than $50,000, such as the Kanes, as to the estimated annualized percentage cost of *their* Agreement over time.

---

[49] **Exhibit A**, Offer Package at 13 (TUCE Page 9 of 10).

132.     Even for a homeowner who may receive a $50,000 Unison Investment Payment, it is unclear how this chart accounts for other factors that determine the final payment due to Unison, and thus the estimated annualized cost of *their* Agreement. Such other factors include the Original Agreed Value of the home, the Unison Purchase Price, and the Ending Agreed Value. Indeed, in the paragraphs following the chart, the TUCE notes: "[t]he annualized cost of the Unison HomeOwner Agreement is determined when the agreement is terminated … and is dependent, in part, on how the value of your Property changes during the Term."[50] Yet the chart does not include any hypothetical home values whatsoever, making its methodology and conclusions all the more confusing.

133.     For the Kanes, who received a $91,525 Unison Investment Payment (before fees were deducted), this chart provides no insight into the estimated annualized percentage cost of *their* Agreement.

134.     Another chart entitled the "Estimated Total Cost Over the Term for A $50,000 Unison Investment Payment"[51] also fails to inform homeowners of the cost *for their actual Agreement*. On information and belief, this is a form chart that appears in all TUCEs.

---

[50] **Exhibit A**, Offer Package at 13 (TUCE Page 9 of 10).
[51] *Id.* at 14 (TUCE Page 10 of 10).

| Estimated Total Cost Over The Term For A $50,000 Unison Investment Payment | | | | | | |
|---|---|---|---|---|---|---|
| | | Term Assumption (years) | | | | |
| | | 2 | 5 | 10 | 15 | 30 |
| Annual Home Price Appreciation Assumption | -4.0% | - $13,720 | - $32,310 | - $50,000 | - $50,000 | - $50,000 |
| | -2.0% | $6,930 | - $16,814 | - $32,012 | - $45,750 | - $50,000 |
| | 0.0% | $0 | $0 | $0 | $0 | $0 |
| | 2.0% | $7,070 | $18,214 | $38,324 | $60,527 | $141,988 |
| | 4.0% | $14,280 | $37,914 | $84,043 | $140,165 | $392,595 |
| | 6.0% | $21,630 | $59,189 | $138,398 | $244,398 | $830,111 |

135.     The text following the chart explains that the estimates within it are based on an "Original Agreed Value of $500,000, a $50,000 Unison Investment Payment, and a 35% Investor Percentage."[52] How that translates to an Agreement like the Kanes, where the Original Agreed Value is $523,000, the Unison Investment Payment is $91,525, and the Investor Percentage is 70% is completely unknowable based on the information provided. It is unclear how this chart would inform any homeowner who did not have the *exact* same terms as those included in the example.

---

[52] **Exhibit A**, Offer Package at 14 (TUCE Page 10 of 10).

136.    In another chart labeled "Examples of the Payment to Unison at the End of the Unison Homeowner Agreement"[53] Unison appears to provide repayment estimates based on the Kanes' contract, including their Original Agreed Value[54] (although that is not made explicit in the chart) and Unison's Investor Percentage, but without a concrete term identified (5 years, 10 years, or 30 years) as shown below. On information and belief, substantially similar charts are provided to each homeowner by Unison.

**UNISON**

### Examples of the Payment to Unison at the End of the Unison HomeOwner Agreement

| Scenario | Change In Value | Future Home Value | Times Investor Percentage | Equals | Less Unison Purchase Price Balance | Equals Payment to Unison | Unison Gain (Loss) On Investment* |
|---|---|---|---|---|---|---|---|
| 1 | Increase | $585,760.00 | 70.00% | $410,032.00 | $274,575.00 | $135,457.00 | $43,932.00 |
| 2 | Larger Increase | $732,200.00 | 70.00% | $512,540.00 | $274,575.00 | $237,965.00 | $146,440.00 |
| 3 | Decrease | $460,240.00 | 70.00% | $322,168.00 | $274,575.00 | $47,593.00 | $-43,932.00) |
| 4 | Larger Decrease | $392,250.00 | 70.00% | $274,575.00 | $274,575.00 | $0.00 | ($-91,525.00) |
| 5 | Unchanged | $523,000.00 | 70.00% | $366,100.00 | $274,575.00 | $91,525.00 | $0.00 |

\*    Unison cannot lose an amount greater than the Unison Investment Payment under the terms of the Unison HomeOwner Agreement. The examples assume the following:

- No Remodeling Adjustment or Deferred Maintenance Adjustment applies.
- If the value of the Property increases by an amount greater than shown in Scenario 2, Unison's gain on investment will be proportionately larger, which will increase the payment to Unison.

137.    Although the title of the chart references the "End of the Unison Agreement" it is unclear what time length is used in the calculations provided. While the Agreement's term is 30 years, there are several events that could result in the Agreement ending earlier, and, as Unison's CEO noted, most Agreements terminate much earlier, around the 10-year mark.

---

[53] **Exhibit A**, Offer Package at 12 (TUCE Page 8 of 10).
[54] The chart does make explicit that it is relying on the Original Agreed Value of the Kane's home, but that is the assumption, on information and belief, given that the "Unchanged" future value is the same as the Kanes' Original Agreed Value.

35

138.    If the chart is intended to represent the amount due at the end of a 30-year term, it grossly underestimates the payment due to Unison given historical market data. Based on 30-year data from the Federal Reserve, home values increased nationwide from $153,500 to $534,000 between 1995 and 2025.[55]  This is an increase of approximately 248%.

139.    Relying on this data, the Kanes' home could be worth as much as $1,819,427 at the end of a 30-year term. Applying the formula use in the chart, this would result in a payment to Unison of $999,024 at the conclusion of the Agreement.

140.    This figure far exceeds the highest payment amount listed in the chart, which is $237,965. Indeed, just over seven years into the 30-year term, Unison estimates that the Kane's home is currently worth anywhere between $646,590 and $790,276 as of March 31, 2026. Based on these current estimates, Unison calculates its current share as anywhere between $178,038 and $278,618. As a result, the Kanes have already entered territory where the amount due Unison may significantly exceed the payment amounts listed in the TUCE.

141.    Additionally, although it would be simple to include, the chart does not have a column that reflects the dollar amount that the homeowner would recover under each estimate at the time of the sale (before any other costs, fees, or mortgage debt is included). Omission of this number fails to give homeowners a full understanding of the impact of the Agreement on any potential future sale.

142.    Finally, the numbers in the chart do not reflect the many other costs of the Agreement, including transaction fees, appraisal fees, Deferred Maintenance payments,

---

[55] *Average Sales Price of Houses Sold for the United States*, FRED, Fed. Rsrv. Bank of St. Louis (Feb. 20, 2026) https://fred.stlouisfed.org/series/ASPUS, (last visited on Mar. 25, 2026) (average sale prices of houses sold in the United States).

Protective Advances, or any other homeowner obligations incurred during the Term of the Agreement.

143.    As presented, the "Example of Payments to Unison" chart does not inform homeowners of the actual potential repayment obligations due at the end of the Agreement. If anything, it actively misleads homeowners into concluding they will owe much less.

**E.    Unison Mispresents Nearly Every Aspect of its Product and Engages in Other Unfair Practices.**

144.    Unison misrepresents nearly every aspect of its product to homeowners. Unison employs these tactics throughout its interactions with homeowners – starting with marketing and continuing through post-Agreement communications. As a result of these practices, homeowners are continually deceived about the true nature of the Unison product and cannot fully understand their payment obligations under the Agreement until payment is actually due.

145.    To begin with, Unison engages in misleading and deceptive marketing practices, where it touts itself as a financial partner, and misleads homeowners about the total costs of the transaction through both confusing statements and omissions of material information. These representations induce homeowners into the contract, but many of them do not actually see the Agreement itself until closing.

146.    At closing, upwards of 100 pages of documentation, containing multiple contracts, are dropped on homeowners. The Agreement includes statements that expressly contradict marketing statements, including a statement that Unison is actually *not* a partner in the transaction.[56]

---

[56] **Exhibit B**, Covenant Agreement at ¶ 9.3.

147.    The Agreement documents set forth the potential cost and repayment formulas, but those repayment formulas do not inform homeowners because they are complex, confusing, contingent on future events, and require inputs that are unknown and unknowable at the time of signing, and that cannot be known until payment actually becomes due.

148.    Then, throughout the Agreement, Unison sends quarterly statements, that, once again, claim Unison is a "financial partner" with the homeowner, in direct contradiction of the Agreement itself, but in line with Unison's statements in its misleading marketing campaigns. The quarterly statements direct homeowners to contact the "Unison Partner Services Team" at "HomePartners@unison.com" if they are experiencing financial challenges, stating that "[a]s your financial partner, we'd love to help."[57]

149.    The quarterly statements also provide confusing cost and payment estimates that are similar to upfront marketing materials and the TUCE, and which fail to account for many potential fee and cost elements, including closing costs, appraisal costs, deferred maintenance adjustments, and other penalties or homeowner obligations. The quarterly statements also includes a series of "reminders" that list other potential repayment scenarios that further mislead, confuse, and deceive the homeowner about their obligations under the Agreement.

150.    In addition to the overall transaction being unfair and deceptive, Unison makes numerous specific statements throughout the transaction that are also unfair and deceptive.

151.    As discussed throughout, Unison markets itself as a "partner" with the homeowner. This representation is made repeatedly throughout Unison's website and marketing

---

[57] **Exhibit I**, Unison Quarterly Statement at 1.

materials with statements like "We win when you win" and "Unison is your partner, here when you need us."[58]

152.    Additionally, a marketing video on Unison's website and YouTube also emphasizes the purported partnership aspect of the Agreement. The video explains that Unison is a "partnership, fair and square and yes, it's kind of cool."[59]

153.    The video continues: "Again, we're partners … so we split the change in value of your home, even if your home depreciates, we actually take the hit along with you. You heard that right. Either we both profit or we both share in the loss. That's what we mean by a fair partnership. We're truly there with you through the ups and the downs."[60]

154.    Additionally, Unison's quarterly statements repeat that it is a "financial partner" who would "love to help" if the homeowner is experiencing financial challenges.[61]

155.    These representations lead the homeowner to believe that they are, in fact, partners with Unison and that they will share together in the increase or decrease in the value of the home.

156.    This gives consumers an inaccurate impression of the relationship and the terms of the Agreement, and builds false trust that induces them to enter into the Agreement. These statements are unfair and deceptive for many reasons.

---

[58] *Products: Equity Sharing Agreement*, UNISON, https://www.unison.com/equity-sharing-agreement, (accessed on Nov. 6, 2025 and last visited on Mar. 25, 2026).
[59] Unison, *How it Works – Unison Equity Sharing – Homeowner*, YOUTUBE, at 0:42-45 (June 30, 2023), https://www.youtube.com/watch?v=KG7ygY6_sWM, (last visited on Mar. 25, 2026).
[60] *Id.* at 1:15-34.
[61] **Exhibit I**, Unison Quarterly Statement at 1.

39

157.     First, the Agreement itself explicitly disclaims any partnership relationship with the homeowner, directly contradicting Unison's other representations. "Investor shall not be deemed a partner . . . or fiduciary with, or of, Owner." [62]

158.     This makes sense, because one aspect of a partnership is a fiduciary relationship. Unison could not possibly abide by this duty with homeowners, given its goal to increase returns for its investors.

159.     Additionally, Unison is not a partner in even the layman's sense of the word. Unison has built into the Agreement a variety of mechanisms designed to ensure it will maximize the Company's return and minimize risk, even if the home value depreciates, including by manipulating the Original Agreed Value, requiring the homeowner to shoulder all costs, and having significant influence over the Ending Agreed Value. Indeed, Unison admits in the Offer Package provided to homeowners that "cannot lose an amount greater than the Unison Investment Payment under the terms of the Unison HomeOwner Agreement."[63]

160.     Further, the representation that Unison will share in any decrease in value of the home is unfair and misleading because in certain circumstances, Unison expressly disclaims a share of any depreciation. If the homeowner exits the Agreement during the "Restriction Period" or elects a "Special Termination," Unison does not share in any decrease in value.

161.     Unison also makes statements about the homeowner maintaining "control [of] the property and receiv[ing] the benefits of home ownership, such as occupancy rights."[64] It markets

---

[62] **Exhibit B**, Covenant Agreement at ¶ 9.3.
[63] **Exhibit A**, Offer Package at 12 (TUCE Page 8 of 10).
[64] *If I partner with Unison, who owns the home?*, UNISON, https://www.unison.com/faqs/equity-sharing-agreement, (last visited on Mar. 25, 2026).

the product to homeowners as a "simple, fair way to access the wealth that is tied up in your home"[65] so that homeowners can "live the life [they] really want."[66]

162.    These statements mislead consumers about the complexity of the Agreement, including the significant restrictions placed on the home under the Agreement. These restrictions include prohibiting renting out the home, requiring retention of the home as a primary residence, limiting the maximum total debt the homeowner can carry during the Agreement, imposing limits on refinancing and other equity products, and granting Unison the right to interfere in a sale if it believes the sale price is too low.

163.    Unison's website mentions some of these restrictions in the Frequently Asked Question section. However, these statements fail to ensure that the homeowner has an accurate understanding of the realities of the product when considered alongside Unison's competing statements about the ease and simplicity of the Agreement that are featured prominently on Unison's website and other marketing materials.

164.    These limits can place homeowners in an extremely difficult position. As an example, the homeowner must keep the home at a certain level of repair under the Unison Agreement. If performing repairs or upgrades is required, homeowners may need to use additional financing products or take on more debt. But the Unison Agreements prevents homeowners from doing so without Unison's signoff, especially if it would result in the homeowner exceeding the maximum debt amount. In Colorado, where the cost of home

---

[65] Unison, *How it Works – Unison Equity Sharing – Homeowner*, YOUTUBE, at 0:17-19 (June 30, 2023), https://www.youtube.com/watch?v=KG7ygY6_sWM, (last visited on Mar. 25, 2026).
[66] *Products: Equity Sharing Agreement*, UNISON, https://www.unison.com/equity-sharing-agreement, (last visited on Mar. 25, 2026).

maintenance is nearly 20% higher than the national average, this can cause significant issues for homeowners who may need additional financing to maintain their homes.[67]

165.    On information and belief, no Unison representative is present at closing. Only a notary attends, therefore, the homeowner is unable to ask a Unison representative questions about these restrictions under the Agreement, or any other provision of the Agreement.

166.    Unison also makes misleading representations about the amount homeowners will have to pay at the conclusion of the Agreement. These statements appear in various places throughout the website and give the homeowner the impression the payment will not be significant or impact any equity amassed through their monthly mortgage payments.

167.    One Frequently Asked Question suggests a homeowner may owe *nothing* at the conclusion of the Agreement. The question is "Is it possible I could end up owing Unison back less money at the end than I received at the beginning?" The answer is:

> "Yes. Unison is not a loan; we are invested in your home alongside you, so we win and lose together. Though such cases are not common, with significant decline in your home's value–something neither of us are looking for!--it is possible that the value of the agreement, and your ending amount due to Unison, would be $0. It's this feature along with the absence of any monthly payments that distinguishes an equity sharing agreement from a loan."[68]

168.    This is unfair and deceptive. Under nearly all circumstances the homeowner will owe Unison in amounts that exceed the initial amounts advanced. And Unison has built several mechanisms into the Agreement to ensure that it reaps a return on the Agreement. Highlighting a

---

[67] Jenny McCoy, *Older adults on fixed incomes are finding homeownership in Colorado financially harder than ever*, THE COLORADO SUN (Dec. 10, 2025), https://coloradosun.com/2025/12/10/homeownership-colorado-older-adults/.

[68] *Is it possible I could end up owing Unison back less money at the end than I received at the beginning?*, UNISON, https://www.unison.com/faqs/equity-sharing-agreement, (last visited on Mar. 25, 2026).

remote scenario in which a homeowner may owe $0 at the conclusion of the Agreement despite Unison's one-sided agreement misleads consumers about the total costs and risks associated with Unison's product.

169. These examples, alongside Unison's other statements serve to mislead and confuse homeowners about the amount they will be required to pay Unison at the conclusion of the Agreement.

170. Unison repeatedly emphasizes that its product does not create debt.

171. This is unfair and deceptive. Debt is a future payment obligation, and the Unison Agreement creates a future payment obligation for homeowners.

172. Unison's statements that there is no interest associated with the Agreement are also unfair and deceptive. Interest is merely the amount owed in return for the use of borrowed money.

173. Under the Agreement, homeowners will, in the vast majority of circumstances, be required to pay Unison more than they were advanced. Additionally, if Unison makes protective advances on behalf of a homeowner, those explicitly accrue interest at 1.5% per month.

174. Unison's statements that its product is not a loan are unfair and deceptive for the reasons discussed herein, and designed to lure homeowners into its product, rather than other, potentially more suitable, equity products. In quarterly statements to homeowners, Unison continues to describe itself as an "equity-sharing agreement" rather than a loan.[69]

175. Unison also emphasizes throughout its website and promotional videos that there are no monthly payments. This is unfair and deceptive because the homeowner must continue to

---

[69] **Exhibit I**, Unison Quarterly Statement at 2.

make monthly payments under the Agreement, such as property taxes, insurance, and mortgage payments, if applicable.

176.    Finally, Unison engages in unfair practices related to appraisals. In many circumstances, the Ending Agreed Value used to determine Unison's Investor Proceeds relies on an appraised value of the home. As a result, Unison has an interest in a high appraisal value at the conclusion of the Agreement. Unison's interest is exemplified by the provision in the Agreement that permits Unison to order an additional appraisal if it determines that a proposed sale price is too low. By invoking this provision, Unison can obtain a higher appraisal, that will result in Unison recouping a larger amount of the homeowners' equity.

177.    The impact of Unison's repeated and prolific misrepresentations is that homeowners have no real understanding of the Agreement into which they are entering. They believe the Agreement is simple, easy, and allows them to access their home equity with no interest or monthly payment obligations. In reality, while homeowners may get an immediate influx of cash at the start of the Agreement, they are severely limited in their control over their home during the Agreement, and risk losing their home or selling for very little return for themselves at the conclusion of the Agreement.

178.    Unison's unfair and deceptive practices continue throughout the course of the Agreement, leaving homeowners continually confused and misled about the terms and implications of the Unison Agreement.

**F.      Unison's Product Has a Significant and Ongoing Impact on the Colorado Public.**

179.    Unison has been extending its Agreements in Colorado since at least 2018. Based on land records, there are nearly 300 Agreements in the five largest counties in Colorado. In

those same counties, approximately 40 homeowners have ended their Agreement with Unison, meaning that they either sold their home or otherwise paid Unison to terminate the contract.

180.    Unison's practices are ongoing, with hundreds of residents trapped in existing contracts, and several new Agreements being extended this calendar year. As long as Unison's practices in Colorado continue unchecked, more and more residents will become ensnared in predatory Agreements. And, as a result, more and more residents will be forced to either sell their homes, and walk away with little to show, or come up with a significant amount of money to pay Unison to terminate their contracts in the future.

181.    Unison's products are particularly dangerous for the public because they misrepresent the Agreements' true terms and mislead homeowners about how much they will owe at the conclusion of the Agreement. As a result, Colorado residents believe they are entering into a flexible, loan-alternative product, when, in reality, they are signing up for a high-cost product that will severely limit their ability to control their own home and may result in them losing it altogether.

182.    Unison uses sophisticated market models to locate the best areas in which to extend its Agreements. It then reaches the homeowners in those markets via a broad advertising and marketing scheme, including sending flyers to particular residents' homes, and maintaining a website and online presence to market its product as a so-called interest-free, no debt, loan alternative. While Unison and its leadership have sophistication in market modeling and complex financial transactions, the everyday homeowners who they target do not.

183.    Unison's actions impact Colorado residents, as well as the local real estate market. Residents are ensnared in predatory contracts in which they must shoulder all fees and costs,

45

while living in a home that is severely encumbered – not only by the lien Unison records on their home, but by additional contract terms that prevent them from renting out their home, securing additional financing (without explicit approval), and limiting the amount of debt the homeowner can take-on. As a result of these actions, the local real estate market is impacted because homes cannot be sold unless Unison is explicitly involved, and additional home financing tools are all but impossible to extend to Unison customers.

**THE KANES' TRANSACTION**

184.     The Kanes have lived in their current home in Centennial, Colorado since the early 2000s. Chuck is 70 years old, and Kate is 69.

185.     Chuck works for a commercial janitorial cleaning company that he owns. Over the course of her career Kate has served in various project management and administrator roles in the construction and medical transportation industries.

186.     In or around fall 2018, the Kanes received a flyer in the mail from Unison purporting to offer an upfront sum of money with no interest and no monthly repayment obligations. The flyer piqued the Kanes' interest. They had been thinking about remodeling their kitchen, and Unison purported to offer an interest-free way to do so. The Kanes planned to sell their home when they reached retirement, and they believed the kitchen remodel would increase the resale value.

187.     In response to the flyer, Chuck called Unison and spoke with a representative. Over the course of several conversations the representative built trust with Chuck, who is not sophisticated in real estate or other complex financial transactions. The representative bonded with Chuck over their shared appreciation for football, including bantering about a rivalry

between the two teams they respectively supported. Due to the rapport they built, Chuck even sent the representative a jersey for a retired player on his preferred team.

188.    The representative encouraged Chuck to enter into the Agreement. During these conversations, the representative reiterated appealing aspects of the product, including that it was interest-free, had no monthly payments, and would not appear on the Kanes' credit report. The representative also suggested that he himself would enter into the Agreement if he were in the Kanes' position and emphasized how quickly the initial advance would be paid.

189.    During these calls, Chuck does not remember the representative mentioning that Unison would record a deed of trust on their property, or that Unison would charge over $3,500 in transaction fees. If the representative did mention these issues, there was not a significant focus on them during the conversations. The representative also did not explain how Unison would actually calculate the amount owed at the end of the transaction.

190.    Unison sent the Kanes an Offer Package on October 16, 2018. The Offer Package included the documents discussed in Paragraphs 52-53, above. The Offer Package provided that the Kanes would receive a Unison Investment Payment, or initial advance, of $91,525, minus the cost of the Unison Transaction Fee, which was $3,569.[70] The Unison Investment Payment, before fees, was approximately 17.5% of the "Original Agreed Value" of the Kane's home.

191.    The Original Agreed Value was set at $523,000 based on an appraisal ordered by Unison. The appraisal was conducted in a perfunctory manner with the appraiser spending limited time evaluating the Kanes' more than 3,000 square foot home and surrounding property.

---

[70] **Exhibit A**, Offer Package at 1.

In return for the Unison Investment Payment, the Kanes granted Unison a 70% interest in the future value of the home, called the "Investor Percentage."[71]

192.    The Kanes have no memory of any Unison representative informing them of the Transaction Fee prior to receiving the Offer Package, nor did any Unison representative explain how the initial advance was derived. The Offer Package noted that the offer was only available until October 26, 2018, using dark underline to emphasize this language.[72]

193.    On October 21, 2018, the Kanes electronically signed the Offer Package.[73] At the time the Kanes signed, they had not seen any of the documents underlying the Agreement, and they had not met with a Unison representative in person.

194.    Ultimately, Unison's representations that the product was interest-free and did not require any monthly payments persuaded the Kanes to enter into the Agreement. Based on these same representations, the Kanes did not seek out or consider loan alternatives. They also did not seek out a lawyer to review the Agreement because they trusted the advice from the representative with whom Chuck had spoken. Had the Kanes known or understood the Agreement created a lien on their property and carried interest, they would not have entered the Agreement.

195.    On October 23, 2018, the Kanes met with a notary to execute the Agreement. The Kanes' Agreement spans close to 100 pages and consists of the following documents: the Unison HomeOwner Covenant Agreement, Unison HomeOwner Option Agreement, Memorandum of HomeOwner Agreement, Unison Deed of Trust, Unison Homeowner Agreement Closing

---

[71] **Exhibit A**, Offer Package at 1.
[72] *Id.*
[73] *Id.* at 4.

Instructions, Unison Agreement Corp. Closing Statement, and a Deferred Maintenance

Addendum.[74]

196.     Despite the complexity and scope of the Agreement, no representative from

Unison attended the signing. Indeed, the Kanes still have never met in person with anyone from

Unison. After finalizing the Agreement, the Kanes received a total of $87,956.00, which is the

Unison Investment Payment of $91,525, less the Unison Transaction Fee of $3,569.

197.     Although the Kanes met with a notary to execute the Agreement, and the

Agreement appears to be in force and effect, the Kanes do not have signed copies of several

documents comprising the Agreement, including the Covenant Agreement, Option Agreement,

Deferred Maintenance Addendum, and Closing Instructions. This is so even though the Closing

Instructions require signatures of those four documents. The Kanes do not recall seeing these

four documents before the closing appointment to sign the Agreement.

198.     The Deferred Maintenance Addendum, a document that the Kanes do not recall

seeing during the closing, and for which they have no signed copy, claims there is improper

grading and water damage in parts of the Kanes' home. The Deferred Maintenance Addendum

allows Unison to apply a Deferred Maintenance Adjustment that reflects its estimate of the

diminution of value caused by these issues unless the Kanes make repairs at their own cost.[75]

This is one mechanism by which Unison can increase the total amount due by the Kanes at the

conclusion of the Agreement.[76]

---

[74] *See* **Exhibits B-E** and Unison Homeowner Agreement Closing Instructions, Unison Agreement Corp. Closing
Statement, and Deferred Maintenance Addendum, attached hereto as **Exhibits F – H** respectively.
[75] *See* **Exhibit H**, Deferred Maintenance Addendum at 1-2.  Unison's pagination of the Addendum appears to be
erroneous as the first page of the document indicates it is three pages in length and the second page indicates it is
two pages in length.
[76] *See* **Exhibit B**, Covenant Agreement §§ 8.4, 10.4, and Schedule A Definitions at 36-40.

199.    After executing the Agreement, Unison recorded a Deed of Trust on the Kanes' property. The Deed of Trust creates a lien on the title to the property and grants Unison foreclosure rights in the event of the Kane's default.[77]At the time of signing, the Kanes did not understand the impact the Deed of Trust would have on their title to their home.

200.    Land records reflect that Unison Agreement Corp. assigned its rights under four separate documents to Odin New Horizon Real Estate Fund LP the day before the Kanes met with a notary in person.[78] The Kanes were not aware of the assignment to Odin New Horizon Real Estate Fund LP at the time they entered the Agreement or for many years after.

201.    Unison obscured the true nature and cost of the Agreement, preventing the Kanes from understanding the risks and their future repayment obligations associated with the transaction. For example, none of the documents contain disclosures that comply with applicable lending or consumer credit laws. Even to date, the Kanes do not fully understand their repayment obligations, as their estimated repayments in their December 31, 2025 quarterly statement ranged from $164,243 to $261,759 in just the last few months of 2025.[79] Just three months later, the repayment amount has increased to a range of $178,038 to $278,618 as of March 31, 2026. These estimates do not include other costs or fees the Kanes may be subject to, and a Special Termination may result in a completely different repayment amount.

202.    Finally, the Agreement purports to offer the Kanes a "Unison Purchase Price Balance" of $274,575.[80] Although the Unison Purchase Price Balance is characterized as a payment to the Kanes upon the sale of their house, it is in fact just an offset of the profits that

---

[77] **Exhibit A**, Offer Package at 6 (TUCE Page 2 of 10).
[78] *See* Assignment of Unison HomeOwner Agreement (Oct. 22, 2018), attached hereto as **Exhibit J**.
[79] **Exhibit I**, Unison Quarterly Statement at 1.
[80] **Exhibit A**, Offer Package at 3.

50

Unison would take from the sale. To date, the Kanes still do not fully understand how the Unison Purchase Price Balance will impact their final repayment obligation.

203.     The Kanes ultimately used the Unison Investment Payment to remodel their kitchen, extend their deck, and pay off credit cards.

204.     As of March 31, 2026, Unison estimates that the Kanes' home is worth somewhere between $646,590 to $790,276. Based on that home value, Unison estimates that the Kanes would owe between $178,038 to 278,618 if they exited the Agreement now.[81]

205.     A repayment obligation of $178,038 or $278,618 for a loan of $87,956.00 after approximately seven and a half years constitutes a simple interest rate of 13.66% or 28.9% per year respectively and an annual percentage rate of approximately 9.8% and 16.6% respectively, despite Unison's statements that its product is "interest-free."

206.     If the Kanes sold their home to pay Unison, they would be required to cover the costs of the items identified in the Deferred Maintenance Addendum included at the outset of the Agreement, and the Kanes would be responsible for all selling and closing costs, further reducing the amount of proceeds they would receive from a sale, as Unison does not share in these expenses.

207.     In addition to their Unison Agreement, the Kanes have an FHA loan with a balance of about $190,000, reducing even further the amount of proceeds that would flow to the Kanes from a sale of their home.

208.     The Kanes have not been on an equal footing at any point in the transaction. Unison is a multimillion dollar financial technology company that drafted the nearly 100 pages

---

[81] **Exhibit I**, March 31, 2026 Unison Quarterly Statement at 1.

comprising the Agreement. Unison has complex methods of market and financial analysis that give it far superior knowledge of how its Agreement will actually work in practice. Unison also includes a variety of terms in the Agreement that benefit Unison to the detriment of homeowners, including determining the Original Agreed Value, requiring the homeowner to pay all costs and fees, and exercising significant control over the appraisal process and the Ending Agreed Value. Moreover, Unison presented the terms of the Agreement to the Kanes on a take-it-or-leave-it basis.

209.    Meanwhile, the Kanes did not have legal representation and have little experience with complex financial transactions, including real estate transactions. They did not receive a copy of the Agreement prior to signing, and no Unison representative attended the signing. As a result of these factors and Unison's misrepresentations about the terms and characteristics of the product, the Kanes did not understand the true terms or consequences of the Agreement at the time of signing and still do not appreciate or understand the full scope of the terms of their consequences.

210.    The Kanes had no idea that the Agreement would obligate them to pay so much to Unison at the end of the Agreement. Had they understood the true cost and nature of the transaction with Unison at the time they entered the Agreement, they would not have agreed to it.

211.    The Kanes have enjoyed living in their home over the last twenty-four years. They have fond memories of gatherings with friends in their basement and backyard. They love the large trees that surround their yard.

212.    But, as they enter their 70s, the Kanes would like to retire and downsize to a smaller home that is easier to navigate physically and less costly to maintain. On a physical level,

the stairs in the Kanes' home cause problems for Chuck, who recently had a hip replacement, has spinal deterioration, and has three heart stents. As a financial matter, the Kanes incur substantial costs in maintaining their home, and under the terms of their Agreement with Unison, the Kanes bear those costs alone. A smaller home without stairs and with less maintenance costs would be easier for the Kanes to navigate, both physically and financially.

213.    Even if the Kanes wanted to retrofit their home to make it easier for Chuck to navigate the stairs, they would not be able to do so without the express consent of Unison, given the maximum debt limit imposed by the Agreement. Nor can the Kanes relocate to a more suitable home while renting out their current home under the Agreement.

214.    The unfortunate reality for the Kanes is that the Unison Agreement stands in the way of their plans for the future. Despite a lifetime of hard work, they have no control over their home, which they have lived in for over 20 years. They must either remain in place, despite the increasing difficulty of living in the home as they age or sell their home in order to repay Unison. In the latter scenario, the payment to Unison would be so significant that the Kanes would not be able to purchase another home and would have only limited savings to support themselves going forward.

215.    If the Kanes remain in place now, the Unison Agreement will terminate when they are in their early 90s, if Unison does not "exercise its option" before that. The thought of having to sell their home and pay Unison a significant amount of the sale proceeds at that time in their lives is a source of anxiety for the Kanes, who have worked hard to build a sense of security for themselves.

## CLASS ACTION ALLEGATIONS

216.    The Kanes bring this class action under Federal Rule of Civil Procedure 23(a),

23(b)(2) and 23(b)(3), and/or 23(c)(4) on behalf of themselves and all other similarly situated

Colorado residents who have entered into Unison Agreements relating to property located in

Colorado. The Class Period is ongoing through the date of class certification in this action.

217.    The class is so numerous that joinder of all members is impractical. While the

exact number and identity of class members is unknown to Plaintiffs at this time and can only be

determined through appropriate discovery, publicly available land records reflect that there are

hundreds of Agreements in just five counties in Colorado. The precise number and identification

of the Class members will be ascertainable from Unison's own records.

218.    There are questions of law and fact common to all members of the Class. Those

common questions include, but are not limited to, the following:

a.   Whether Unison's Agreement is an "option" contract.

b.   Whether Unison designs its Agreements to ensure that, at least most of the time, Unison homeowners have a payment obligation at the conclusion of the Agreement;

c.   Whether Unison's form contracts, documents and/or uniform advertising are unlawful, unfair, or deceptive;

d.   Whether Unison's form contracts, documents, and/or uniform advertising inform the homeowner of the total cost of the transaction;

e.   Whether Unison's statements about the Agreement's terms, including but not limited to whether it carries interest or creates debt, are unfair or deceptive;

f.   Whether Unison's statements about being a "partner" with the homeowner are unfair or deceptive;

g.   Whether Unison's product is a consumer loan under the Colorado Credit Code;

h.  Whether Unison's product is a residential mortgage loan as defined by C.R.S. §§ 38-40-103.5(1)(d), 12-10-702(21) or a reverse mortgage as defined by C.R.S. § 11-38-102(4);

i.  Whether Unison's product is unconscionable;

j.  Whether Unison's product and/or marketing and advertising violates the Colorado Consumer Protection Act.

219.  Plaintiffs' claims are typical of the Class claims because they, like the Class members, entered into a Unison Agreement. Plaintiffs' contract with Unison is typical, as at all relevant times, Unison's HomeOwner and HomeBuyer Agreement contracts have contained materially similar terms with respect to the structure of its advance payments; its purported "option" mechanism for ensuring its future payment; securing the homeowner's obligations through a security interest in a residence; and characterizations of the product, including that the product is not a loan.

220.  Plaintiffs will fairly and adequately protect the interests of the Class because they share the same interest in challenging Unison's practices as the rest of the Class, their interests do not conflict with the interests of the Class, and they have obtained counsel experienced in litigating class actions and matters involving similar or the same questions of law.

221.  The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. Unison's business model stems from common and uniform practices, including the use of a common sophisticated model for evaluating home values in the State of Colorado, the use of form Agreements and supporting documents to be signed by class members, uniform advertising and public statements about the terms of the Agreement, and common formulas for determining the potential repayment model at

the conclusion of the Agreement. These common and uniform practices, among others, have resulted in uniform violations of law, and these issues will predominate over individualized ones.

222.    A class action is superior to other available methods for fairly and efficiently adjudicating class members' claims. There will be no difficulty in the management of this action as a class action given the common issues that predominate. Members of the Class do not have an interest in pursuing separate actions against Defendants, as the value of each class member's individual claim is small compared to the substantial expense, burden, and uncertainty of individual prosecution. Class certification will also obviate the needs for unduly duplicative litigation, which might result in inconsistent judgments and/or a burden on judicial resources. In the interest of justice and judicial efficiency, it is desirable to concentrate the litigation of all class members' claims in a single forum.

## CAUSES OF ACTION

**COUNT I**
**UNCONSCIONABILITY**
**VIOLATIONS OF THE COLORADO CONSUMER CREIDT CODE C.R.S. § 5-5-109**
**AND/OR COLORADO COMMON LAW**

223.    The Kanes repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

224.    The Uniform Consumer Credit Code (UCCC) prohibits "consumer credit transactions" that are unconscionable.

225.    The Unison transaction is a "consumer credit transaction" under the UCCC because it meets all the requirements of a "consumer loan" as defined in C.R.S. § 5-1-301(15):

> a.    There are hundreds of Unison Agreements in Colorado, and therefore Unison is regularly engaged in the business of making loans;

56

b.  The Kanes and the Class are all natural persons;

c.  The Kanes and the Class incurred the debt for personal, family, or household purposes;

d.  The debt was by written agreement in which a finance charge was made; and

e.  The debt was secured by an interest in land.

226.  The Unison transaction creates a debt because homeowners are obligated to repay Unison at the conclusion of the Agreement, including upon termination or an exercise event. The Unison product is designed to ensure that, at least most of the time, the homeowner will have to make a payment to Unison at the conclusion of the Agreement.

227.  Like the UCCC, Colorado common law prohibits unconscionable agreements.

228.  As described above and set forth herein, the Unison Agreements are substantively and procedurally unconscionable, based on the following, non-exhaustive factors:

a.  The Kanes and the members of the Class are ordinary consumers without sophistication in complex financial transactions;

b.  Unison is a collective of large financial companies engaged in the business of soliciting homeowners and placing them in an Agreement like the ones entered into by the Kanes and the Class;

c.  The Kanes and the Class occupy significantly unequal bargaining positions relative to Unison, including that Unison has complex methods of market and financial analysis whereas consumers do not and Unison is a collective of companies with sophistication in complex financial agreements;

d.  Unison drafted all documents, amounting to approximately 100 pages and presented them as contracts of adhesion;

e.  Unison drafted the documents such that they are extremely difficult to understand due to their use of cross-references, approximately a dozen different formulas for calculating repayment, inconsistent repayment formulas, approximately 80 different defined terms, and use of small print;

f.  Unison provided no meaningful explanation of the documents to the Kanes or the similarly situated Class prior to or at signing;

g.  The Kanes and the similarly situated Class are not provided with the documents underlying the Agreement as a matter of course before signing the Offer Package. Instead, class members must affirmatively request the documents underlying the Agreement prior to signing the Offer Package. The language in the Offer Package informing class members of this option is not emphasized in any way;

h.  Unison failed to provide accurate disclosures related to the transaction and cost of credit as required by law;

i.  Unison instead provided purported disclosures that were misleading and obscured the risks and costs of the transaction, including confusing and misleading TUCE charts in the Offer Package;

j.  Unison deploys a variety of mechanisms that tilt the transaction in their favor, including decreasing the Original Agreed Value of the home, requiring the homeowner to cover all fees and costs, and having significant influence over the appraisal process and the Ending Agreed Value, all while marketing themselves as a "partner" with the homeowner;

k.  Unison drafted and presented the documents in a manner that exploited the unequal bargaining power of the parties such that the Kanes and the Class would not and could not understand the full nature and consequences of the Agreement, including, but not limited to, the prominent display of the "Unison Purchase Price Balance," which causes consumers to believe they will receive a deposit of a significant sum of money from Unison at the conclusion of the Agreement;

l.  Unison requires the Kanes and the Class to pay a prepayment penalty if they sell their home within the first three years of the transaction (the Restriction Period) or via a Special Termination, to further insulate Unison from loss at a cost to the consumer;

m.  Unison requires the Kanes and the Class to transfer wealth from themselves to Unison by requiring that consumers bear all costs to protect and increase Unison's profit, including transaction costs, costs associated with the purchase of the property, the costs of maintenance of the property, appraisal costs, payment of taxes and insurance, payment of all seller's costs, and payment of additional fees;

n.  The actual costs of the Agreement to the Kanes and the Class is extremely high;

o.  The terms of the transaction are substantially one-sided in favor of Unison, who drafted the documents and their terms, and designed the Agreement to

58

guarantee a substantial rate of return to Unison and insulate Unison from cost or risk, while placing an outsized burden of the costs and risks on the Kanes and the Class, as described above.

## COUNT II
## VIOLATIONS OF THE COLORADO CONSUMER CREDIT CODE
### C.R.S. § 5-3-101 (Disclosure)

229. The Kanes repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

230. The Unison transaction is a "consumer credit transaction" under the UCCC because it meets all the requirements of a "consumer loan" as defined in C.R.S. § 5-1-301(15):

    a. There are hundreds of Unison Agreements in Colorado, and therefore Unison is regularly engaged in the business of making loans;

    b. The Kanes and the Class are all natural persons;

    c. The Kanes and the Class incurred the debt for personal, family, or household purposes;

    d. The debt was by written agreement in which a finance charge was made; and

    e. The debt was secured by an interest in land.

231. The Unison transaction creates a debt because homeowners are obligated to repay Unison at the conclusion of the Agreement, including upon termination or an exercise event. The Unison product is designed to ensure that, at least most of the time, the homeowner will have to make a payment to Unison at the conclusion of the Agreement.

232. The UCCC requires that a "creditor shall disclose to the consumer to whom credit is extended with respect to a consumer credit transaction the information, disclosures, and notices required by the federal 'Truth in Lending Act,' the federal 'Consumer Leasing Act', and any regulation thereunder." C.R.S.§ 5-3-101(2).

59

233.    Unison is a "creditor" as defined under the UCCC because the Company "arranges … consumer credit transaction[s]" (*i.e.*, the Unison Agreement) and is "initially payable" under that Agreement.  C.R.S.§ 5-1-301(17).

234.    The Unison transaction is "credit" under the UCCC because Unison grants the homeowners the right to defer their payment of debt. C.R.S.§ 5-1-301(16).

235.    Under the UCCC, the "information, disclosures, and notices required by [the Truth in Lending Act, the Consumer Leasing Act, and the regulations thereunder] must be provided if the transaction is a consumer credit transaction under this code, even though the transaction is one of a class of credit transactions exempted by [the aforementioned laws]." C.R.S.§ 5-3-101(3).

236.    Under the Truth in Lending Act (TILA), creditors must disclose, among other things, the finance charge and annual percentage rate of a loan. 15 U.S.C. §§ 1638(a)(3), (4).

237.    Because Unison is a creditor and the Unison Agreement is a consumer credit transaction and credit under the UCCC, Unison is required to make disclosures as required by TILA and its accompanying regulations.

238.    Unison does not make the required TILA disclosures.

239.    Therefore, the Unison Agreements violate Section 5-3-101 of the UCCC.

## COUNT III
## VIOLATIONS OF THE COLORADO CONSUMER CREDIT CODE
### C.R.S. § 5-3-110 (Advertising)

240.    The Kanes repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

241.    The Unison transaction is a "consumer credit transaction" under the UCCC because it meets all the requirements of a "consumer loan" as defined in C.R.S.§ 5-1-301(15):

   a. There are hundreds of Unison Agreements in Colorado, and therefore Unison is regularly engaged in the business of making loans;

   b. The Kanes and the Class are all natural persons;

   c. The Kanes and the Class incurred the debt for personal, family, or household purposes;

   d. The debt was by written agreement in which a finance charge was made; and

   e. The debt was secured by an interest in land.

242.    The Unison transaction creates a debt because homeowners are obligated to repay Unison at the conclusion of the Agreement, including upon termination or an exercise event. The Unison product is designed to ensure that, at least most of the time, the homeowner will have to make a payment to Unison at the conclusion of the Agreement.

243.    The UCCC states that a "creditor may not advertise, print, display, publish, distribute, broadcast, transmit, or cause to be advertised, printed, displayed, published, distributed, broadcast, or transmitted in any manner any false, misleading, or deceptive statement or representation with regard to the rates, terms, or conditions of credit of a consumer credit transaction."  C.R.S. § 5-3-110.

244.    Unison is a "creditor" as defined under the UCCC because the Company "arranges … consumer credit transactions" (*i.e.*, the Unison Agreement) and is "initially payable" under that Agreement.  C.R.S.§ 5-1-301(17).

245.    The Unison transaction is "credit" under the UCCC because Unison grants the homeowners the right to defer their payment of debt.

246.    As alleged here, Unison advertises, prints, displays, publishes, distributes, broadcasts, or transmits false, misleading, or deceptive statements or representations regarding the rates, terms, and/or conditions of the Unison Agreement and therefore violates this provision of the UCCC, including through statements that its product is interest free, that the product does not create debt, that the product is not a loan, and that Unison is a partner in the transaction.

## COUNT IV
## VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT
### C.R.S. §§ 6-1-101 *et. seq.*

247.    The Kanes repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

248.    The Colorado Consumer Protection Act prohibits "persons" from engaging in myriad of unfair or deceptive trade practices in the course of business. C.R.S. § 6-1-105.

249.    Unison is a person as defined by C.R.S. § 6-1-102(6) because it is a corporation and/or other legal or commercial entity.

250.    As alleged herein, Unison engaged in unfair and/or deceptive trade practices, including but not limited to:

a.    Advertising and providing misleading representations regarding the rates, terms, and conditions of its product;

b.    Failing to provide homeowners with the underlying Agreement documents prior to closing unless the homeowner explicitly requests them;

c.    Providing false and misleading statements in the transaction documents, including false statements that product "is not a loan" and that the Agreement has "no interest;"

d.    Extending loans that are highly likely to exceed a finance charge of 12% without obtaining the licensing approval necessary to do so, while also characterizing the product as one with no interest;

62

e.  Extending loans that carry any interest amount or finance charge, despite marketing its product as "interest-free;"

f.  Mischaracterizing the transaction as an "option" rather than a credit product, loan, and/or mortgage product;

g.  Representing itself as a "partner" with the homeowner during marketing, even though it expressly disclaims its role as a partner in the Agreement, and includes numerous provisions in the Agreement that are contrary to a partnership, such as placing all costs of the transaction on consumers while ensuring Unison reaps the benefits;

h.  Failing to maintain appropriate licensure or otherwise comply with lending laws;

i.  Structuring the Agreement over the course of 100 pages, at least eight different documents, and using complex formulas, cross-references, and definitions to prevent consumers from understanding the terms, costs, and consequences of the transaction;

j.  Using tactics to obscure the true cost of the product in advertising, at the time of signing, and throughout the course of the Agreement;

k.  Leading homeowners to believe that they will receive a second payment from Unison, called the Unison Purchase Price Balance that is often hundreds of thousands of dollars, even though the Unison Purchase Price Balance is merely an offset to the amount of money Unison will receive from the sale of a home and is not deposited into homeowners' bank accounts;

l.  Misrepresenting in advertising and throughout the course of the Agreement that Unison is in partnership with consumers when in fact the transaction is designed to Unison's financial benefit and to consumers' detriment;

m.  Continuing to describe itself in quarterly billing statements as an "equity-sharing agreement" rather than a loan, and a "financial partner" despite explicit language in the Agreement disclaiming partnership status and the fact that the transaction is designed to Unison's benefit;

n.  Providing homeowners with confusing and misleading payment estimates in the Offer Package and in quarterly statements throughout the course of Agreement;

o.  Placing restraints on consumers' use of their homes, including restrictions on renting out the home during the term, imposing a maximum debt amount, restricting homeowners' ability to obtain refinancing and other mortgage

products, and imposing a penalty for the sale of the home during the Restriction Period or a Special Termination;

p.  Otherwise placing the Kanes and the Class in a highly lopsided and unfair transactions that benefits Unison while placing the costs and risks on consumers.

251.  Unison's conduct constitutes violations of the Consumer Protection Act by:

a.  Making false representations of the characteristics and benefits of the transaction, in violation of C.R.S. § 6-1-105(1)(e);

b.  Advertising goods, services, or property with intent not to sell them as advertised, C.R.S. § 6-1-105(1)(i);

c.  Making false or misleading representations of fact concerning the price of their services in violation of C.R.S. § 6-1-105(1)(l);

d.  Failing to meaningfully or effectively disclose material information about the transaction to induce consumers to enter into the transaction in violation of C.R.S. § 6-1-105(1)(u);

e.  Failing to obtain necessary governmental licenses and permits, namely, the failure to obtain licenses required for supervised lenders, C.R.S. §§ 5-1-301(2), 5-1-301(46), 5-2-301, and for mortgage companies and mortgage loan originators, C.R.S. § 12-10-704, 705, in violation of C.R.S. § 6-1-105(1)(z);

f.  Violating C.R.S. § 38-40-105 in violation of C.R.S. § 6-1-105(1)(uu);

g.  Violating C.R.S. § 12-10-713 in violation of C.R.S. § 6-l-105(1)(bbb);

h.  Knowingly or recklessly engaging in unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent acts or practices in violation of C.R.S. § 6-1-105(1)(rrr).

252.  Unison's acts occurred in the course of their business activities.

253.  Unison's acts significantly impact the public, including by:

a.  Originating at least hundreds of Agreements throughout Colorado while obscuring the nature, risk, and cost of the transaction;

b.  Using highly sophisticated modeling that allows Unison to target consumers whose homes are most likely to benefit Unison;

64

c.   Advertising and marketing to consumers who have no particular expertise or sophistication in complex financial products;

d.   Recording at least hundreds of liens that unlawfully encumber consumers' properties;

e.   Placing restraints on the sale and financing of real property, thereby impacting liquidity in the real estate market;

f.   Drafting form contracts that are offered on a take-it-or-leave-it basis;

254.   Unison's acts caused the Kanes' and the Class injury, including by:

a.   Misrepresenting the true costs, nature, and risks of their product, which prevented the Kanes and the Class from being able to accurately assess whether to enter into the transaction; and continuing to obscure the true cost and nature of the product during the Agreement;

b.   Failing to obtain requisite licensing, such that Unison was prohibited in the first instance from extending the transaction;

c.   Recording liens that unlawfully encumber consumers' property, thereby impacting consumers' ability to sell their homes.

255.   The Kanes and the Class are thus entitled to and seek all available remedies under the Colorado Consumer Protection Act.

**COUNT V**
**VIOLATIONS OF THE MORTGAGE LENDING REQUIREMENTS**
**C.R.S. §§ 38-40-101 *et seq.***

256.   The Kanes repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

257.   Under Colorado's mortgage laws, a "residential mortgage loan" is "a loan that is primarily for personal, family, or household use and that is secured by a mortgage, deed of trust, or other equivalent, consensual security instrument on a dwelling." C.R.S. §§ 12-10-702(21), 38-40-103.5(1)(d).

65

258.    The Unison transaction is a residential mortgage loan because it provides

homeowners an upfront payment that at least most of the time, the homeowner will have to repay

to Unison. The loan is to be used primarily for personal, family or household use, and Unison

secures the upfront payment by a deed of trust.

259.    Unison is a mortgage company, mortgage lender and/or mortgage loan originator.

C.R.S. §§ 12-10-702(12), (13), (14), C.R.S. §§ 38-40-105(7)(d), (e).

260.    Colorado law proscribes mortgage lenders and mortgage loan originators from

engaging in a number of prohibited acts, including:

a.  Knowingly advertising, displaying, distributing, or broadcasting false,
deceptive, or misleading statements with regard to rates, terms, or conditions
of a mortgage loan, as prohibited by C.R.S. § 38-40-105(1)(a);

b.  Making false promises or misrepresentations or concealing essential or
material facts to entice borrowers to enter into a mortgage transaction when
under the terms of the transaction, the mortgage lender or mortgage loan
originator, knew or reasonably should have known, of the falsity,
misrepresentation, or concealment, as prohibited by C.R.S. § 38-40-105(1)(b);

c.  Facilitating the consummation of a mortgage loan agreement that is
unconscionable, as prohibited by C.R.S. §§ 38-40-105(1)(d), (2);

d.  Knowingly facilitating the consummation of a mortgage loan transaction that
violates C.R.S. § 12-10-713, by among other things, knowingly making
misrepresentations or knowingly making false or misleading advertisements,
as prohibited by C.R.S. § 38-40-105(1)(e).

261.    Unison engages in these prohibited acts by, *inter alia*,

a.  Knowingly advertising, displaying, distributing, or broadcasting false,
deceptive, or misleading statements with regard to the Unison Agreement,
including during advertising, consummation of the Agreement, and throughout
the term of the Agreement;

b.  Making false promises or misrepresentations or concealing essential or
material facts to entice borrowers to enter into the Unison Agreement, when
Unison knew or reasonably should have known, of the falsity,
misrepresentation, or concealment; and

     c.   Facilitating unconscionable Agreements.

262.    Therefore, Unison engages in prohibited acts enumerated in Paragraph 260 and thereby violates C.R.S. § 38-40-105.

**COUNT VI**
**VIOLATIONS OF REVERSE MORTGAGE REQUIREMENTS**
**C.R.S §§ 11-38-101 *et. seq.***

263.    The Kanes repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

264.    A "reverse mortgage" is defined as "a written instrument evidencing or creating a nonrecourse loan secured by real property which … provides cash advances[;] … requires no partial or other payment of principal or interest until the entire loan becomes due and payable; and is made by any lender." C.R.S. § 11-38-102(4).

265.    A "lender" includes persons who regularly make loans or advances secured by interests in residential real property. C.R.S. § 11-38-102(3).

266.    Reverse mortgages may become due and payable upon the occurrence of any one of the following events

     (a)  The home securing the reverse mortgage is sold.
     (b) The borrower ceases to occupy the home as a principal residence.
     (c) Any fixed maturity date agreed to by the lender and the borrower is reached.
     (d) An event occurs which is specified in the terms of the reverse mortgage and which jeopardizes the lender's security.
     (e) Upon death of the borrower.

C.R.S. § 11-38-107(1).

267.    The Unison Agreement is a reverse mortgage because it provides a lump sum cash advance to homeowners and does not require (or even allow) pre or partial payments until the

67

Agreement terminates.  The Agreement is non-recourse because Unison's recovery is limited by the value of the property at the time the Agreement terminates. Unison is a lender because it regularly makes loans or advances secured by an interest in real property, as evidenced by land records reflecting hundreds of Agreements in Colorado.

268.    Moreover, the Unison Agreement becomes due and payable upon (a) the sale or transfer of the property by the owner, (b) death of the last surviving owner, (c) expiration of the Agreement term, (d) a material and uncured event of default by the homeowner or (e) any other termination event specified in the Agreement.

269.    Colorado law has a number of requirements governing reverse mortgages that serve to protect consumers against predatory practices and inform consumers of the risk of entering into a reverse mortgage transaction, including:

a.   Permitting payment of a reverse mortgage, in whole or in part, without penalty at any time during the period of the reverse mortgage, as required by C.R.S. § 11-38-103;

b.   Receipt of an attestation in writing, that the applicant has been advised by the lender to obtain independent counseling regarding the advisability of entering into a reverse mortgage transaction and that the applicant has either obtained counseling or waived counseling in writing, as required by C.R.S. § 11-38-111. The statute states that "no reverse mortgage shall be made by a lender" unless such attestation is received. C.R.S. § 11-38-111.

270.    Unison penalizes consumers if they sell their homes within Restriction Period, or if they end the Agreement via a Special Termination, in violation of C.R.S. § 11-38-103.

271.    Unison extends reverse mortgages without advising applicants to obtain independent counseling, and therefore, it does not receive an attestation in writing that the applicant has obtained or waived counseling, in violation of C.R.S. § 11-38-111.

272.    Therefore, Unison violates the statutory requirements applicable to reverse mortgages.

## COUNT VII
## DECLARATORY JUDGMENT
### 28 U.S.C. §§ 2201, 2202 and Federal Rule of Civil Procedure 57

273.    The Kanes repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

274.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in a case of actual controversy.

275.    The declaratory relief requested clarifies the rights, status, and obligations of the parties.

276.    An actual controversy exists between the Class and Unison because Unison has initiated and continues to initiate Agreements that violate the Colorado Uniform Consumer Credit Code, Colorado Consumer Protection Act, the Colorado Mortgage Lending Laws and/or Reverse Mortgage Laws.

277.    The Agreements impose financial obligations on the Kanes and the Class and encumber their property.

278.    The Kanes and the Class seek a declaration as to the validity of the Agreements, as well as their rights and duties under the Agreements.

279.    The Kanes and the Class seek a declaration that their rights and duties under those contracts are void, voidable, invalid, and/or otherwise unenforceable in whole or in part.

280.    The Kanes and the Class seeks a declaratory judgment from this Court as follows:

a. Defendants' contracts are void, unconscionable, invalid, and/or unenforceable, and that no amounts are owed, C.R.S. §§ 5-5-109, 6-1-113(2.9), and 38-40-105(2);

b. that Defendants cannot impose a finance charge or interest on the Kanes or similarly situated consumers, C.R.S. §§ 5-5-109, 6-1-113(2.9), 38-40-105(2); and/or

c. in the event the payment due at the conclusion of any Unison Agreement includes a finance charge that exceeds 12%, homeowners are not obligated to pay the finance charge unless Unison has obtained a license to operate as a supervised lender prior to the Agreement being originated pursuant to C.R.S. §§ 5-1-301(2), (46), 5-2-301, 5-5-201; and/or

d. the fee-shifting provision in the Agreement is invalid and unenforceable because it violates public policy and is unconscionable.

## JURY TRIAL DEMAND

281. Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

282. WHEREFORE, the Kanes individually and on behalf of the members of the proposed Class, respectfully request this Court enter judgment in their favor and against Defendants as follows:

a. Certify the case as a class action pursuant to Federal Rule of Civil Procedure 23, and appoint Plaintiffs and their attorneys as class representatives and class counsel, respectively;

b. Declare the Defendants jointly and severally liable;

c. Issue an Order providing for any and all injunctive, equitable, or declaratory relief the Court deems appropriate, including but not limited to declaring void, rescinding, terminating, voiding and or reformulating the Agreements;

d. Declare that the transactions at issue are residential mortgage loans, consumer loans and/or reverse mortgages and that the Defendants are mortgage companies, mortgage lenders and/or mortgage loan originators;

e. Declare that Defendants are creditors;

70

f.   Declare that Defendants cannot impose a finance charge or interest on the Kanes or the Class;

g.   Declare that in the event the amount due at the conclusion of any Unison Agreement includes a finance charge that exceeds 12%, homeowners are not obligated to pay the finance charge unless Unison has obtained a license to operate as a supervised lender prior to the Agreement being originated pursuant to C.R.S. §§ 5-1-301(2), (46), 5-2-301, 5-5-201;

h.   Declare that the fee-shifting provision in Unison's Agreement is unenforceable;

i.   Permanently enjoin Defendants from enforcing or selling the HomeBuyer and HomeOwner Agreement products, at least in the form and manner currently in use;

j.   Order that all documents related to the HomeBuyer and HomeOwner products that Defendants recorded with Clerk and Recorder's Offices throughout Colorado are void and must be released;

k.   Award monetary damages, including but not limited to any statutory, compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

l.   Award reasonable attorneys' costs and fees for Plaintiffs' investigation into and prosecution of this action;

m.   Grant additional declaratory, injunctive, and equitable relief as the Court may deem just and proper;

n.   Award additional relief as this Court may deem just and proper.

71

Respectfully Submitted,

Dated:  April 6, 2026                          **SINGLETON SCHREIBER, LLP**

                                               */s/  Elizabeth Aniskevich*
                                               Elizabeth Aniskevich (DC Bar No. 994603)
                                               Jennifer Yadoo (DC Bar No. 1780435)
                                               SINGLETON SCHREIBER, LLP
                                               650 Massachusetts Ave. NW, Suite 600
                                               Washington, DC 20001
                                               Telephone:  (619) 771-3473
                                               eaniskevich@singletonschreiber.com
                                               jyadoo@singletonschreiber.com

                                               *Attorneys for Plaintiffs*
                                               *(Charles Kane and Katharine Kane)*

## CERTIFICATION

Pursuant to D.Colo.LAttyR 5(a)(3)(C), the undersigned hereby certifies that she is a

member in good standing of the bar of this Court.


*/s/  Elizabeth Aniskevich*
Elizabeth Aniskevich (DC Bar No. 994603)