IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-01444-GPG-NRN

KATHARINE KANE,
CHARLES KANE,
JAMIE WILLIAMS,
ALICIA WILLIAMS, and
DOUGLAS CLAYTON *on behalf of
themselves and all others similarly
situated*,

   Plaintiffs,

  v.

UNISON AGREEMENT
CORPORATION; UNISON
INVESTMENT MANAGEMENT, LLC;
and
REAL ESTATE EQUITY EXCHANGE,
INC. d/b/a UNISON, UNISON
AGREEMENT CORP. and UNISON
INVESTMENT MANAGEMENT LLC

   Defendants.

---

CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND

---

## **<u>INTRODUCTION</u>**

1.   Owning a home is a cornerstone of the proverbial American dream.

Purchasing a home is often a result of years of savings and hard work and is a source

of significant pride and financial stability. For many, their home is a primary source of

generational wealth that will be passed on to their children and family members.

2.      The equity one builds in a home over time is often a person's largest asset, and an important piece of their overall economic wellbeing. Over time, many homeowners will access the equity in their home to assist with other financial obligations, such as supplementing retirement, education, home improvements, or long-term care costs for themselves or a loved one.

3.      Today, the home equity market is valued at approximately $35 trillion dollars and is the largest asset class in the United States. The equity built over time traditionally belongs to the homeowner. But, in recent years, institutional and high-net-worth investors have been seeking a piece of that pie for themselves in ways that are increasingly deceptive and unfair to homeowners.

4.      Enter Unison. Unison was founded in the early 2000s to give investors access to the home equity market, without those investors actually having to own or sell the homes themselves to reap profits. To do this, Unison created a product that it claims is an "option" investment contract. Under the contract, Unison provides homeowners an upfront payment of cash in exchange for a stake in the home's future value. In other words, homeowners can tap into a portion of their equity now by promising an even larger amount of their equity to Unison in the future.

5.      To entice homeowners, Unison markets itself as a "partner" who will share in the transaction "fair and square." It states that its product is a "simple" "loan alternative" that creates "no debt," carries "no interest," and requires no monthly payments.

6.      The problem is that none of these statements are true.

2

7.    First, Unison is not a partner by any stretch of the imagination, and the arrangement rarely, if ever, ends up "fair and square" for the homeowner. Instead, Unison deploys a variety of mechanisms to ensure that it maximizes its return, at the homeowner's expense. This includes discounting the original value of the home, requiring the homeowner to pay all costs and fees throughout the term of the agreement, and exerting significant control over the appraisal process and the "Ending Agreed Value" of the home, which is ultimately used to calculate Unison's repayment.

8.    Additionally, Unison's product *is* a loan. It does create debt, and the homeowner will almost certainly be required to repay every penny they receive, plus effective interest in the form of a significant lump sum ballon payment at the conclusion of the term. The payment amount is often so exorbitant that homeowners must sell their home in order to pay, with many walking away from the sale with little to show for the equity they worked hard to amass over time.

9.    Unsuspecting homeowners who enter into Unison agreements have no way of knowing the realities of the product or its economic implications. This is because by labeling its product an "option contract," Unison bypasses the laws governing consumer credit and mortgage products. Those laws would require Unison to disclose the true cost of its product to homeowners before they entered into the agreement. Unison also engages in a variety of practices during marketing, signing, and servicing of the agreement that keep homeowners in the dark when it comes to the true nature of the Unison product, in violation of the Colorado Consumer Protection Act.

3

10.     By the time homeowners start to piece together the truth of the Unison product they are already locked into the agreement, and their home is encumbered by a deed of trust. At this point, the only way out is to find a significant amount of cash, often in the six figures, to buy out Unison, or sell their home. Homeowners who have spent years working hard, saving, and building equity are left holding the bag, while Unison and its investors reap annualized profits of over 20%.

11.     Katharine and Charles Kane (the Kanes),[1] Jamie and Alicia Williams (the Williams), and Douglas Clayton (Douglas) (collectively, "Plaintiffs") are homeowners in Colorado who, regrettably, entered into a Unison agreement.

12.     The Kanes entered their agreement after receiving a flyer in the mail that advertised Unison's product as "interest free" money. They used the initial advance from Unison to remodel their kitchen, in hopes that it would increase their home's future value. As the Kanes enter their seventies, they are ready to downsize and, hopefully, retire. The size and layout of their home has become increasingly difficult to navigate as they age. Chuck in particular has trouble with the stairs. The cost of maintaining the home is also becoming harder to shoulder and would be nearly impossible upon retirement.

13.     But, despite their years of hard work and over two decades of building equity in their home, the Kanes are all but trapped by the Unison agreement. As of March 31, 2026, Unison estimates the Kanes will owe up to $278,618 to terminate the

---

[1] This Complaint refers to the two married couples Katharine ("Kate") and Charles ("Chuck") Kane collectively as "the Kanes" and Jamie and Alicia Williams as "the Williams." To avoid confusion, it individually refers to them as "Kate" and "Chuck" for the Kanes, and "Jamie" and "Alicia" for the Williams.

contract, when they were advanced just over $87,000 after fees at the start. For now, they can either remain in their home, despite the increasing physical difficulty of doing so, or they can sell their home now and terminate the Unison agreement – although they would walk away unable to purchase another home and with very little money for savings. Worse yet, even if the Kanes choose to stay put, at some point the Unison agreement will terminate. If the Kanes still remain in their home at the end of the 30-year term, they will be forced to find a staggering amount of money to buy out Unison or sell their home and relocate when they are in their 90s, with limited money to do so.

14.     Douglas Clayton entered into a Unison Agreement in 2024 while exploring a home equity line of credit (HELOC). After speaking with a Unison representative, he determined that the Unison product may be a better fit, particularly because it was advertised as "interest free." Despite Unison's marketing that homeowners can use the initial payment to "live the life [they] really want," Douglas was required by Unison to apply *more than half* of his initial payment to his primary mortgage and certain credit cards identified by Unison. After making those required payments and the transaction fees, Douglas received just $28,294 from his initial $63,750 payment. Douglas also did not understand many of the mechanics of the Agreement, and there was no Unison representative present at closing for questions. Although Douglas receives Quarterly Statements, the numbers in them are not accurate estimates of his potential repayment obligations. Douglas will be 94 when his Agreement terminates, and he worries about how much he will owe Unison when the time comes.

5

15. Finally, Jamie and Alicia Williams entered into a Unison Agreement because they needed help covering business expenses for a small business they owned at the time. Like Douglas, Unison required the Williams to pay off more than $30,000 of their primary mortgage – which carried a low interest rate and was not the intended use of their equity. As a result, after fees and the required mortgage buy down, the Williams received just $30,861 of the $64,600 initial payment.

16. Recently, Jamie secured a new job that is nearly two hours from the Willams's home in Weld County. To avoid a four-hour daily commute, he and Alicia are currently renting in Adams County, and have listed their home for sale. They anxiously await how much they will owe Unison. They worry the amount due will prevent them from becoming homeowners again, a source of significant pride and achievement for them both.

17. While hundreds of Colorado residents like the Kanes, Douglas, and the Williams, struggle to figure out their financial future, business is booming for Unison. It has over 17,000 agreements with homeowners, in properties cumulatively valued at $8.8 billion dollars, including over at least 400 agreements in Colorado. Unison's practices in Colorado are ongoing, with several agreements entered into by unwitting residents just this year.

18. Plaintiffs bring this action on behalf of themselves and all other similarly situated Colorado residents who have entered into Unison Agreements relating to property located in Colorado. Plaintiffs seek to hold Unison liable for its violations of the

6

Colorado Consumer Protection Act, the Colorado Uniform Consumer Credit Code, and the Colorado Mortgage Lending Laws and/or Reverse Mortgage Laws.

## **JURISDICTION AND VENUE**

19.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because this is a class action in which there are more than 100 class members, the matter in controversy exceeds the sum of $5,000,000, and Defendants are citizens of a different state than that of at least one putative class member.

20.     Alternatively, the Court has jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

21.     This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202 and Federal Rule of Civil Procedure 57. There exists an actual controversy regarding the validity of contracts issued by Defendants, and the relief requested herein is necessary to declare the parties' contractual rights and duties and obligations under those contracts.

22.     This Court has personal jurisdiction over Defendants because Defendants have transacted business in the State of Colorado by offering and providing their home equity products in Colorado since at least 2018.

23.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and this action involves real property situated in this District.

## PARTIES

24.    Kate and Chuck Kane are citizens of Colorado and reside in Centennial,

Colorado, located in Arapahoe County. Kate is 69 years old and Chuck is 70 years old.

25.    Jamie and Alicia Williams are citizens of Colorado and currently reside in

Adams County. Jamie is 59 years old, and Alicia is 50 years old.

26.    Douglas Clayton is 66 years old and a citizen of Colorado. He currently

resides in Longmont, Colorado, located in Boulder County.

27.    Defendant, Unison Agreement Corp. ("UAC"):

    a.    is a Delaware Corporation registered as a Foreign Corporation with the Colorado Secretary of State with a principal place of business at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111;

    b.    is not licensed or registered as a mortgage company, mortgage lender, and/or mortgage loan originator with the Nationwide Mortgage Licensing System or the Division of Real Estate for its Unison Agreement "option" product, C.R.S. §§ 12-10-704, 705;

    c.    originated the transactions at issue in this Complaint;

    d.    and is a wholly owned subsidiary of Real Estate Equity Exchange, Inc. (REX).

28.    Defendant, Unison Investment Management, LLC (UIM):

    a.    is a Delaware corporation and SEC-registered investment advisor with a principal place of business at 4 Embarcadero Center, Suite 710, San Francisco, CA 94111;

    b.    UIM provides investment advisory services to pooled investment vehicles (Funds). The Funds invest primarily in Unison homeowner agreements, originated by Unison Agreement Corp. or securities issued by issuers or securitizations of Unison Agreements;

    c.    UIM together with its affiliates serve as general partners and investment managers of the Funds. Such affiliates are typically under common control and/or possess substantial identity of personnel and/or equity owners with UIM;

8

    d.    as of December 31, 2024, UIM had regulatory assets under management of approximately $1,685,557,326; and

    e.    is a wholly owned subsidiary of REX.

29.    Defendant, Real Estate Equity Exchange, Inc. (REX):

    a.    is a Delaware corporation with a principal place of business at 4 Embarcadero Center, Suite 710, San Francisco, CA 94111;

    b.    is the corporate parent of UAC and UIM;

    c.    according to information it provides to consumers, does business under the names "Unison," "Unison Agreement Corp.," and "Unison Investment Management LLC," and establishes and maintains the websites and many materials for UAC and UIM; and

    d.    and is not licensed or registered as a mortgage company, mortgage lender, and/or mortgage loan originator with the Nationwide Mortgage Licensing System or the Division of Real Estate for its Unison Agreement "option" product, C.R.S. §§ 12-10-704, 705.

30.    Upon information and belief, at all relevant times, there has existed a unity of interest and ownership between UAC, UIM, and REX (referred to collectively herein as Defendants or Unison). As an example of this unity of interest, UIM's Form ADV Part 2A notes that its affiliates (which include UAC and REX) are "typically under common control and/or possess substantial identity of personnel and/or equity owners."

31.    Defendants are joined, by agreement, in a joint venture or common enterprise. They have combined their property, skill, and knowledge for the purpose of carrying out a single business enterprise, namely the origination of and realizing financial gains from the Unison products described herein.

32.    Together, Defendants are a vertically integrated home equity mortgage origination, securitization, and investment advising firm focused on the asset class of owner-occupied residential real estate.

33.    The persons dominate, control, and manage Defendants, namely Thomas Sponholtz (CEO of all three entities), Scott Case (CFO of all three entities), and Matthew O'Hara (CIO of UAC and UIM), among others.

34.    Upon information and belief, Defendants use the same offices and employees, including offices located at 4 Embarcadero Center, Ste. 710, San Francisco, CA 94111.

35.    Defendants were, and are, the alter egos of one another, such that any liability incurred by one Defendant is chargeable against the other.

36.    Because of their agreement and cooperation in the wrongful acts set forth herein, Defendants are responsible for the acts of one another.

37.    Unison operates in thirty states and Washington D.C., including over 240 metro areas.

## **FACTS**

**A.    Unison is Developed to Provide Investors Access to the Multitrillion Dollar Home Equity Market.**

38.    According to Unison's 2024 Home Equity Report, the American home equity market has "reached new heights." As of June 2024, the market totaled $35 trillion.[2] Older adults often have the highest level of home equity—valued at $14 trillion—because they have owned their homes the longest.[3]

---

[2] Jian Tong Chua & Winfield Xu, *2024 Unison Home Equity Report* 1 (Nov. 2024), https://contentimages.o-prod.unison.com/pdf/2024%20Home%20Equity%20Report.pdf (last visited on Mar. 25, 2026).
[3] *Senior Home Equity Stands at $13.95 Trillion, NRMLA* (Mar. 31, 2025), https://www.nrmlaonline.org/about/press-releases/senior-home-equity-stands-at-13-95-trillion (last visited on Mar. 25, 2026).

39.     Across the country, including in Colorado, homeownership remains one of the most reliable ways to build wealth, primarily through the gradual accumulation of home equity.  In Colorado, between 2020 and 2025, the average household equity grew by 48%, reaching $218,008 in 2025.[4]

40.     Home equity plays a critical role in homeowners' financial security. Many homeowners access their home equity to supplement their retirement or pay off debts. Others use home equity to pay for significant expenses such as home improvements, education, healthcare costs, or long-term care. Products that allow homeowners to access their equity for these reasons are commonplace and include home equity lines of credit (HELOC), home equity loans (sometimes referred to as a second mortgage), cash-out refinances, and reverse mortgages.

41.     In the early 2000s, Thomas Sponholtz (Sponholtz), the founder and Chief Executive Officer of Unison, got the "big idea" for Unison's home equity product.[5]  The idea came to him while working at Barclays Global Investors and "looking around for large asset classes [he] could add to [his] client's portfolio."[6] Sponholtz noticed that the residential real estate market was largely untapped by institutional investors, despite it being the "largest asset class, both globally and in the U.S." [7]

---

[4] *How home equity has changed in every U.S. state since 2020*, CNBC MAKE IT (Aug. 15, 2025), https://www.cnbc.com/2025/08/15/home-equity-changes-for-all-50-states-in-the-last-5-years.html (last visited on Mar. 25, 2026).
[5] Lend Academy, *Podcast 103: Thomas Sponholtz and Jim Riccitelli of Unison*, (June 7, 2017) https://www.heyfuturenexus.com/podcast-103-thomas-sponholtz-jim-riccitelli-unison/ (last visited on Mar. 25, 2026). (Podcast 103).
[6] *Id.*
[7] *Id.*

42.     The absence of institutional investors in the market was driven by the burdens associated with the traditional way of investing in and profiting from residential real estate, which requires purchasing a home and renting it or reselling it. Sponholtz recognized that this method of investment is often inefficient and comes with "tremendous amount of administrative cost in maintaining and being a property manager of [] homes."[8]

43.     With his clients and investors in mind, Sponholtz created Unison. Unison gives investors access to the residential real estate asset class—that is, to the equity that individual homeowners accrue over time—through Unison's "equity sharing" products. In essence, these products are designed to allow Unison to claim a portion of homeowners' equity without taking on any of the concomitant costs, labor, burdens, or obligations of homeownership or real estate management.

44.     At Unison's inception, it offered two products, one for homeowners and one for homebuyers, referred to as the HomeOwner Product and the HomeBuyer Product, respectively.[9] According to Spohnholtz, the products "work the same way so if you understand one, you'll understand both."[10]

45.     The products work by Unison providing homeowners an upfront cash payment (either at time of purchase or during ownership) in exchange for a purported "option" to purchase a substantial percentage of the home in the future. As discussed

---

[8] *Podcast 103*, *supra* note 5.
[9] Throughout this Complaint the term "homeowner" is used to describe the individuals who are in Unison contracts, regardless of whether they entered into the HomeBuyer or HomeOwner product.
[10] *Podcast 103*, *supra* note 5.

12

herein, Unison deploys a variety of mechanisms throughout the transaction to all but guarantee against the risk of loss to the company.

46.    Unison was launched in 2005. As of today, Unison's website boasts that the "total value of homes [it has] invested in across the country" is $8.8 billion.[11] Unison has agreements with over 17,000 homeowners and a wide geographical presence, operating in "30 states + Washington, D.C."[12] Unison has hundreds of agreements in Colorado alone, and continues to enter into new agreements within the state, including during this calendar this year.

47.    Together, Unison notes, the markets in which it offers its product make up more than 83% of U.S. real estate by value.[13] It is no coincidence that Unison operates in markets that represent the vast majority of the country's real estate value. Unison has a "10-year forecast on every house in America"[14] and uses its "proprietary investment decision engine" to carefully select the markets in which it will operate. The investment decision engine "capture[s] and integrate[s] the most recent market and industry research about real estate, demographic trends, and key economic indicators such as employment and population growth. … With this information, Unison seeks to invest in Unison Agreements on properties that it believes have a greater likelihood of appreciation."[15]

---

[11] *Company: About Us*, UNISON, https://www.unison.com/about-us, (last visited on June 2, 2026).
[12] *Id*.  *See also*, *About*, UNISON IM, https://www.unisonim.com/about-us, (last visited on June 2, 2026).
[13] *Id*.
[14] *Podcast 103*, *supra* note 5.
[15] Unison Investment Management, LLC, Firm Brochure 8 (Form ADV Part 2A) (June 23, 2025) https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=982540

48.     Unison's investment decision engine has paid off, at least for Unison and its investors. Notably, Unison describes "institutional investors" and "high net worth individuals" as "typical[]" investors.[16] Over the ten-year period from 2012 to 2022, Unison had a net annualized return of 20.7% for its investors.

49.     Unison touts the "unlimited upside and limited downside"[17] of its product to its investors, highlighting that "residential real estate has historically generated strong returns," and that its portfolios provide "low volatility and high risk-adjusted net returns."[18]

50.     In recent years, Unison has begun securitizing its product. To date, it has securitized over a billion dollars of its agreements in at least three different funds managed by Unison IM, including a $94.2 million securitization in March 2026.[19]

51.     The truth of Unison's business model is that it is designed to benefit its high net worth individual and large investors, not the homeowners it purports to be in "partnership" with.

**B.     The General Structure of the Unison Transaction**

52.     At the outset of the Unison transaction, the homeowner is usually provided with an Offer Package. The Offer Package "consists of the following items: 1. Offer

---

[16] Unison Investment Management, LLC, Firm Brochure 8 (Form ADV Part 2A) (June 23, 2025) https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=982540

[17] *About*, UNISON IM, https://www.unisonim.com/about-us, (last visited on Mar. 25, 2026).

[18] UNISON IM, https://www.unisonim.com, (last visited on Mar. 25, 2026). *See also About*, UNISON IM, https://www.unisonim.com/about-us, (last visited on Mar. 25, 2026).

[19] Press Release, UNISON, Unison Announces Securitization of $94.2 Million Unison Home Equity Agreements (Mar. 26, 2026), https://www.unison.com/press/94-million-home-equity-agreement-securitization, (last visited on June 4, 2026).

Letter, 2. Section 10 – Summary of Financial Terms and Fees, 3. Conditions of Offer, 4. Important Information Notice, 5. Total Unison Cost Estimate (TUCE), [and] 6. Notice To [Interested Parties] Who Are Not Signatories to The Unison HomeOwner Agreement."[20]

53.     Notably, the Offer Package does *not* include copies of the full agreements to which the homeowner will ultimately be bound. According to the Offer Package, if homeowners would "like to read a full copy of the legal agreements that comprise the Unison HomeOwner Agreement" they can "contact [their] program specialist and [the documents] will be provided."[21] This language is not bold, underlined, or otherwise emphasized.  However, the date and time of the Offer Package expiration is emphasized.

54.     Before accepting the Offer Package, homeowners often communicate with Unison representatives over email or the phone. Those communications are frequently short in duration and do not focus on the substantive terms of the agreement, so much as the items needed to move forward.

55.     By signing the Offer Package, the homeowner "agrees that [they] are and shall be responsible to pay the Unison transaction fee,"[22] and, in more recent Agreements, other third-party fees, including appraisals, inspection and settlements costs, which are routinely thousands of dollars.[23]

---

[20] **Exhibit 1**, Kane Offer Package at 2 (PDF Page 3 of 24). Due to the excessive volume, appraisal and inspection pages have been omitted from "Offer Package" exhibits attached hereto.
[21] *Id.* at 1 (PDF Page 2 of 24).
[22] *Id.* at 2 (PDF Page 3 of 24).
[23] **Exhibit 7**, Clayton Agreement Closing Statement (PDF Page 59 of 83).

56.    After signing the Offer Package, Unison arranges for a closing meeting for the homeowner to sign the underlying agreements. Those agreements include four primary documents with interlocking and cross-cutting terms and obligations: the HomeOwner Covenant Agreement, the HomeOwner Option Agreement, the Memorandum of Unison HomeOwner Agreement, and the Unison HomeOwner Security Instrument (which Unison says "may be a 'Deed of Trust' or 'Mortgage' depending on the state").[24] These four documents are referred to collectively herein as the "Agreement."[25]

57.    These Agreement documents have remained substantially similar throughout Unison's operation in Colorado. Most homeowners see these documents for the first time at closing, which is typically short in duration and attended only by a non-Unison notary who cannot answer questions about the Agreement's terms.

58.    At the outset of the Agreement, the homeowner receives an initial upfront payment of money, called a "Unison Investment Payment" or "Initial Payment."[26]

59.    In return for this payment, the homeowner grants Unison a percentage share in the future value of the home, called the "Investor Percentage." The Agreement term is set for thirty years, although according to Sponholtz, homeowners typically exit the agreement much earlier, after just ten years.

---

[24] **Exhibit 1**, Kane Offer Package TUCE Page 2 of 10 (PDF Page 7 of 24).
[25] The four documents for the Kanes, the Williams, and Douglas Clayton are included in **Exhibits 2**, **5**, and **7** respectively.
[26] **Exhibit 2**, Kane Option Agreement at ¶1(a) (PDF Page 47 of 88); **Exhibit 7**, Clayton Option Agreement at ¶1.3 (PDF Page 31 of 83). The "Unison Investment Payment" and "Initial Payment" are used interchangeably by Unison.

60.     The homeowner must pay all origination costs and fees associated with the Agreement, including appraisal fees, transaction costs, and any settlement and closing costs (such as title, state taxes, and recording fees).

61.     After the Agreement is signed, Unison records a Deed of Trust to secure its interest in the property and the obligations of the homeowner.

62.     During the term of the Agreement, the homeowner must comply with several obligations imposed by the Agreement, or risk default. Those obligations include paying all costs for the home, such as insurance and property taxes, and the costs of maintenance and repair. The homeowner must maintain the home to Unison's standard during the Agreement.

63.     Additionally, the home must remain owner occupied, with the homeowner maintaining the property as their "principal residence" throughout the term, "unless agreed to in writing by Unison." The Agreements also place restrictions on if and how homeowners can rent out their own homes and imposes a "maximum debt amount" that homeowners cannot exceed. Additionally, the Agreement limits homeowners' ability to freely obtain additional financing and equity products secured by their home, and can make refinancing difficulty. These restrictions are significant and not understood by homeowners at the time of signing.

64.     If the homeowner falls behind on insurance or property taxes, Unison can obtain forced place insurance and make "Protective Advances" to cover missed payments. Protective Advances accrue interest at 1.5% per month.[27]

---

[27] **Exhibit 2**, Kane Covenant Agreement at ¶ 8.11 (PDF Page 25 of 88).

65.     At the conclusion of the Agreement, the homeowner must pay Unison an amount called the "Investor Interest," which is determined by a formula that considers the "Ending Agreed Value" of the home (as defined by Unison) and the "Investor Percentage" identified at the start of the Agreement, as well as any other unpaid obligations of the homeowner, such as any repair items identified by Unison in a Deferred Maintenance Addendum or any Protective Advances made by Unison. The many ways in which the "Investor Interest" can be calculated are discussed in detail in Section D.

66.     According to the Agreement, the homeowner must repay Unison in a single lump sum. No prepayments or partial payments are permitted. Many homeowners are unable to pay Unison without first selling their home. If the homeowner initiates a sale to repay Unison, the homeowner must pay all costs associated with the sale, including closings costs and appraisal costs, which could be in the thousands of dollars.

**C.     Unison Mislabels its Product an "Option Contract" to Evade Credit, Mortgage, and Consumer Protection Laws.**

67.     Unison claims its product is an "option" contract because, according to Unison, the homeowner only has to pay if Unison decides, upon a triggering event, to "exercise its option" and acquire its interest in the value of the home.

68.     By affixing the "option" label to its product, Unison has developed a self-serving regulatory vacuum, where ostensibly no credit or mortgage regulation is necessary or applicable. As of late, however, an increasing number of courts, including

18

one in Colorado, have recognized that Unison's product is more akin to a consumer loan or mortgage product, and that the "option" label exalts form over function.

69.    Consumer loans and mortgage products are complex and come with certain risks and costs for borrowers. To ensure that homeowners are protected and informed when using such products, Colorado has enacted several laws governing consumer credit and mortgage lending activity, including for reverse mortgages. These laws include licensing and disclosure requirements that inform consumers of costs and prevent excessive interest rates or surprise payment amounts. In addition to the specific laws that govern consumer credit and mortgage lending, Colorado's Consumer Protection Act also prohibits unfair and deceptive trade practices related to financial products. Unison's Agreement falls under the purview of these laws.

70.    First, Unison's product is a "residential mortgage loan" under Colorado's laws. Unison provides homeowners with an advance of money for personal family, or household use, secures its interests via a deed of trust, and requires payment (that is typically many times more than the initial amount advanced) when the Agreement terminates. These are the elements of a residential mortgage loan under Colorado law.

71.    Indeed, in a recent Position Statement, the Colorado Division of Real Estate made clear that "home equity [investment] contracts" such as Unison's, "can qualify as residential mortgage loan[s], requiring licensure to originate. The expectation of homeowner repayment signals that a home equity contract is a loan."[28]

---

[28] Colo. Dep't of Reg. Agencies, Div. of Real Est., Position Statement, MLO 2.0 – License Requirements for Originating Home Equity Contracts (Jan. 21, 2026), https://dre.colorado.gov/sites/dre/files/documents/Position%20Statement%20Home%20Equity%20Contracts%20%28adopted%202026-01-21%29.pdf (Colorado Real Estate Division Position Statement).

72.     Unison certainly expects that homeowners will repay Unison some dollar amount at the end of the Agreement. Unison's entire business model is to enter into Agreements that, at least most of the time, will result in Unison receiving a payment at the conclusion of the Agreement. It carefully selects favorable markets in which to offer its product and touts the "unlimited upside" and 20.7% annualized returns over a ten-year period to its investors.

73.     Additionally, numerous statements made by Unison indicate that the payment obligation at the end of the Agreement is absolute. The Offer Package explains "[i]f you have not sold your Property or otherwise terminated the Unison HomeOwner Agreement by the end of the thirty (30) year Term, you will need to sell the Property or otherwise settle the Unison HomeOwner Agreement by paying Unison an amount equal to the value of its investment interest in the Property at that time." In the Frequently Asked Question Section, on Unison's website one question reads: "What happens at the end of the agreement?" The response is: "You can use the funds provided by Unison for up to 30 years. After 30 years, you will need to either sell your home or buy us out."

74.     Moreover, in some circumstances, a payment that exceeds the amount initially advanced by Unison is not just expected but guaranteed. Unison effectively guarantees a repayment by homeowners who sell during the "Restriction Period" (either the first 3 or 5 years after entering the Agreement) or seek to buy Unison out via a "Special Termination." This is because Unison does not share in any decrease in value

20

of the home during these events, and it retains wide latitude to select an "Ending Agreed Value" of the home that gives Unison claim to a larger pot of the homeowners' equity.

75.     The Division of Real Estate's Position Statement further explains that an equity sharing agreement can be a mortgage loan even if the final repayment amount is not known at the outset of the transaction: "While the repayment amount may be speculative (the future payment depends on the home value at the time of the triggering event), these agreements anticipate that the property will accrue additional equity over a specified period of time and ensure that homeowner repayment will, at the very least, cover the initial amount provided to the homeowner."[29] This is precisely how Unison's Agreement functions.

76.     Despite Unison's expectation of repayment by the homeowner, it fails to abide by any mortgage lending laws. Indeed, its website proclaims: "Equity sharing agreements issued by Unison [] are not offered under mortgage lending licenses. Where offered [by Unison] equity sharing agreements are not currently required to be licensed." [30]

77.     Unison's product also falls within the definition of a reverse mortgage under Colorado law because it is a nonrecourse loan, secured by real property, that provides a cash advance to the homeowner, and requires no partial or other payment until the entire loan becomes due. These are the elements of a reverse mortgage under Colorado law. Also similar to reverse mortgage products, payment under Unison's

---

[29] Colorado Real Estate Division Position Statement, *supra* note 28.

[30] *State Licenses*, UNISON, https://www.unison.com/licenses, (last visited on June 2, 2026).  To the extent Unison Mortgage Corporation is licensed in Colorado, it offers a different product than the one at issue here, and Unison Mortgage Corporation is not a party to this lawsuit.

Agreement becomes due upon (a) the sale or transfer of the property by the owner, (b) death of the last surviving owner, (c) expiration of the Agreement term, or (d) a material and uncured event of default by the homeowner, or (e) any other event specified in the Agreement.

78.    Moreover, even if Unison's product somehow escapes regulation as a type of mortgage, it is least a consumer loan subject to Colorado's credit laws because Unison regularly extends money to Colorado residents for personal, family, or household use, with a finance charge, and secures its debt by an interest in land.

79.    Notably, a similar home equity company called Unlock, a Unison competitor, disclosed that it was subpoenaed by the Colorado Attorney General regarding its activities under the Colorado Consumer Credit Code. On November 1, 2024, Unlock received a letter from the Colorado Attorney General directing it to cease and desist from further origination activities in Colorado.[31] The Unlock product is similar to Unison's product in many regards, including that it purports to be an "option" contract rather than a credit product or mortgage.

80.    Any one of these labels: residential mortgage loan, reverse mortgage, or consumer loan, more accurately describes Unison's product as compared to "option contract." When properly labeled, Unison becomes subject to many state laws and regulations that require it to disclose the true cost and nature of the Agreement to homeowners, as well as the federal Truth in Lending Act. But, because it claims itself an

---

[31] Presale Report Unlock HEA Trust 2025-2, MORNINGSTAR | DBRS (Nov. 5, 2025) at 21, https://dbrs-dr.crcc2f9.eas.morningstar.com/research/467421/unlock-hea-trust-2025-2-credit-rating-report (last visited June 5, 2026).

"option contract" Unison fails to comply with any of these laws and instead misrepresents the truth of its product and its business model to lure homeowners into the Agreement.

### D.    Unison's Product is Unfair and Deceptive Because it Misleads Homeowners about the Actual Cost of the Agreement.

81.    The Unison Agreement is unfair and deceptive because it misleads homeowners about the overall cost and nature of the Agreement and fails to provide disclosures that would inform the homeowner as to the total amount due at the conclusion of the Agreement.

82.    Unison claims it is not required to disclose information about the total costs of the Agreement because it is an option contract and not a mortgage or a loan. But Unison's product *is* a loan and those disclosures are required.

83.    Even if the product were not a loan or mortgage, Unison's practices are unfair and deceptive. Unison continually informs homeowners that it is their partner and will share in the ups and downs of the home, when in reality the entire Agreement is drafted for Unison's benefit, and the information provided to homeowners is designed to obfuscate the true cost and nature of the Agreement from the homeowner.

### i.    Unison's Product is Unfair and Deceptive Because the Homeowner Cannot Understand or Determine the Final Payment Amount Due Under the Agreement.

84.    The details and obligations imposed by the Agreement are spread across multiple separate documents that can span up to 100 pages. Those documents include the four core Agreement documents that all homeowners are bound by, and additional documents that frequently include the Unison Closing Statement, the Unison

23

Homeowner Agreement Closing Instructions, a Deferred Maintenance Addendum, a Notice and Acknowledgment for Non-Signatories to the Agreement, an Equity Appreciation Limit Addendum, an Estate Representative And/Or Nearest Living Relative Designation, a Cancellation Notice, a Base Ending Agreed Value and Special Termination Addendum, a Planned Unit Development Rider, an Original Agreed Value Addendum, and various title documents, among others.

85.    These documents contain confusing cross-references, dozens of definitions (many of which also contain cross-references), and several complex mathematical formulas for repayment. Examination of the various payment formulas embedded in the Agreement highlight how difficult, if not impossible, it is for a homeowner to understand how much they will owe Unison at the conclusion of the Agreement. This is true not only at the time they enter the Agreement, but also throughout the duration of the Agreement.

86.    A homeowner's payment obligation becomes due upon several "Exercise Events." The Agreement outlines four such events, each of which requires the homeowner to pay Unison either directly or out of the proceeds of a sale of the home. The four Exercise Events are: (1) the sale or transfer of the property by the owner, (2) death of the last surviving owner, (3) expiration of the Agreement term, and (4) a material and uncured event of default by the homeowner.

87.    The amount due to Unison from the homeowner after an Exercise Event is called the "Investor Interest."

24

88.     The Agreement's explanation of how the "Investor Interest" is calculated is a prime example of how difficult it is for a homeowner to understand what the final payment obligation will be.

89.     According to the Agreement, the "Investor Interest . . . shall be defined and calculated as the Investor Proceeds, if any, *plus* the Unpaid Owner Obligations, if any."[32] Investor Proceeds "shall be defined and calculated as follows: Ending Agreed Value *multiplied by* Investor Percentage *minus* the Unison Purchase Price Balance."[33]

90.     To decode what this means, the homeowner must understand the definition of "Ending Agreed Value" which the Agreement explains is calculated as "**Base Ending Agreed Value** [or **Market Value]**  . . .  *minus any* Remodeling Adjustment* *plus any* Deferred Maintenance Adjustment."[34] The asterisk explains "If there is a Negative Remodeling Adjustment, the absolute value of that number is added rather than subtracted."[35] The terms "Remodeling Adjustment" and "Deferred Maintenance Adjustment" are defined, in Schedule A, among more than 50 to 80 other definitions, depending on the Agreement.

---

[32] **Exhibit 2**, Kane Covenant Agreement at ¶ 10.1(c) (PDF Page 34 of 88) (emphasis in original).

[33] *Id.* at ¶ 10.1(a) (PDF Page 34 of 88) (emphasis in original). In more recent Agreements, this formula remains the same, but the terminology has changed slightly. "Investor Proceeds" is no longer a defined term and the "Purchase Price Balance" is now a "Balance Payment." **Exhibit 7**, Clayton Covenant Agreement Schedule A at A-1 (PDF Page 25 of 83), Clayton Option Agreement at ¶ 3.1 (PDF Page 32 of 83). The formula now reads: "The Investor Interest is calculated first by multiplying the Ending Agreed Value by the Investor Percentage; then subtracting the Balance Payment; then adding any Unpaid Owner Obligations." **Exhibit 7**, Clayton Option Agreement at ¶ 7.2. (PDF Page 33 of 83).

[34] **Exhibit 2**, Kane Covenant Agreement at 10.3, embedded in ¶ 10.2 (PDF Page 34 of 88) (emphasis in original). In more recent Agreements, the formula remains the same but the "Base Ending Agreed Value" is now referred to as the "Market Value." **Exhibit 7**, Clayton Covenant Agreement Schedule B at B-1 (PDF Page 28 of 83).

[35] **Exhibit 2**, Kane Covenant Agreement at 10.3, embedded in ¶ 10.2 (PDF Page 34 of 88).

91.     The Agreement lists several different options for how to calculate the "Base Ending Agreed Value[s]" or "Market Value[s]" – each of which contains its own defined terms and/or additional formulas. The homeowner must determine which option applies to their situation and then sort through any applicable definitions and formulas embedded in each option.

92.     If the homeowner is able to determine the appropriate "Base Ending Value" or "Market Value" calculation, they then must plug it into the "Ending Agreed Value" formula. Once they determine the "Ending Agreed Value," they can then, finally, attempt to determine the "Investor Interest," assuming all information needed for the formula is accurate and available (for example, if an appraisal value is needed for any of the formula inputs, but an appraisal has not yet been conducted, the homeowner cannot definitively determine the amount due).

93.     Understandably, any homeowner embarking on this byzantine set of cross-references, definitions, and confusing formulas would have difficulty discerning the amount they must pay Unison at outset, during, or at the conclusion of the Agreement.

94.     In addition to the "Exercise Events" there are other events that terminate the Agreement and guarantee Unison express repayment. These events similarly make it difficult for the homeowner to understand the total cost of the product.

95.     First, if the homeowner sells or terminates the contract during the "Restriction Period" which is either three years or five years after signing depending on the Agreement, the homeowner must repay Unison. If the home has declined in value

26

during this period, Unison *will not share* in any decline in value, and the "Base Ending

Agreed Value" will be the Effective Sale Price or the Original Agreed Value, *whichever is*

*greater*.[36] This ensures Unison is protected against short-term fluctuations in the real

estate market.

96.     In more recent Agreements, Unison has taken even more aggressive

measures to ensure a return during the Restriction Period by making the "Market Value"

the *greater of* the Effective Sale price or the Original *Appraised* Value (as opposed to

the Original *Agreed* Value). Because the Original Appraised Value is discounted by 5%

to arrive at the Original Agreed Value, Unison's change in formula has ensured an even

higher return and further insulated itself from short-term fluctuations during the

Restriction Period under newer Agreements.[37]

97.     The Quarterly Statements received by John Helzer, a 50-year-old director

of marketing in Boulder County, demonstrate not only how Unison will always receive a

return during the Restriction Period, but also how Unison misleads homeowners about

that reality. John entered into a Unison Agreement in 2023. Unison gave him an Initial

Payment of $118,125, but after Unison required him to pay off over $96,000 in debts

selected by Unison and over $5,000 in transaction fees, he was left with just $15,943.

98.     John is still in his 5-year Restriction Period, and his most recent Quarterly

Statement, received on March 31, 2026, states that he could anywhere between a "low

---

[36] *What is the "restriction period"? Can I sell my home at any time?*, UNISON,
https://www.unison.com/faqs/equity-sharing-agreement, (last visited on Mar. 25, 2026); *see also What
happens when I decide to sell my home?*, UNISON, https://www.unison.com/faqs/equity-sharing-
agreement, (last visited on Mar. 25, 2026); **Exhibit 2**, Kane Covenant Agreement at ¶ 10.4(b) (PDF Page
33 of 88).
[37] **Exhibit 7**, Clayton Covenant Agreement Schedule B table row 1 at B-1 (PDF Page 28 of 83).

estimate" of $77,168 and a "high estimate" $167,817. But, because the lowest possible figure Unison can use to calculate its repayment during the Restriction Period is the Original Appraised Value of John's home, which is $675,000, John would currently owe a *minimum* $141,750. This is significantly higher than the "low estimate" reflected in Unison's ongoing communications to John, and more than the Initial Payment Unison provided. If John sold his home for more during this period, he would owe Unison even more. This is particularly misleading because the Quarterly Statement indicates it "takes into account agreement terms such as the restriction period."

99.    When a homeowner wants to exit the Agreement without selling their home before an Exercise Event, they must do what is referred to as a "Special Termination." A homeowner proceeding through a Special Termination is bound by yet another formula in the Agreement. In a Special Termination, the amount due to Unison is determined by using a "Base Ending Agreed Value" or "Market Value" that is "equal to the greater of the Appraised Value of the Property at the time of the Special Termination, or the **Solicited Sale Value**."[38]

100.    Unison is guaranteed repayment in a Special Termination. In older Agreements, if the appraised value at the time of the Special Termination or the Solicited Sale Value would result in a loss to Unison, the Agreement allows it to instead recover the Unison Investment Payment plus any Unpaid Owner Obligations, at a minimum.[39]

---

[38] **Exhibit 2**, Kane Covenant Agreement at ¶ 6.2 (PDF Page 11 of 88) (emphasis in original); 10.4(i) (PDF Page 35 of 88). **Exhibit 7**, Clayton Covenant Agreement Schedule B table row 7 at B-2 (PDF Page 29 of 83).
[39] **Exhibit 2**, Kane Covenant Agreement at ¶ 6.2 (PDF Page 11 of 88).

101.    In newer Agreements, the Market Value during a Special Termination can also be the *Original Appraised* Value of the Property, if that is greater than the appraisal at the time of the Special Termination or the Solicited Sale Value. By including the Original Appraised Value at the time of the Agreement as an option for payment calculation, Unison guarantees it will be due at least some payment even if the market has dropped precipitously.

102.    Janice Henderson, a 79-year-old retired nurse practitioner and Colorado resident with a Unison Agreement, provides an example of just how much the Special Termination process costs homeowners, and how much control Unison can exert over the payoff amount. Janice entered into her Unison contract in 2021. She received an initial advance of $128,959 after fees. In return she granted Unison a 70% stake in the future value of her home.

103.    According to Janice's last Quarterly Statement, received on March 31, 2026, Unison valued Janice's home anywhere between $601,535 to $735,209. Based on these home values, Unison estimated she would owe anywhere between a "low estimate" of $27,762 and a "high estimate" $121,334.

104.    Janice is ready to exit her Unison Agreement now. She submitted an application for a Special Termination and requested a Unison Payoff Amount. On May 14, 2026, Unison provided her a payoff amount of $151,532 – significantly higher than the amounts reflected in the Quarterly Statement received less than two months earlier. To calculate this Payoff Amount, Unison determined the Market Value by using the

appraised amount at the time of the Special Termination, which valued Janice's home at $778,350.

105.    Janice was surprised by the Payoff Amount, and the appraised value of $778,350, especially considering that her home was recently on the market for $679,999 and did not sell. The appraised value by Unison is also more than $43,000 above the highest home value estimate provided by Unison in the March 2026 Quarterly Statement.

106.    Given the requested payoff amount, Janice has decided not to go through with a Special Termination at this time.

107.    A homeowner is also required to pay Unison upon a default. While this is considered an "Exercise Event" additional costs and consequences apply. In this scenario Unison can foreclose and force a sale of the home.[40] Unison can also implement forced place insurance and make "Protective Advances" for missed insurance or tax payments, which accrue interest at 1.5% per month, from the date of demand until paid in full.[41] Unison can also seek additional liquidated damages if the home is foreclosed upon.[42]

108.    If Unison terminates the agreement due to certain default events, the homeowner is required to pay the "Unison Investment Payment," at a minimum, but also may have to pay the amount of the "Investor Interest" that "exceeds the Unison Investment Payment."[43] In more recent Agreements, Unison can also calculate the

---

[40] **Exhibit 2**, Kane Covenant Agreement at ¶ 7.2 (PDF Page 13 of 88).
[41] *Id.* at ¶ 8.11(b) (PDF Page 25 of 88).
[42] *Id.* at ¶ 7.2(b) (PDF Page 13 of 88).
[43] *Id.* at ¶ 7.3(a) (PDF Page 14 of 88).

amount due following a default by setting the Market Value as equal to the greatest of the Original Agreed Value, the highest Appraised Value after the Event of Default, or the Effective Sale Price. The latitude the Unison grants itself in determining the ending value of the home ensures that it reaps the largest return while leaving homeowners unable to meaningfully understand their payment obligations.[44]

109.    Further, in the event of default, the "Unison Purchase Price Balance" or "Balance Payment" used in the "Investor Interest" formula as an offset to Unison's profits, is subject to a 10% reduction.[45] In this scenario, the homeowner must also pay attorney's fees and costs incurred by Unison.

110.    Unison's practice and pattern of making the total amount due under the Agreement difficult, if not impossible to ascertain is unfair, deceptive, and misleading. It harms consumers by obscuring and/or misleading them as to the true nature and cost of Unison's product, with grave financial consequences. These practices violate Colorado law.

      **ii.**    **Unison's Product is Unfair and Deceptive Because Homeowners Cannot Understand How the Various Fees and Costs Imposed by the Agreement will Impact their Overall Financial Obligation to Unison.**

111.    In addition to the final payment due at the conclusion of the Agreement, the homeowner must shoulder various costs and fees throughout the transaction. These fees often end up costing the homeowner more than just their total dollar amount and

---

[44] **Exhibit 7**, Clayton Covenant Agreement at ¶ 4.D (PDF Page 10 of 83); Schedule B table row 6 at B-2 (PDF Page 29 of 83).
[45] **Exhibit 2**, Kane Covenant Agreement at ¶ 7.3(d) (PDF Page 14 of 88).

increase the amount of money Unison will be entitled to at the conclusion of the Agreement.

112.    At the outset of the Agreement, Unison typically discounts the appraised value of the home to arrive at the Original Agreed Value of the home. Currently Unison applies a 5% discount to the appraised value of the home to arrive at the Original Agreed Value. Unison describes this discount as a "Risk Adjustment" that "helps account for the uncertainty inherent in the appraisal process. It also allows Unison to deliver your funds faster and without the added costs of multiple appraisals."[46]

113.    In reality, the 5% discount to the home's value allows Unison to increase the final delta between the "starting" home value and the "Ending Agreed Value" so that it can claim a larger pot of appreciation for its own at the end of the Agreement.

114.    Additionally, the discount in the Original Agreed Value adversely impacts the advance to the homeowner at the outset of the transaction and the repayment due to Unison at the end of the transaction. This is because both the Unison Investment Payment (the advance to homeowners) and the Unison Balance Payment (the offset of Unison's profits at the end of the transaction) are keyed off of the Original Agreed Value.

115.    By reducing the value of the home by 5% (or any other amount) before determining the dollar amount that the homeowner will receive, the homeowner is already receiving a discounted amount of equity at the outset of the Agreement, in return for promising Unison a significant stake in the home's *undiscounted* future value.

---

[46] *What is the Risk Adjustment and how does Unison determine my home's starting value?*, UNISON, https://www.unison.com/faqs/equity-sharing-agreement, (last visited on Mar. 25, 2026)

116. This 5% reduction applied to determine the Original Agreed Value also reduces the total amount of the Balance Payment that will eventually offset Unison's profits. Because the Balance Payment is fixed at the time the Agreement is executed (and does not change over time), the offset it provides to Unison's profits will become smaller as the home value increases.

117. The Unison Investment Payment is further reduced by thousands of dollars in initiation fees, which includes a transaction fee and other costs. Currently, the transaction fee is 3.9%, as well as an additional fee for third party costs, which include appraisal fees, inspection fees, settlement, title and escrow fees, as well as state mortgage taxes.

118. In some scenarios, Unison also requires homeowners to pay off certain debts, including credit cards or their primary mortgage with the Investment Payment. When this is required, Unison sends the money directly to the creditors. At times, this can result in homeowners receiving only a fraction of what they anticipated at the outset of the Agreement.

119. At the conclusion of the Agreement, there are additional fees and mechanisms in the Agreement that impact the overall costs to the homeowner. First, the homeowner is responsible for all costs associated with selling and closing on the home. These costs can total several thousand dollars.

120. Additionally, in most scenarios involving the sale of the home, Unison determines the Ending Agreed Value of the home based on the gross proceeds of the sale, meaning the sale price *before* any costs or fees are paid by the homeowner. This

means that when Unison determines that total value of the home from which it can extract its Investor Interest, it does not provide the homeowner with an offset for the costs they have paid.

121.   As discussed herein, in many scenarios, Unison has wide latitude to set the Ending Agreed Value, including the ability to select the "greater" value among several options, thereby ensuring maximum returns to Unison.

122.   Unlike the Original Agreed Value, the Ending Agreed Value is not a discounted amount, further increasing the delta of purported home appreciation to which Unison claims it is entitled.

123.   Unison can also significantly increase the total cost of the Agreement via the Deferred Maintenance process. At the outset of the Agreement, Unison may note certain maintenance items that, if not repaired by the homeowner during the Agreement, can be added to the Ending Agreed Value at the conclusion of the Agreement. Unison determines the amount due from Deferred Maintenance by setting a "commercially reasonable estimate" in "consultation" with third-party inspectors and appraisers.

124.   In Unison's Agreement with Jancie Henderson, the 79-year-old retired nurse practitioner, Unison identified *thirty* different maintenance issues in a Deferred Maintenance Addendum to her Agreement. Janice does not remember any Unison representative explaining the Deferred Maintenance Addendum to her before or during signing.

125.   The reason the overall impact of the fees and costs of the transaction are not easy to decipher is, itself, plain. Unison's business model is premised on hiding the

34

truth of the Agreement from homeowners for as long as possible. This ensures that new Agreements are continually entered, so that Unison and its investors can continue to reap significant returns.

>       **iii.    The "Total Unison Cost Estimate" Included in the Offer Package Does Not Actually Disclose the Total Cost of the Agreement.**

126.    Unison includes a Total Unison Cost Estimate or TUCE in its Offer Packages. Although the information included in the TUCE has changed slightly over time, the impact of the TUCE on consumers is the same. It does not provide homeowners with meaningful disclosures about the estimated total cost of their Unison Agreement.

127.    In Offer Letters accompanying earlier in time Agreements, the TUCE included three charts. One such chart purported to estimate the "Annualized Percentage Cost Over the Term for A $50,000 Unison Investment Payment," reproduced below.[47]

| Estimated Annualized Percentage Cost Over The Term For A $50,000 Unison Investment Payment | | | | | | |
|---|---|---|---|---|---|---|
| | | Term Assumption (years)* | | | | |
| | | 2 | 5 | 10 | 15 | 30 |
| Annual Home Price Appreciation Assumption | -4.0% | -14.8% | -18.8% | -100.0% | -100.0% | -100.0% |
| | -2.0% | 7.2% | -7.9% | -9.7% | -15.2% | -100.0% |
| | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| | 2.0% | 6.8% | 6.4% | 5.9% | 5.4% | 4.6% |
| | 4.0% | 13.4% | 11.9% | 10.4% | 9.3% | 7.5% |
| | 6.0% | 19.7% | 16.9% | 14.2% | 12.5% | 10.0% |

---

[47] **Exhibit 1**, Kane Offer Package TUCE Page 9 of 10 (PDF Page 14 of 24).

128.   This chart does not inform homeowners who receive an initial Unison Investment Payment other than $50,000 as to the estimated annualized percentage cost of *their* Agreement over time.

129.   Even for a homeowner who may receive a $50,000 Unison Investment Payment, it is unclear how this chart accounts for other factors that determine the final payment due to Unison, and thus the estimated annualized cost of *their* Agreement. Such other factors include the Original Agreed Value of the home, the Unison Purchase Price, and the Ending Agreed Value. Indeed, in the paragraphs following the chart, the TUCE notes: "[t]he annualized cost of the Unison HomeOwner Agreement is determined when the agreement is terminated … and is dependent, in part, on how the value of your Property changes during the Term."[48] Yet the chart does not include any hypothetical home values whatsoever, making its methodology and conclusions all the more confusing.

130.   A second chart in the earlier in time Offer Letters entitled the "Estimated Total Cost Over the Term for A $50,000 Unison Investment Payment"[49] also fails to inform homeowners of the cost *for their actual Agreement*.

---

[48] *Id.*
[49] *Id.* at TUCE Page 10 of 10 (PDF Page 15 of 24).

36

| Estimated Total Cost Over The Term For A $50,000 Unison Investment Payment | | | | | | |
|---|---|---|---|---|---|---|
| | | Term Assumption (years) | | | | |
| | | 2 | 5 | 10 | 15 | 30 |
| Annual Home Price Appreciation Assumption | -4.0% | - $13,720 | - $32,310 | - $50,000 | - $50,000 | - $50,000 |
| | -2.0% | $6,930 | - $16,814 | - $32,012 | - $45,750 | - $50,000 |
| | 0.0% | $0 | $0 | $0 | $0 | $0 |
| | 2.0% | $7,070 | $18,214 | $38,324 | $60,527 | $141,988 |
| | 4.0% | $14,280 | $37,914 | $84,043 | $140,165 | $392,595 |
| | 6.0% | $21,630 | $59,189 | $138,398 | $244,398 | $830,111 |

131.    As with the first chart, this chart includes figures that may be significantly different than those of the homeowner entering into the Agreement. Here, The TUCE explains the estimates are based on an "Original Agreed Value of $500,000, a $50,000 Unison Investment Payment, and a 35% Investor Percentage."[50] How that translates to an Agreement like the Kanes, where the Original Agreed Value is $523,000, the Unison Investment Payment is $91,525, and the Investor Percentage is 70% is unknowable based on the information provided. It is unclear how this chart would inform any homeowner who did not have the *exact* same terms as those included in the example.

132.    The third chart included in earlier in time Offer Letters is labeled "Examples of the Payment to Unison at the End of the Unison Homeowner Agreement"[51] In these charts, Unison appears to provide repayment estimates based on the actual homeowner's' contract. Below is an example from the Kanes' Offer Letter,

---

[50] *Id.*
[51]*Id.* at TUCE Page 8 of 10 (PDF Page 13 of 24).

which includes their Original Agreed Value[52] (although that is not made explicit in the

chart) and Unison's Investor Percentage, but without a concrete term identified (5 years,

10 years, or 30 years) as shown below.

**UNISON**

**Examples of the Payment to Unison at the End of the
Unison HomeOwner Agreement**

| Scenario | Change In Value | Future Home Value | Times Investor Percentage | Equals | Less Unison Purchase Price Balance | Equals Payment to Unison | Unison Gain (Loss) On Investment* |
|---|---|---|---|---|---|---|---|
| 1 | Increase | $585,760.00 | 70.00% | $410,032.00 | $274,575.00 | $135,457.00 | $43,932.00 |
| 2 | Larger Increase | $732,200.00 | 70.00% | $512,540.00 | $274,575.00 | $237,965.00 | $146,440.00 |
| 3 | Decrease | $460,240.00 | 70.00% | $322,168.00 | $274,575.00 | $47,593.00 | $-43,932.00) |
| 4 | Larger Decrease | $392,250.00 | 70.00% | $274,575.00 | $274,575.00 | $0.00 | ($-91,525.00) |
| 5 | Unchanged | $523,000.00 | 70.00% | $366,100.00 | $274,575.00 | $91,525.00 | $0.00 |

\*   Unison cannot lose an amount greater than the Unison Investment Payment under the terms of the Unison HomeOwner Agreement. The examples assume the following:
- No Remodeling Adjustment or Deferred Maintenance Adjustment applies.
- If the value of the Property increases by an amount greater than shown in Scenario 2, Unison's gain on investment will be proportionally larger, which will increase the payment to Unison.

133.    Although the title of the chart references the "End of the Unison

Agreement" it is unclear what time length is used in the calculations provided. While the

Agreement's term is 30 years, there are several events that could result in the

Agreement ending earlier, and, as Unison's CEO noted, most Agreements terminate

much earlier, around the 10-year mark.

134.    If the chart is intended to represent the likely amount due at the end of a

30-year term, it grossly underestimates the payment due to Unison given historical

market data. Based on 30-year data from the Federal Reserve, home values increased

---

[52] The chart does make explicit that it is relying on the Original Agreed Value of the Kanes's home, but that is the assumption, on information and belief, given that the "Unchanged" future value is the same as the Kanes' Original Agreed Value.

nationwide from $153,500 to $534,000 between 1995 and 2025.[53] This is an increase of approximately 248%.

135.    Relying on this data, the Kanes' home, for example, could be worth as much as $1,819,427 at the end of a 30-year term. Applying the formula used in the chart, this would result in a payment to Unison of approximately $999,000 at the conclusion of the Agreement, a figure that far exceeds the highest payment amount listed in the chart, which is $237,965

136.    Indeed, just over seven years into the 30-year term, Unison estimates that the Kanes' home is currently worth anywhere between $646,590 and $790,276 as of March 31, 2026, which would result in a repayment of $178,038 to $278,618. As a result, the Kanes have already entered territory where the amount due Unison may significantly exceed the payment amounts listed in the TUCE.

137.    For newer Agreements, Unison uses a new TUCE that includes just one chart.

---

[53] *Average Sales Price of Houses Sold for the United States*, FRED, Fed. Rsrv. Bank of St. Louis (Feb. 20, 2026) https://fred.stlouisfed.org/series/ASPUS, (last visited on Mar. 25, 2026) (average sale prices of houses sold in the United States). The Federal Reserve Bank has updated its data for the fourth quarter of 2025 since its website was last accessed on March 25, 2026. The data for the fourth quarter of 2025 now reflects an average sale price of $541,300, meaning the historical increase in average sale prices of houses is even slightly higher than 248%. The potential repayments to Unison in Paragraphs 134-138 are still calculated based off the historical data accessed as of March 2026.

## Total Unison Cost Estimate

Unison's agreement is not debt that you have to pay back with interest, but rather an equity investment that rises and falls in value along with your home. We can't predict your home's **Ending Agreed Value**, so we don't know how much you may end up owing Unison at the end of your Agreement. The following table, however, shows some different scenarios of Unison winning alongside you if your home increases in value, or cushioning your loss in most cases if your home decreases in value. The numbers in this table are based on the Investor Percentage of **59.97 %**, co-investment of **$115,000**, and Original Agreed Value of **$728,650**. As a reminder, your Original Agreed Value reflects a 5% Risk Adjustment to your home's appraised value.

| Ending Agreed Value Scenario (Home Sells For) | Larger Increase 40% | Increase 20% | Appraised Value | Original Agreed Value | Large Decrease –20%* |
|---|---|---|---|---|---|
| Ending Agreed Value | $1,020,110 | $874,380 | $767,000 | $728,650 | $582,920 |
| Change in Value | $291,460 | $145,730 | $38,350 | $0 | ($145,730) |
| **Payment Due to Unison** | **$289,789** | **$202,394** | **$137,998** | **$115,000** | **$27,606** |
| Unison Share of Change in Value* | $174,789 | $87,394 | $22,998 | $0 | ($87,394) |
| Your Share of Change in Value | $116,671 | $58,336 | $15,352 | $0 | ($58,336) |

\* Unison cannot lose an amount greater than the Unison Initial Payment (otherwise known as the co-investment) under the terms of the Unison HomeOwner Agreement.

**The examples above assume the following:**

- The Unison HomeOwner Agreement is terminated by selling the Property after the Agreement's third anniversary.
- No Remodeling Adjustment or Deferred Maintenance Adjustment applies.
- If the value of the Property increases by an amount greater than shown in the "Larger Increase" scenario, Unison's gain on investment will be proportionally larger, which will increase the payment to Unison. **The resulting gain on investment that Unison receives may substantially exceed the total amount of interest payments that you would have paid if you had instead borrowed the amount of the Unison Initial Payment from a lender.**
- You continue to meet all carrying costs of the home, including mortgage and tax payments, property insurance, and upkeep.

138.    This TUCE similarly underestimates potential future home values and thus the amount consumers are likely to owe to Unison. First, the repayment scenarios dealing with 20% and 40% increases in the home's value are based off an increase in

the Original Agreed Value, which is discounted by 5% from the appraised value, and therefore does not reflect the home's true starting value. Second, none of the repayment scenarios reflect historical market data. For example, if the home that is the subject of this TUCE were to increase at the historical level of approximately 248% above its Original Appraised Value, it could be worth as much as $2,668,261 at the end of a 30-year term, resulting in a repayment to Unison of over $1 million at the end of the Agreement. This figure far exceeds the highest payment amount listed in the chart, which is $289,789.

139. Finally, the figures in all of the charts do not reflect the many other costs of the Agreement, including transaction fees, appraisal fees, closing costs, Deferred Maintenance payments, Protective Advances, or any other homeowner obligations incurred during the Term of the Agreement.

**E.     Unison's Entire Business Model Misleads Consumers about the Truth of the Agreement while Ensuring a Return for the Company and its Investors.**

140. A reoccurring theme in Unison's representations to homeowners is that Unison is their partner, and Unison will be there to share in the ups and downs of homeownership with the homeowner. Unison makes these statements repeatedly – in marketing, in the Offer Letter and initial sales communications with homeowners, and again in Quarterly Statements provided to homeowners during the Agreement. These statements are critical to persuading homeowners into Unison Agreements, but they belie the reality of Unison's business model.

41

141.    In truth, Unison's business model is premised on generating the largest possible return *for Unison and its investors*, in ways that go well beyond just the simple sharing in the appreciation of the home. To prevent homeowners from understanding this truth, Unison engages in a variety of unfair and misleading tactics throughout the entire transaction. This includes the confusing and opaque financial formulas and disclosure explained herein, as well as rushed closing and signing processes, and continually misleading statements made to homeowners throughout the Agreement.

142.    Unison's statements regarding partnership are core elements of Unison's marketing and communications to homeowners. Such statements appear multiple times throughout the transaction. In marketing materials and on its website, Unison makes statements like "We win when you win" and "Unison is your partner, here when you need us."[54]

143.    Additionally, a marketing video on Unison's website and YouTube also emphasizes the purported partnership aspect of the Agreement. The video explains that Unison is a "partnership, fair and square and yes, it's kind of cool."[55]

144.    The video continues: "Again, we're partners … so we split the change in value of your home, even if your home depreciates, we actually take the hit along with you. You heard that right. Either we both profit or we both share in the loss. That's what we mean by a fair partnership. We're truly there with you through the ups and the

---

[54] *Products: Equity Sharing Agreement*, UNISON, https://www.unison.com/equity-sharing-agreement, (accessed on Nov. 6, 2025 and last visited on Mar. 25, 2026).
[55] Video: How it works, UNISON, https://www.unison.com/equity-sharing-agreement, (last visited on June 4, 2026); Unison, *How it Works – Unison Equity Sharing – Homeowner*, YOUTUBE, at 0:42-45 (June 30, 2023), https://www.youtube.com/watch?v=KG7ygY6_sWM, (last visited on Mar. 25, 2026) (Unison Promotional Video).

downs."[56] The video ends with "Everything is better when you do it in Unison." Even the Company's namesake is designed to convince homeowners of a partnership relationship.

145.    Unison continues this partnership theme in the Quarterly Statements it sends to homeowners during the course of the Agreement. In those statements, Unison states it is a "financial partner" who would "love to help" if the homeowner is experiencing financial challenges.[57] According to the Quarterly Statement, homeowners can reach a Unison representative at "Unison Partner Services Team" at "HomePartners@unison.com."

146.    The truth, however, is that there is no partnership between homeowners and Unison. Indeed, the Agreement explicitly disclaims any such relationship with the homeowner, stating: "Investor shall not be deemed a partner . . . or fiduciary with, or of, Owner." [58]

147.    Unison's true partner is its investors, to whom it is does share a duty – to increase returns even if that comes with a cost to homeowners. This is reflected throughout the Agreement, which includes multiple provisions designed to increase Unison's "share" of home value to homeowners' detriment. The most glaring tactic is discounting the Original Agreed Value of the house and exercising control over the Ending Agreed Value in an effort to maximize Unison's profit. But several other tactics increase the amount due to Unison, including high transactions fees and costs,

---

[56] Unison Promotional Video at 1:15-34, *supra* note 55.
[57] **Exhibit 3**, Kane Unison Quarterly Statement at 1 (PDF Page 2 of 5).
[58] **Exhibit 2**, Kane Covenant Agreement at ¶ 9.3 (PDF Page 29 of 88).

requiring the homeowner to pay all fees and costs associated with selling, the use of Deferred Maintenance Addendums and special formulas that insulate Unison from loss, such as the Special Termination or Restriction Period formulas. A "partner" would not include such provisions, or at minimum, would fully disclose the existence and impact of these provisions to the homeowner.

148.    But Unison does not make these disclosures. Instead, homeowners routinely do not even see the Agreement documents until the day they sign them, at a rushed closing attended only by a non-Unison notary.

149.    Unison makes a variety of other statements and representations that mislead homeowners about the nature of their relationship with Unison and the product itself. First, Unison's representations that it will share in any decrease in value of the home is unfair and misleading because in certain circumstances, such as the Restriction Period and a Special Termination, Unison expressly disclaims a share of any depreciation.

150.    Additionally, in marketing and advertising Unison tells homeowners "[we] convert up to 15% of your home's value to cash, so you can live the life you really want"[59] and that one can use the "wealth in your home to achieve your life goals."[60] However, homeowners are surprised to find out that Unison may *require* them to use the "wealth in [their] home" to pay off certain *Unison selected debts* with the Initial Payment by Unison.

---

[59] *Home Equity Solutions: Equity Sharing Agreement*, UNISON, https://www.unison.com/equity-sharing-agreement, (last visited on June 5, 2026).
[60] UNISON, https://www.unison.com/, (last visited on June 5, 2026).

151.    This was the case for John Helzer, the 50-year-old director of marketing, who was required to put $96,791.50 of his $118,125 Initial Payment to accounts selected by Unison. John was not delinquent or behind on these accounts. He found Unison's control over how he used his initial payment "infantilizing" but because he was in a period of financial instability, he moved forward with the Agreement. As described further herein, certain class representatives, such as Douglas and the Williams, had similar experiences, with Unison even requiring payments towards their primary mortgages with the initial advance. In those circumstances, they accessed their equity only to put it right back into their home at Unison's orders. Unison's control over how the Initial Payment is dispersed is a far cry from its statements that homeowners can use the money for the "life [they] really want."

152.    Unison statements about the homeowner maintaining "control [of] the property and receiv[ing] the benefits of home ownership, such as occupancy rights." are also unfair and misleading. The reality is that the Agreement imposes significant restrictions on homeowners, including restrictions on renting out the property, requiring the home to remain a primary residence, limiting the maximum total debt the homeowner can carry during the Agreement, imposing limits on refinancing and other equity products, and granting Unison the right to interfere in a sale if it determines the sale price is too low.

153.    While Unison's website mentions some of these restrictions in the Frequently Asked Question section, these statements fail to ensure homeowners have an accurate understanding of the realities of the product when considered alongside

45

Unison's competing statements about the ease and simplicity of the Agreement that are featured prominently on Unison's website and other marketing materials.

154.    These limits, particularly on other financing or equity products, can place homeowners in a difficult position. In Colorado, where the cost of home maintenance is nearly 20% higher than the national average, homeowners may need additional home financing products to complete repairs and maintenance.[61] However, the Unison Agreement can prevent homeowners from further accessing their equity.

155.    Jeff and Jodi Langdon, residents of Douglas County, Colorado, who are in their early 50s, have experienced this difficulty firsthand. They entered into a Unison Agreement in 2019 after deciding it was a better choice for them than a HELOC based on Unison's representations that its product was interest free and would not appear on their credit reports. They did not understand that Unison would need to be involved in any future refinancing of their home. They eventually refinanced while in the Unison Agreement, but the process was lengthy and difficult because very few lenders were willing to work with Unison, and several banks would not accept Unison's ordered appraisals. By 2024, the Langdon's wanted out of their Unison Agreement. They thought they could obtain a HELOC and pay off Unison. But, because a HELOC would exceed the maximum authorized debt limit imposed by Unison they were denied. Now, not only are they stuck in their Unison Agreement, they also are unable to make certain repairs to their home without access to a HELOC.

---

[61] Jenny McCoy, *Older adults on fixed incomes are finding homeownership in Colorado financially harder than ever*, THE COLORADO SUN (Dec. 10, 2025), https://coloradosun.com/2025/12/10/homeownership-colorado-older-adults/.

156.    Randy Castle, a 58-year-old property manager in Denver, Colorado, had a similar experience. Randy and his wife entered into a Unison Agreement in 2019, during a time when Randy was experiencing unemployment. They turned to Unison based on the Company's statements of being in partnership with homeowners and because the product was interest free. The Castles do not have a lot of experience with complex financial transactions and did not understand the Special Termination provisions or the restrictions imposed on their home. Recently, they considered taking out a HELOC to pay off Unison given that they now owe almost two times the initial money they received according to Quarterly Statements. But they were unaware they would need Unison's approval to do so. For now, the Castles have put those efforts on pause. To Randy, the Unison Agreement feels like becoming a renter in your own home again.

157.    Additionally, as it relates to repairs and maintenance, Unison advertises a "Remodeling Adjustment" to homeowners, as a way for homeowners to purportedly receive credit for any improvements to their home during the Agreement. In practice, however, the limits on the Remodeling Adjustment are significant. In order to qualify for the adjustment, the homeowner must pay for an appraisal to determine the value of the Remodeling Adjustment. This appraisal is based on the "actual value of the property as-is (which is called the 'Actual Value') and a hypothetical figure representing what the value of the Property would be if it had not been materially modified (which is called the 'Hypothetical Value.')"[62] Unison retains broad discretion in this process, and because the Remodeling Adjustment is not applied until the end of the Agreement, any

---

[62] **Exhibit 7**, Clayton Covenant Agreement at ¶ 9.A.4.3 (PDF Page 13 of 83).

improvement may receive little credit, as the appraiser will take into account age and depreciation of the improvements.[63] If the Agreement is terminated during the Restricted Period, no Remodeling Adjustment applies.[64]

158.   Brian Lakes, a 55-year-old voice over artist in El Paso County, Colorado, undertook improvements to his home with the hope that he would obtain a Remodeling Adjustment. He entered into a Unison Agreement in 2023, after coming across Unison while researching HELOCs. After entering the Agreement, he and his wife spent about $15,000 on landscaping to improve the exterior condition of the property. When he went to submit documentation of the improvement, he found the process confusing. He did not understand that he would need to pay for an appraisal to determine the value of the Remodeling Adjustment, or that the Remodeling Adjustment is not applied until the Unison Agreement is settled. Because the appraiser will take into account the age and depreciation of the improvements, Brian is concerned he will get little to no benefit from the landscaping improvements he made to his home. He does not fully understand if or how the Remodeling Adjustment will ultimately lower his payment to Unison.

159.   Unison also makes misleading representations about the amount homeowners will have to pay at the conclusion of the Agreement. These statements appear in various places throughout the website and give the homeowner the impression the payment will not be significant or impact any equity amassed through

---

[63] *Id.*
[64] *Id.* at ¶ 9.A.7 (PDF Page 14 of 83).

their monthly mortgage payments, despite the fact that Unison has designed the

Agreement to ensure that in most instances it will reap a return.

160.    One Frequently Asked Question suggests a homeowner may owe *nothing*

at the conclusion of the Agreement. The question is "Is it possible I could end up owing

Unison back less money at the end than I received at the beginning?" The answer is:

> "Yes. Unison is not a loan; we are invested in your home
> alongside you, so we win and lose together. Though such
> cases are not common, with significant decline in your home's
> value–something neither of us are looking for!--it is possible
> that the value of the agreement, and your ending amount due
> to Unison, would be $0. It's this feature along with the absence
> of any monthly payments that distinguishes an equity sharing
> agreement from a loan."[65]

161.    Highlighting a remote scenario in which a homeowner may owe $0 at the

conclusion of the Agreement despite Unison's one-sided agreement misleads

consumers about the total costs and risks associated with Unison's product.

162.    Gary Trevino is one of many Colorado residents who did not understand

the financial implications of the Agreement, and to whom the repayment amount poses

serious consequences. Gary is a 59-year-old veteran of the United States Army residing

in El Paso County, Colorado. He lives on a fixed income consisting of a special tax-free

payment to retired veterans with combat-related disabilities and social security. Gary

entered into the Agreement in 2018. He needed help paying off debts and was hoping to

---

[65] *Is it possible I could end up owing Unison back less money at the end than I received at the beginning?*, UNISON, https://www.unison.com/faqs/equity-sharing-agreement, (last visited on Mar. 25, 2026).

free up a couple of hundred dollars a month for food and electricity. He was drawn to Unison based on statements that it was interest free and had "no payments."

163.    Gary received an initial payment of $59,375. After paying Unison transaction fees and sending part of the initial payment directly to creditors, Gary received a check for just $2,733. According to his most recent Quarterly Statement received on March 31, 2026, Gary could owe Unison anywhere between $144,575 and $216,286, for an advance of $57,059 after fees. That is effectively a simple interest rate of approximately 20.68% to 37.63%, and an APR ranging from approximately 13.3% to 19.6%.

164.    The payment amount is a serious problem for Gary, who contracted Covid in July 2021. After a long hospital stay, he lost nearly 40% of his lung function and now requires supplemental oxygen. Gary's home in Colorado sits at about 7,400 feet of altitude, making it difficult to breathe with his lung condition. He and his wife would like to move somewhere closer to sea-level, like the San Antonio, Texas area where much of Gary's family lives. But, because of what he owes Unison under the Agreement, it is not financially feasible to sell his home at this time.

165.    Unison's newer Agreements further mislead homeowners about the potential amount due at the conclusion of the Restriction Period through a misleading and confusing "Equity Appreciation Limit" that purports to cap consumers' repayment obligation during the Restriction Period. The "Equity Appreciation Limit" is misleading because it allows Unison to still reap a significant repayment. Despite the "Limit," consumers may owe Unison 120% of the initial advance during the first year of the

50

Restriction Period and at a 20% annually compounded rate during the remainder of the

Restriction Period.

166.    Unison also misleads homeowners about the potential amount due at the

conclusion of the Agreement with its statements about the product being interest-free.

These statements are unfair and deceptive because in nearly all circumstances,

homeowners will owe more money than they were initially advanced, constituting a

finance charge and resulting in what is effectively an interest rate. Additionally, if Unison

makes protective advances on behalf of a homeowner, those explicitly accrue interest at

1.5% per month.

167.    Unison also repeatedly emphasizes that its product does not create debt.

This is unfair and deceptive. Debt is a future payment obligation, and the Unison

Agreement creates a future payment obligation for homeowners.

168.    Unison's statements that its product is not a loan are unfair and deceptive

for the reasons discussed herein and are designed to evade applicable laws and

disclosures while luring homeowners into its product, rather than other, potentially more

suitable, equity products. In Quarterly Statements to homeowners, Unison continues to

describe itself as an "equity-sharing agreement" rather than a loan.[66]

169.    Unison also emphasizes throughout its website and promotional videos

that there are no monthly payments. This is unfair and deceptive because the

homeowner must continue to make monthly payments under the Agreement, such as

property taxes, insurance, and mortgage payments, if applicable.

---

[66] **Exhibit 3**, Kane Quarterly Statement at 2 (PDF Page 3 of 5).

51

170. Unison also engages in unfair practices related to appraisals. Based on information and belief, appraisals at the outset of the Agreement tend to be under market, whereas those the conclusion of the Agreement tend to be higher than market. By engaging in this practice, Unison is able to increase the amount of appreciation in home value to which it claims it is entitled.

171. Finally, Unison continues to make unfair and misleading statements to homeowners throughout the Agreement in Quarterly Statements. As described herein, for homeowners in the Restriction Period, the repayment amounts in the Quarterly Statement, particularly the "low" estimated repayment are inaccurate. They are also inaccurate for homeowners who wish to pursue a Special Termination. For others, the range of repayment amounts is often so large it does not actually provide the homeowner with any real insight into their financial obligations. And the estimates do not account for the many other ways that Unison can increase the amount the homeowner must pay, including the required payment of fees and costs, any Deferred Maintenance charges, and any Protective Advances and accrued interest during the Agreement.

172. The impact of Unison's repeated and prolific misrepresentations is that homeowners have no real understanding of the Agreement into which they are entering. They believe they are in partnership with Unison and that the Agreement is simple, easy, and allows them to access their home equity with no interest or monthly payment obligations. In reality, while homeowners may get an immediate influx of cash at the start of the Agreement, they are severely limited in their control over their home during the Agreement, and risk losing their home or selling for very little return for themselves

52

at the conclusion of the Agreement. Unison's unfair and deceptive practices continue throughout the course of the Agreement, leaving homeowners continually confused, misled, and uncertain about the terms and implications of the Unison Agreement.

### F. Unison's Product Has a Significant and Ongoing Impact on Colorado Residents and the Public.

173. Unison has been extending its Agreements in Colorado since at least 2018. Based on land records, there are approximately 400 Agreements in the nine largest counties in Colorado. In those same counties, approximately 40 homeowners have ended their Agreement with Unison, meaning that they either sold their home or otherwise paid Unison to terminate the contract.

174. Unison's practices are ongoing, with hundreds of residents trapped in existing contracts, and several new Agreements being extended this calendar year. As long as Unison's practices in Colorado continue unchecked, more and more residents will become ensnared in predatory Agreements. And, as a result, more and more residents will be forced to either sell their homes, and walk away with little to show, or come up with a significant amount of money to pay Unison to terminate their contracts in the future.

175. Unison's reverberations are also felt by the children and loved ones of Colorado residents who enter into Unison contracts and pass away during the Agreement. This is because the Agreement deems the death of the last surviving signatory an "Exercise Event." Under this Exercise Event, Unison requires it be provided with "immediate" notice of the signatory's death, sets time limits on the period by which the estate must pay back Unison or alternatively sell the home, and requires the estate

53

to pay for an appraisal of the home, ordered by Unison. The Agreement also states it "will have priority" over other expenditures by the estate that are "not reasonably necessary to administer and protect the property." It provides no extension of its time limits for those who are grieving or may not know of the Agreement's existence at the time of their loved one's death, explaining that "all time periods . . . will run from the actual date of death. . .. Failure of your estate or any other individual or entity to notify [Unison] of the death . . . will not toll or suspend the running of the time periods."

176.   For Sean Springate, a 36-year-old firefighter and father of two young children living in El Paso County, Colorado, the impacts of this Exercise Event are all too real. Sean's father, Michael Springate, also lived in El Paso County, and entered into a Unison Agreement in 2022. At that time, Michael was semi-retired. Unfortunately, in April 2026, at just 62, Michael passed away after a rapid decline from pancreatic cancer.

177.   Sean is the executor of his dad's estate and is now faced with navigating the complexities of the Unison Agreement. Although Sean was vaguely aware his father entered into some sort of home financing product in 2022, he only learned of the Unison Agreement after his father passed away. Sean was not expecting to have to deal with the issues raised by the Unison Agreement during this time of grief. Sean's dad left much of his estate, including his house, to Sean and his sister. With the Agreement in place, a significant portion of what Michael hoped to leave his children will now likely go to Unison.

178.   Unison's products are particularly dangerous for the public because they misrepresent the Agreements' true terms and mislead homeowners about how much

54

they will owe at the conclusion of the Agreement. As a result, Colorado residents believe they are entering into a flexible, loan-alternative product, when, in reality, they are signing up for a high-cost product that will severely limit their ability to control their own home and may result in them losing it altogether.  Unison uses sophisticated market models to locate the best areas in which to extend its Agreements. It then reaches the homeowners in those markets via a broad advertising and marketing scheme, including sending flyers to particular residents' homes, and maintaining a website and online presence to market its product as a so-called interest-free, no debt, loan alternative. While Unison and its leadership have sophistication in market modeling and complex financial transactions, the everyday homeowners who they target do not.

179.    Unison's actions impact Colorado residents, as well as the local real estate market. Residents are ensnared in predatory contracts in which they must shoulder all fees and costs, while living in a home that is severely encumbered – not only by the lien Unison records on their home, but by additional contract terms that prevent them from renting out their home, securing additional financing (without explicit approval), and limiting the amount of debt the homeowner can take-on.  As a result of these actions, the local real estate market is impacted because homes cannot be sold unless Unison is explicitly involved, and additional home financing tools are all but impossible to extend to Unison customers.

### THE KANES' TRANSACTION

180.    The Kanes have lived in their current home in Centennial, Colorado since the early 2000s. Chuck is 70 years old, and Kate is 69.

181.    Chuck works for a commercial janitorial cleaning company that he owns. Over the course of her career Kate has served in various project management and administrator roles in the construction and medical transportation industries.

182.    In or around fall 2018, the Kanes received a flyer in the mail from Unison purporting to offer an upfront sum of money with no interest and no monthly repayment obligations. The flyer piqued the Kanes' interest. They had been thinking about remodeling their kitchen, and Unison purported to offer an interest-free way to do so. The Kanes planned to sell their home when they reached retirement, and they believed the kitchen remodel would increase the resale value.

183.    In response to the flyer, Chuck called Unison and spoke with a representative. Over the course of several conversations the representative built trust with Chuck, who is not sophisticated in real estate or other complex financial transactions. The representative bonded with Chuck over their shared appreciation for football, including bantering about a rivalry between the two teams they respectively supported. Due to the rapport they built, Chuck even sent the representative a jersey for a retired player on his preferred team.

184.    The representative encouraged Chuck to enter into the Agreement. During these conversations, the representative reiterated appealing aspects of the product, including that it was interest-free, had no monthly payments, and would not appear on the Kanes' credit report. The representative also suggested that he himself would enter into the Agreement if he were in the Kanes' position and emphasized how quickly the initial advance would be paid.

185.    During these calls, Chuck does not remember the representative mentioning that Unison would record a deed of trust on their property, or that Unison would charge over $3,500 in transaction fees. If the representative did mention these issues, there was not a significant focus on them during the conversations. The representative also did not explain how Unison would actually calculate the amount owed at the end of the transaction.

186.    Unison sent the Kanes an Offer Package on October 16, 2018. The Offer Package included the documents discussed herein. The Offer Package provided that the Kanes would receive a Unison Investment Payment, or initial advance, of $91,525, minus the cost of the Unison Transaction Fee, which was $3,569.[67] The Unison Investment Payment, before fees, was approximately 17.5% of the "Original Agreed Value" of the Kanes' home.

187.    The Original Agreed Value was set at $523,000 based on an appraisal ordered by Unison. The appraisal was conducted in a perfunctory manner with the appraiser spending limited time evaluating the Kanes' more than 3,000 square foot home and surrounding property. In return for the Unison Investment Payment, the Kanes granted Unison a 70% interest in the future value of the home, called the "Investor Percentage."[68]

188.    The Kanes have no memory of any Unison representative informing them of the Transaction Fee prior to receiving the Offer Package, nor did any Unison

---

[67] **Exhibit 1**, Kane Offer Package at 1 (PDF Page 2 of 24).
[68] *Id*.

representative explain how the initial advance was derived. The Offer Package noted that the offer was only available until October 26, 2018, using dark underline to emphasize this language.[69]

189.    On October 21, 2018, the Kanes electronically signed the Offer Package.[70] At the time the Kanes signed, they had not seen any of the documents underlying the Agreement, and they had not met with a Unison representative in person.

190.    Ultimately, Unison's representations that the product was interest-free and did not require any monthly payments persuaded the Kanes to enter into the Agreement. Based on these same representations, the Kanes did not seek out or consider loan alternatives. They also did not seek out a lawyer to review the Agreement because they trusted the advice from the representative with whom Chuck had spoken. Had the Kanes known or understood the Agreement created a lien on their property and effectively carried interest, they would not have entered the Agreement.

191.    On October 23, 2018, the Kanes met with a notary to execute the Agreement. The Kanes' Agreement spans close to 100 pages and consists of the four core Agreement documents, as well as the Unison Homeowner Agreement Closing Instructions, Unison Agreement Corp. Closing Statement, and a Deferred Maintenance Addendum.[71]

---

[69] *Id.*
[70] *Id.* at 4 (PDF Page 5 of 24).
[71] *See* **Exhibit 2**, Kane Covenant Agreement, Kane Option Agreement, Kane Memorandum of Agreement, Kane Deet of Trust, Kane Homeowner Agreement Closing Instructions, Kane Closing Statement, and Kane Deferred Maintenance Addendum.

58

192.    Despite the complexity and scope of the Agreement, no representative from Unison attended the signing. Indeed, the Kanes still have never met in person with anyone from Unison. After finalizing the Agreement, the Kanes received a total of $87,956.00, which is the Unison Investment Payment of $91,525, less the Unison Transaction Fee of $3,569.

193.    Although the Kanes met with a notary to execute the Agreement, and the Agreement appears to be in force and effect, the Kanes do not have signed copies of several documents comprising the Agreement, including the Covenant Agreement, Option Agreement, Deferred Maintenance Addendum, and Closing Instructions. This is so even though the Closing Instructions require signatures of those four documents. The Kanes do not recall seeing most of these documents before the closing appointment to sign the Agreement.

194.    The Deferred Maintenance Addendum, a document that the Kanes do not recall seeing during the closing, and for which they have no signed copy, claims there is improper grading and water damage in parts of the Kanes' home.

195.    After executing the Agreement, Unison recorded a Deed of Trust on the Kanes' property. The Deed of Trust creates a lien on the title to the property and grants Unison foreclosure rights in the event of the Kanes' default.[72] At the time of signing, the Kanes did not understand the impact the Deed of Trust would have on their title to their home.

---

[72]**Exhibit 1**, Offer Package TUCE Page 2 of 10 (PDF Page 7 of 24).

196.    Land records reflect that Unison Agreement Corp. assigned its rights under four separate documents to Odin New Horizon Real Estate Fund LP the day before the Kanes met with a notary in person.[73] The Kanes were not aware of the assignment to Odin New Horizon Real Estate Fund LP at the time they entered the Agreement or for many years after.

197.    Unison obscured the true nature and cost of the Agreement, preventing the Kanes from understanding the risks and their future repayment obligations associated with the transaction. For example, none of the documents contain disclosures that comply with applicable lending or consumer credit laws. Even to date, the Kanes do not fully understand their repayment obligations. Their estimated repayments in their December 31, 2025 Quarterly Statement ranged from $164,243 to $261,759.[74] Just three months later, as of March 31, 2026, the repayment amount has increased to a range of $178,038 to $278,618. These estimates do not include other costs or fees the Kanes may be subject to, including deferred maintenance costs.  A Special Termination may result in a completely different repayment amount as well.

198.    Finally, the Agreement purports to offer the Kanes a "Unison Purchase Price Balance" of $274,575.[75] Although the Unison Purchase Price Balance is characterized as a payment to the Kanes upon the sale of their house, it is in fact just an offset of the profits that Unison would take from the sale. To date, the Kanes still do

---

[73] *See* **Exhibit 2**. Kane Assignment of Unison HomeOwner Agreement (Oct. 22, 2018) (PDF Page 84 of 88).
[74] **Exhibit 3**, Kane Quarterly Statement at 1 (PDF Page 2 of 5).
[75] **Exhibit 1**, Kane Offer Package at 3 (PDF Page 4 of 24).

not fully understand how the Unison Purchase Price Balance will impact their final repayment obligation.

199.    The Kanes ultimately used the Unison Investment Payment to remodel their kitchen, extend their deck, and pay off credit cards.

200.    The Kanes current repayment[76] of $178,038 to $278,618 for an initial advance of $87,956.00 after fees seven and a half years later is effectively a simple interest rate of 13.66% to 28.9% per year and an annual percentage rate of approximately 9.8% to 16.6%. This is despite Unison's statements that its product is "interest-free." In the future, if the Kanes' home increases in value, they will owe Unison more.

201.    If the Kanes sold their home to pay Unison, they would be required to cover the costs of the items identified in the Deferred Maintenance Addendum included at the outset of the Agreement, and all selling and closing costs, further reducing the amount of proceeds they would receive from a sale, as Unison does not share in these expenses.

202.    In addition to their Unison Agreement, the Kanes have an FHA loan with a balance of about $190,000, reducing even further the amount of proceeds that would flow to the Kanes from a sale of their home.

203.    The Kanes have not been on an equal footing at any point in the transaction. Unison is a multimillion-dollar financial technology company that drafted the nearly 100 pages comprising the Agreement. Unison has complex methods of market

---

[76] **Exhibit 3**, Kane Quarterly Statement (Mar. 31, 2026) at 1 (PDF Page 4 of 5).

and financial analysis that give it far superior knowledge of how its Agreement will actually work in practice. Unison also includes a variety of terms in the Agreement that benefit Unison to the detriment of homeowners, including determining the Original Agreed Value, requiring the homeowner to pay all costs and fees, and exercising significant control over the appraisal process and the Ending Agreed Value. Moreover, Unison presented the terms of the Agreement to the Kanes on a take-it-or-leave-it basis.

204.   Meanwhile, the Kanes did not have legal representation and have little experience with complex financial transactions, including real estate transactions. They did not receive a copy of the Agreement prior to signing, and no Unison representative attended the signing. As a result of these factors and Unison's misrepresentations about the terms and characteristics of the product, the Kanes did not understand the true terms or consequences of the Agreement at the time of signing and still do not appreciate or understand the full scope of the terms of the Agreement's consequences.

205.   The Kanes had no idea that the Agreement would obligate them to pay so much to Unison at the end of the Agreement. Had they understood the true cost and nature of the transaction with Unison at the time they entered the Agreement, they would not have agreed to it.

206.   The Kanes have enjoyed living in their home over the last twenty-four years. They have fond memories of gatherings with friends in their basement and backyard. They love the large trees that surround their yard.

207.   But, as they enter their 70s, the Kanes would like to retire and downsize to a smaller home that is easier to navigate physically and less costly to maintain. On a

physical level, the stairs in the Kanes' home cause problems for Chuck, who recently had a hip replacement, has spinal deterioration, and has three heart stents. As a financial matter, the Kanes incur substantial costs in maintaining their home, and under the terms of their Agreement with Unison, the Kanes bear those costs alone. A smaller home without stairs and with less maintenance costs would be easier for the Kanes to navigate, both physically and financially.

208.   Even if the Kanes wanted to retrofit their home to make it easier for Chuck to navigate the stairs, they would not be able to do so without the express consent of Unison, given that they would need financing and they are limited by the maximum debt limit imposed by the Agreement. Nor can the Kanes freely relocate to a more suitable home while renting out their current home under the Agreement.

209.   The unfortunate reality for the Kanes is that the Unison Agreement stands in the way of their plans for the future. Despite a lifetime of hard work, they have no control over their home, which they have lived in for over 20 years. They must either remain in place, despite the increasing difficulty of living in the home as they age or sell their home in order to repay Unison. In the latter scenario, the payment to Unison would be so significant that the Kanes would not be able to purchase another home and would have only limited savings to support themselves going forward.

210.   If the Kanes remain in place now, the Unison Agreement will terminate when they are in their early 90s, if Unison does not "exercise its option" before that. The thought of having to sell their home and pay Unison a significant amount of the sale

63

proceeds at that time in their lives is a source of anxiety for the Kanes, who have worked hard to build a sense of security for themselves.

## THE WILLIAMS'S TRANSACTION

211.    Jamie and Alicia Williams have owned their home in Windsor, Colorado, located in Weld County, since 2017. Jamie is 59 years old, and Alicia is 50.

212.    Jamie works in power systems operations, and Alicia is a team lead of the web development team at the Space Weather Prediction Center. Previously, the Williams owned a small business called Waterjet Wonders, Ltd. that designed and manufactured floor murals, medallions, and other displays made from natural stone.

213.    In or around spring 2019, the Williams were looking to pay off expenses associated with their business. They came across Unison as a potential option. Unison's promises of no monthly payments made the product attractive to the Williams because every dollar counted during that time. Given Unison's representations that the product was also interest free, the Williams did not predict they could eventually owe Unison much more than they were advanced.

214.    Prior to entering into the Agreement, Jamie corresponded with Unison by email and over the phone. Jamie estimates he had four or five calls with Unison, all relatively short in duration. The calls and the emails pertained mostly to Jamie's questions about the Unison ordered appraisals of the home, described below. There was little to no discussion about the details of the Agreement during Jamie's communications with Unison.

64

215.    On April 22, 2019, a Unison appraisal valued the Williams's home at $455,000. This appraisal was in line with the Williams's expectations of their home's market value at the time, based on publicly available sources. Then, on April 26, 2019, a second Unison appraisal valued their home at just $407,000, significantly lower than the other recent appraisal of their home. Based on the average of the two Unison ordered appraisals, Unison attempted to set the Original Agreed Value of the home at $431,000.

216.    Jamie was surprised by the outcome of the second appraisal, noting to Unison that it was 10.5% lower than the first Unison appraisal conducted just days earlier. Unison did not provide Jamie with any explanation for the significant difference in appraised values. Instead, Unison ordered a third appraisal on May 17, 2019, that came back with a value of $430,000. Jamie asked twice for copies of the appraisals, but Unison would only provide them as part of the Offer Package if Jamie agreed to move forward with the application process.

217.    On June 6, 2019, Unison sent the Williams an Offer Package that established the "Original Agreed Value" of the Williams's home at $430,667, the average amount of the three Unison ordered appraisals, and nearly identical to the first proposed Original Agreed Value that Jamie had questioned.[77] The Offer Package provided that the Williams would receive a Unison Investment Payment of $64,600, minus the cost of the Unison Transaction fee of $2,519, in exchange for a 60% interest in the future value of their home.[78] Unison did not provide the documents underlying the Agreement, nor

---

[77] **Exhibit 4**, Williams Offer Package at 1 (PDF Page 2 of 26).
[78] *Id.* at 1, 3 (PDF Pages 2, 4 of 26).

did it bold, underline, or otherwise emphasize that the Williams could request those documents from Unison. Similar to the Kanes' Offer Package, the date and time of the Offer Package expiration is underlined and emphasized.[79]

218.    The Offer Package contains copies of the three Unison appraisals. Each appraisal states that the "intended use" of the appraisal is for the "lender/client" to "evaluate the property that is the subject of this appraisal for a mortgage finance transaction." Nonetheless, even though Unison is the "intended user" of the appraisal, the Williams's closing statement reflects that they paid appraisal costs through their $2,519 transaction fee.

219.    The Williams signed the Offer Package on June 6, 2019, and the next day they executed the Agreement.[80] The closing was attended only by a notary, and no Unison representative was present. The Williams's Agreement included the same documents as that of the Kanes', except for the Deferred Maintenance Addendum.[81] The Williams also executed additional documents, including a Base Ending Agreed Value & Special Termination Addendum, an Original Agreed Value Addendum, a Planned Unit Development Rider, and a Schedule of Debts to be Paid at Closing from Unison HomeOwner Agreement Proceeds (Schedule of Debts), as well as documents

---

[79] *Id.* at 1 (PDF Page 2 of 26)

[80] *Id.* at 3 (PDF Page 4 of 26); **Exhibit 5**, Williams Covenant Agreement at 36 (PDF Page 37 of 113).

[81] **Exhibit 5**, Williams Covenant Agreement, Williams Option Agreement, Williams Memorandum of Agreement, Williams Deed of Trust, Williams Homeowner Agreement Closing Instructions, Williams Closing Statement.

created by the title company engaged by Unison to effectuate the transaction, which refer to Unison as the "lender" and the Williams as "borrowers."[82]

220.    The Base Ending Agreed Value & Special Termination Addendum modifies the Williams's Covenant Agreement such that the Williams could request a Special Termination only on or after the fifth anniversary of their Agreement. Although the extension of this period is significant because it extends the Restriction Period by two years, no Unison representative explained this document to the Willams before or at the time of signing.

221.    The Original Agreed Value Addendum is presumably designed to protect Unison against disputes related to the significant variance in its appraisals of the Willams's property. It provides that "notwithstanding anything to the contrary," the Original Agreed Value of the property was set to $430,667.00.[83] The Original Agreed Value was "[b]ased on [Unison's] projection and analysis of the risks and benefits associated with [its] investment in the Property."[84] Again, no Unison representative explained this document to the Willams before or at the time of signing.

222.    The Planned Unit Development Rider required the Williams to perform all obligations required by their Homeowners' Association and granted Unison the right to make Protective Advances if the Williams did not pay dues or assessments to the Association.

---

[82] **Exhibit 5**, Williams Planned Unit Development Rider (PDF Page 76 of 113), Williams Schedule of Debts, Williams Original Agreed Value Addendum, Williams Base Ending Agreed Value & Special Termination Addendum, and Williams Title Documents (PDF Pages 90-113).
[83] *Id.* Williams Original Agreed Value Addendum to Unison Homeowner Agreement at 1 (PDF Page 91 of 113).
[84] *Id.*

223.    Finally, Unison required the Willams to pay $31,220, or over half of their Unison Investment Payment after fees, directly towards their primary mortgage, as reflected in the Schedule of Debts.[85] This was not something the Willams wanted to do because of their favorable 4.125% interest rate on their primary mortgage, and because they turned to Unison for money to assist with business expenses – not for help paying their monthly mortgage or personal bills. However, in correspondence with Unison, a Unison Program Specialist informed the Willams they were required to do a "mortgage buy down" of their primary mortgage given their current "LTV" ratio. Notably, LTV stands for loan to value ratio, an often-used ratio in mortgage lending to determine whether a lender will extend a loan to a consumer.

224.    After the required "mortgage buy down" of $31,220 and the transaction fee of $2,519 the Williams were left with $30,861.[86] They used this money to pay off business expenses.

225.    Despite the length and complexity of the Agreement, the Willams signed the Agreement during a closing that lasted only about 30-45 minutes. The notary indicated that she had another appointment that day, resulting in the Williams experiencing time pressure to sign the documents. The Williams had questions concerning certain provisions of the Agreement, but when they asked, the notary explained she was unable to answer their questions because she did not work for Unison. From Jamie's perspective, the notary's only role was to witness their signatures.

---

[85] **Exhibit 5**, Williams Schedule of Debts at 1 (PDF Page 90 of 113).
[86] *Id.*, Williams Closing Statement at 1 (PDF Page 84 of 113).

226.    After executing the Agreement, Unison recorded a Deed of Trust on the Williams's property.[87] The Deed of Trust creates a lien on the title to the property and grants Unison foreclosure rights in the event of the Williams's default. Land records reflect that Unison Agreement Corp. assigned its rights under four separate documents to Unison Midgard Holdings LLC the day before closing occurred.[88] The Williams were not aware of the assignment to Unison Midgard Holdings LLC at the time they entered the Agreement or for many years after.

227.    Because Unison obscured the true nature and cost of the Agreement, the Williams did not understand the risks and their future repayment obligations associated with the transaction. For example, none of the documents contain disclosures that comply with applicable lending or consumer credit laws.

228.    The Williams did not begin to understand or appreciate their repayment obligations until late 2025, when they first considered selling their home and learned they could owe Unison two to three times the amount originally advanced.

229.    According to the Williams's March 31, 2026 Quarterly Statement, Unison estimates they owe anywhere between $126,956 and $198,234 for an initial advance of $62,081, after transactions fees.[89] This is effectively a simple interest rate ranging from 15.29% to 32.09%, and an annual percentage rate ranging from approximately 11.0% and 18.5%. These effective rates do not even consider that the Williams only received half of the initial advance because Unison required them to "buy down" their low interest

---

[87] **Exhibit 5**, Williams Deed of Trust (PDF Page 64 of 113).
[88] *Id.*, Williams Assignment of Unison HomeOwner Agreement (PDF Page 85 of 113).
[89] **Exhibit 6**, Williams Quarterly Statement (PDF Page 2 of 3).

69

primary mortgage even though the Williams did not wish to do so. Had the Williams understood that their repayment obligations would reach such significant amounts, they would not have entered into the Agreement.

230.    The Williams's repayment obligations are not just hypothetical. In May 2026, the Williams decided to sell their home because Jamie started a new job outside of Weld County. If they remained in their home in Weld County, Jamie would be required to commute over two hours each way. The Williams are now renting in Adams County, Colorado.

231.    Upon notifying Unison of their intent to sell their home, the Williams provided Unison with requested documents, including a Property Sale Form, an MLS sheet, and the listing agreement. Unison has informed the Williams that their payoff amount "will be based on the open market sale price of [their] home plus or minus Remodeling Adjustment or Deferred Maintenance items." Despite their Agreement containing over 80 defined terms, there is no definition of what constitutes the "open market sale price," leaving uncertainty as to how Unison will determine the "Ending Agreed Value" and thus the amount the Williams will be required to repay Unison.

232.    In addition to paying back Unison, the Williams have about a $256,800 balance remaining on their mortgage and an approximately $23,000 balance to pay off solar panels they installed. They are also responsible for all costs associated with the sale of their home under the Unison Agreement, as well as any ordered appraisals.

233.    The Williams have not been on an equal footing at any point in the transaction. Unison is a large financial company that drafted the over 100 pages that

70

comprise the Williams's Agreement. Unison has superior knowledge of how its Agreement will actually work in practice, leaving the Williams uncertain as to how Unison will determine the Ending Agreed Value of their home, and in turn, how much money they owe to Unison. Unison also exerted control over the appraisal process, resulting in at least one appraisal that the Williams perceive to have substantially undervalued their house and contributed to the Original Agreed Value in the Agreement. Unison presented the terms of the Agreement to the Williams on a take-it-or-leave-it basis, including the requirement that the Williams make a significant payment on their primary mortgage, which the Williams did not wish to do that the time.

234.    Meanwhile, the Williams did not have legal representation and have limited experience with complex financial transactions, including real estate transactions. No Unison representative was available at signing to answer their questions, nor did they even receive a copy of the Agreement prior to signing. As a result of these factors and Unison's misrepresentations about the terms and characteristics of the product, the Williams did not understand the true terms or consequences of the Agreement at the time of signing and are still left in the dark about how much they will owe Unison when they sell their home. Had the Williams understood the true cost, nature, and risk of the transaction at the time they entered the Agreement, they would not have agreed to it.

235.    Owning a home for close to a decade has been a significant achievement for Jamie and Alicia, both of whom grew up in modest households. Homeownership has provided the Williams with a sense of pride and served as a tangible marker of personal

71

success. Due to the substantial amount they will likely owe Unison, the Williams are not confident they will be able to own a home again.

## DOUGLAS CLAYTON'S TRANSACTION

236.  Douglas Clayton has lived in and owned his home in Longmont, Colorado, located in Boulder County, since 2015. He is 66 years old. Douglas is the head custodian & facility manager of a middle school located in Weld County, Colorado.

237.  In or around late 2023 or early 2024, Douglas was looking to obtain a home equity line of credit (HELOC). After searching online for a HELOC provider, he started receiving advertisements from Unison which described itself as a loan alternative. He was intrigued by Unison's representations that he would not need to make monthly payments.

238.  After an initial email to Unison, he had a brief conversation with a Unison representative. Based on Douglas's understanding of the product, he determined that Unison's product seemed more flexible and less costly than a HELOC. Douglas exchanged a few additional emails with Unison representatives, mostly about the application process and the amount of money he would receive under the Agreement. He decided to move forward.

239.  Under the terms of Douglas's Agreement, Unison set the Original Agreed Value of his home at $403,750.[90] Unison reached the Original Agreed Value by appraising his home at $425,000 and then discounting the appraised value by 5%.[91]

---

[90] **Exhibit 7**, Clayton Option Agreement at 1 (PDF Page 31 of 83).
[91] *Id.*

72

Douglas did not understand how the discount would impact his ultimate payment obligations. The Agreement further provided that Douglas would receive a Unison Initial Payment[92] of $63,750, minus $4,718 in transaction fees and costs for appraisals, inspection, and settlement.[93] In exchange, Douglas granted Unison a 60% interest in the future value of his home.[94]

240.    In addition to the documents that comprise the Kanes' Agreement, including the Deferred Maintenance Addendum, Douglas also executed a Schedule of Debts to be Paid at Closing from Unison HomeOwner Agreement Proceeds (Schedule of Debts), a Cancellation Notice, an Estate Representative And/Or Nearest Living Relative Designation, an Equity Appreciation Limit Addendum, as well as documents created by the title company engaged by Unison to effectuate the transaction, which refer to Unison as the "lender" and Douglas as the "borrower."[95] Although the Effective Date of the documents is listed as February 7, 2024, Douglas did not sign the documents underlying the Agreement until February 14, 2024.[96]

241.    The Deferred Maintenance Addendum included in his Agreement noted electrical issues and wear and tear on Douglas's roof.[97] If Unison applies the Deferred Maintenance Adjustment, its dollar amount is added to Unison's calculation of the

---

[92] This payment was previously referred to as the "Unison Investment Payment" in the Kanes' and Williams's Agreements.
[93] **Exhibit 7**, Clayton Closing Statement at 1 (PDF Page 59 of 83).
[94] *Id.*, Clayton Option Agreement at 1 (PDF Page 31 of 83).
[95] *Id.*, Clayton Covenant Agreement, Clayton Option Agreement, Clayton Memorandum of Agreement, Clayton Deed of Trust, Clayton Homeowner Agreement Closing Instructions, Clayton Closing Statement, Clayton Deferred Maintenance Addendum, Clayton Equity Appreciation Limit Addendum, Clayton Estate Representative and/or Nearest Living Relative Designation, Clayton Cancellation Notice, and Clayton Title Documents.
[96] *See e.g.* **Exhibit 7**, Clayton Covenant Agreement at 21 (PDF Page 24 of 83).
[97] *Id.*, Clayton Deferred Maintenance Addendum at 1 (PDF Page 62 of 83).

Ending Agreed Value of Douglas's home, thereby increasing the amount that Douglas owes to Unison.

242.    Unison required Douglas to divert $30,738 of the initial payment to debts identified and selected by Unison, as reflected in The Schedule of Debts, including $7,140 toward his primary mortgage and $23,598 toward six credit cards.[98] Douglas did not request this to be done during communications with Unison. Like the Williams, Douglas was required to complete certain "paydown contingencies" to meet certain "loan to value" and "debt to income ratios" that Unison had established during its "underwriting process." Notably, underwriting and the consideration of "loan to value" and "debt to income" ratios are routine parts of the mortgage lending process.

243.    Douglas would have preferred to continue making mortgage payments at his regular schedule due to his favorable interest rate of about 2.5%, but he did not object because the $7,140 paydown of his primary mortgage was not presented as optional or negotiable. Douglas was also perplexed about the credit cards that Unison required him to pay off, as he had not missed payments on those accounts. However, to move forward with the transaction, Douglas permitted Unison to pay these debts directly from his Initial Payment. As a result of these "paydown contingencies" and after accounting for $4,718 in fees, Douglas was left with only $28,294 of the $63,750 Initial Payment.[99] With the remainder of the money, Douglas paid off additional credit cards and paid for yard maintenance and upkeep.

---

[98] *Id.*, Clayton Closing Statement Schedule of Debts at 1 (PDF Page 60 of 83).
[99] *Id.*, Clayton Closing Statement at 1 (PDF Page 59 of 83).

74

244.    The Cancellation Notice provided that the Unison HomeOwner Agreement "will result in a lien and security interest on [Douglas's] home." It further provided that Douglas "may cancel [the] transaction by notifying [Unison] in writing by the Cancellation Deadline below, **which is 3 business days from the day you receive your Agreement documents.**"[100] Notably, federal law grants borrowers three business days to rescind consumer credit transactions in which a security interest has been taken in a consumer's principal dwelling.

245.    The Equity Appreciation Limit Addendum established a "Restriction Period" of three years. It provides that the Investor Interest may not exceed the "Equity Appreciation Limit," which depends on a "Max Appreciation Factor," which Unison set at 20%.[101] The Equity Appreciation Limit Addendum contains two formulas, one for the first year of Douglas's Agreement and another formula that applies during the remainder of the three-year restriction period. Neither formula uses plain terms to describe the limit of what Douglas may actually owe Unison.

246.    For the first year after the Effective Date, the "Equity Appreciation Limit" is calculated as "**Equity Appreciation Limit =** (Initial Payment) x (1 + Max Appreciation Factor)." During the remainder of the Restriction Period, the Equity Appreciation Limit is calculated as "**Equity Appreciation Limit** = (Initial Payment) x (1 + Max Appreciation Factor)^M. In this scenario "M, used as an exponent, represents the fraction, Term Months/12."[102]

---

[100] *Id.*, Clayton Cancellation Notice at 1 (PDF Page 72 of 83) (emphasis in original).
[101] *Id.*, Clayton Equity Appreciation Limit Addendum at 1 (PDF Page 69 of 83).
[102] *Id.*

247.    Although the Equity Appreciation Limit Addendum itself does not use plain terms, in effect, it means during the first year of the Agreement, Unison capped the amount that Douglas could owe Unison at 120% of his Initial Payment. For the remainder of the Restriction Period, Unison capped the amount owed based on a 20% annually compounded rate. Notably, the Equity Appreciation Limit Addendum omits that there is a minimum amount Douglas will be required to repay Unison during the Restriction Period, given that Unison will not share in a decrease in value in Douglas's home during the Restriction Period. Despite the complexity of this Addendum, no Unison representative explained this document to Douglas before or at the time of signing. He did not understand what the formulas meant in practice at the time of signing and still does not fully understand them as of today.

248.    Despite the length and complexity of the Agreement, the closing lasted only about 20 minutes. No Unison representative attended. Only a notary was present, and the notary explained that she had only received the documents underlying his Agreement earlier that day and that she was not knowledgeable about them. The notary had a stack of papers and every few pages she asked for Douglas's signature. Although Douglas had questions concerning the Agreement, he did not ask them due to the notary's unfamiliarity with the documents.

249.    After executing the Agreement, Unison recorded a Deed of Trust on Douglas's property.[103] The Deed of Trust creates a lien on the title to the property and grants Unison foreclosure rights in the event of Douglas's default. Land records reflect

---

[103] *Id.*, Clayton Deed of Trust (PDF Page 43 of 83).

that Unison Agreement Corp. assigned its rights to Unison Midgard Holdings LLC one week before closing occurred.[104] Douglas was not aware of the assignment to Unison Midgard Holdings LLC at the time he entered the Agreement or for years after.

250.    Because Unison obscured the true nature of the Agreement, Douglas did not understand the restrictions that accompanied it. At the time Douglas entered the Agreement, he was unaware of the maximum authorized debt limit placed on his home and the requirement that he obtain Unison's consent before any future refinancing. He was also unaware of restrictions against renting out his home.

251.    Unison also obscured the cost of Douglas's Agreement. None of the documents contain disclosures that comply with applicable lending or consumer credit laws, and Douglas's regular Quarterly Statements do not appear to reflect the minimum amount he would owe Unison at this point in time.

252.    For example, Douglas's most recent Quarterly Statement from March 31, 2026 states that he could owe anywhere between $51,550 and $102,672 to Unison.[105] However, because Douglas is still in the Restriction Period, and will be until February 2027, the numbers in the Quarterly Statement, particularly the "low estimate" of $51,550 are misleading. That is because during the Restriction Period, Unison is guaranteed to recover at least its initial investment in the property. It does so by refusing to share in any depreciation in the value of the home during the period, and by using the Original

---

[104] *Id.*, Clayton Assignment of Unison HomeOwner Agreement at 1 (PDF Page 64 of 83).
[105] **Exhibit 8**, Clayton Quarterly Statement at 1 (PDF Page 2 of 3).

Appraised Value or the Effective Sale Price of the home to calculate the payment due,

***whichever is greater***.[106]

253.    Douglas' home's Original Appraised Value was $425,000, a number that

appears nowhere in the Quarterly Statement. Because the "Market Value" will never be

less than the Original Appraised Value during the Restriction Period, [107] Douglas will

owe a *minimum* of $76,500 if he sells during the Restriction Period.[108] If his home sells

for more than $425,000, he will owe even more. As a result, the "low estimate" currently

reflected in the Quarterly Statement could never be accurate during the Restriction

Period. Nonetheless, the Quarterly Statement misleadingly says that the repayment

estimate "takes into account agreement terms such as the restriction period."[109]

254.    As with the other aspects in the Agreement, Douglas did not understand

the Restriction Period until he revisited his contract after learning of litigation against

Unison in May 2026.

255.    In addition to Unison's "share" of the future value of Douglas' home, he

would also be required to pay whatever costs Unison assigns to the Deferred

Maintenance items it identified at the outset of the Agreement. Douglas also has an

approximate balance of $263,000 on his primary mortgage after completing a cash-out

refinance a few years ago. If Douglas sold, he would also be responsible for all selling

and closing costs, as well as any ordered appraisals.

---

[106] **Exhibit 7**, Clayton Covenant Agreement Schedule B table row 1 at B-1 (PDF Page 28 of 83).
[107] The "Market Value" was previously referred to as the "Base Ending Agreed Value" in the Kanes' and Williams's Agreements.
[108] This number is derived by taking 60% of the Original Appraised Property Value of $425,000 and subtracting the Balance Payment of $178,500.
[109] **Exhibit 8**, Clayton Quarterly Statement at 1, n. 2 (PDF Page 2 of 3).

256.    Douglas has not been on an equal footing with Unison at any point in the transaction. Unison is a large financial company that drafted the nearly 100 pages comprising of Douglas's Agreement. Unison has superior knowledge of how its Agreement will actually work in practice and includes terms that are to its own benefit, including discounting the appraised value of Douglas's home by 5% to increase the amount of its future repayment. Unison also presented the terms of the Agreement on a take-it-or-leave-it basis, including the requirement that Douglas pay certain debts, including paying down his mortgage, which he did not wish to do at the time.

257.    Meanwhile, Douglas did not have legal representation and has limited experience with complex real estate transactions. No Unison representative attended closing, nor did Douglas receive a copy of the Agreement prior to signing. Douglas was also unaware of the restrictions underlying the Agreement, including that he obtain Unison's consent for future equity products and the Agreement's restrictions against renting out his home. Had Douglas understood the true cost, nature, limitations, and risk of the transaction at the time he entered the Agreement, he would not have agreed to it.

258.    Home ownership has played a prominent role in Douglas's life. He has owned a home since he was 22 years old. He is comfortable in his current home and he does not plan to move from it any time soon. But the Unison Agreement looms large over him. When his Agreement terminates, he will be 94 years old. As he begins to understand how the Unison Agreement works, he worries about how he will be able to pay back Unison at the end of the term or if he needs to sell his home before that.

## CLASS ACTION ALLEGATIONS

259.    Plaintiffs bring this class action under Federal Rule of Civil Procedure 23(a), 23(b)(2) and 23(b)(3), and/or 23(c)(4) on behalf of themselves and all other similarly situated Colorado residents who have entered into Unison Agreements relating to property located in Colorado. The Class Period is ongoing through the date of class certification in this action.

260.    The class is so numerous that joinder of all members is impractical. While the exact number and identity of class members is unknown to Plaintiffs at this time and can only be determined through appropriate discovery, publicly available land records reflect that there are hundreds of Agreements in just nine counties in Colorado. The precise number and identification of the Class members will be ascertainable from Unison's own records.

261.    There are questions of law and fact common to all members of the Class. Those common questions include, but are not limited to, the following:

a.    Whether Unison's Agreement is an "option" contract;

b.    Whether Unison designs its Agreements to ensure that, at least most of the time, Unison homeowners have a payment obligation at the conclusion of the Agreement;

c.    Whether Unison's form contracts, documents and/or uniform advertising are unlawful, unfair, or deceptive;

d.    Whether Unison's form contracts, documents, and/or uniform advertising inform the homeowner of the total cost of the transaction;

e.    Whether Unison's statements about the Agreement's terms, including but not limited to whether it carries interest or creates debt, are unfair or deceptive;

80

f.  Whether Unison's statements about being a "partner" with the homeowner are unfair or deceptive;

g.  Whether Unison's product is a consumer loan under the Colorado Credit Code;

h.  Whether Unison's product is a residential mortgage loan as defined by C.R.S. §§ 38-40-103.5(1)(d), 12-10-702(21) or a reverse mortgage as defined by C.R.S. § 11-38-102(4);

i.  Whether Unison's product is unconscionable;

j.  Whether Unison's product and/or marketing and advertising violates the Colorado Consumer Protection Act.

262.    Plaintiffs' claims are typical of the Class claims because they, like the Class members, entered into a Unison Agreement. Plaintiffs' contracts with Unison are typical, as at all relevant times, Unison's HomeOwner and HomeBuyer Agreement contracts have contained materially similar terms with respect to the structure of its advance payments; its purported "option" mechanism for ensuring its future payment; securing the homeowner's obligations through a security interest in a residence; and characterizations of the product, including that the product is not a loan.

263.    Plaintiffs will fairly and adequately protect the interests of the Class because they share the same interest in challenging Unison's practices as the rest of the Class, their interests do not conflict with the interests of the Class, and they have obtained counsel experienced in litigating class actions and matters involving similar or the same questions of law.

264.    The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members. Unison's business model stems from common and uniform practices, including the use of a common

sophisticated model for evaluating home values in the State of Colorado, the use of form Agreements and supporting documents to be signed by class members, uniform advertising and public statements about the terms of the Agreement, and common formulas for determining the potential repayment model at the conclusion of the Agreement. These common and uniform practices, among others, have resulted in uniform violations of law, and these issues will predominate over individualized ones.

265.    A class action is superior to other available methods for fairly and efficiently adjudicating class members' claims. There will be no difficulty in the management of this action as a class action given the common issues that predominate. Members of the Class do not have an interest in pursuing separate actions against Defendants, as the value of each class member's individual claim is small relative to the substantial expense, burden, and uncertainty of individual prosecution. Class certification will also obviate the need for unduly duplicative litigation, which might result in inconsistent judgments and/or a burden on judicial resources. In the interest of justice and judicial efficiency, it is desirable to concentrate the litigation of all class members' claims in a single forum.

**CAUSES OF ACTION**

**COUNT I**
**UNCONSCIONABILITY**
**VIOLATIONS OF THE COLORADO CONSUMER CREIDT CODE C.R.S. § 5-5-109**
**AND/OR COLORADO COMMON LAW**

266.    The Plaintiffs repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

82

267.    The Uniform Consumer Credit Code (UCCC) prohibits "consumer credit transactions" that are unconscionable.

268.    The Unison transaction is a "consumer credit transaction" under the UCCC because it meets all the requirements of a "consumer loan" as defined in C.R.S. § 5-1-301(15):

a.    There are hundreds of Unison Agreements in Colorado, and therefore Unison is regularly engaged in the business of making loans;

b.    The Plaintiffs and the Class are all natural persons;

c.    The Plaintiffs and the Class incurred the debt for personal, family, or household purposes;

d.    The debt was by written agreement in which a finance charge was made; and

e.    The debt was secured by an interest in land.

269.    The Unison transaction creates a debt because homeowners are obligated to repay Unison at the conclusion of the Agreement, including upon termination or an exercise event. The Unison product is designed to ensure that, at least most of the time, the homeowner will have to make a payment to Unison at the conclusion of the Agreement.

270.    Like the UCCC, Colorado common law prohibits unconscionable agreements.

271.    As described above and set forth herein, the Unison Agreements are substantively and procedurally unconscionable, based on the following, non-exhaustive factors:

83

a.    The Plaintiffs and the members of the Class are ordinary consumers without sophistication in complex financial transactions;

b.    Unison is a collective of large financial companies engaged in the business of soliciting homeowners and placing them in an Agreement like the ones entered into by the Plaintiffs and the Class;

c.    The Plaintiffs and the Class occupy significantly unequal bargaining positions relative to Unison, including that Unison has complex methods of market and financial analysis whereas consumers do not and Unison is a collective of companies with sophistication in complex financial agreements;

d.    Unison drafted all documents, amounting to approximately 100 pages and presented them as contracts of adhesion;

e.    Unison drafted the documents such that they are extremely difficult to understand due to their use of cross-references, approximately a dozen different formulas for calculating repayment, inconsistent repayment formulas, approximately 50 to 80 different defined terms depending on the Agreement, and use of small print;

f.    Unison provided no meaningful explanation of the documents to the Plaintiffs or the similarly situated Class prior to or at signing;

g.    The Plaintiffs and the similarly situated Class are not provided with the documents underlying the Agreement as a matter of course before signing the Offer Package. Instead, class members must affirmatively request the documents underlying the Agreement prior to signing the Offer Package. The language in the Offer Package informing class members of this option is not emphasized in any way;

h.    Homeowners routinely do not even see the Agreement documents until the day they sign them, and there is no Unison representative available at the closing if the homeowner has questions.

i.    Unison failed to provide accurate disclosures related to the transaction and cost of credit as required by law;

j.    Unison instead provided purported disclosures that were misleading and obscured the risks and costs of the transaction, including confusing and misleading TUCE charts in the Offer Package;

84

k.  Unison deploys a variety of mechanisms that tilt the transaction in their favor, including decreasing the Original Agreed Value of the home, requiring the homeowner to cover all fees and costs, and having significant influence over the appraisal process and the Ending Agreed Value, all while marketing themselves as a "partner" with the homeowner;

l.  Unison drafted and presented the documents in a manner that exploited the unequal bargaining power of the parties such that the Plaintiffs and the Class would not and could not understand the full nature and consequences of the Agreement, including, but not limited to, the prominent display of the "Unison Purchase Price Balance," which causes consumers to believe they will receive a deposit of a significant sum of money from Unison at the conclusion of the Agreement;

m.  Unison requires the Plaintiffs and the Class to pay a prepayment penalty if they sell their home within the first three years or five years of the transaction (the Restriction Period) or via a Special Termination, to further insulate Unison from loss at a cost to the consumer;

n.  Unison requires the Plaintiffs and the Class to transfer wealth from themselves to Unison by requiring that consumers bear all costs to protect and increase Unison's profit, including transaction costs, costs associated with the purchase of the property, the costs of maintenance of the property, appraisal costs, payment of taxes and insurance, payment of all seller's costs, and payment of additional fees;

o.  The actual costs of the Agreement to the Plaintiffs and the Class is extremely high;

p.  The terms of the transaction are substantially one-sided in favor of Unison, who drafted the documents and their terms, and designed the Agreement to guarantee a substantial rate of return to Unison and insulate Unison from cost or risk, while placing an outsized burden of the costs and risks on the Plaintiffs and the Class, as described above, and including a fee-shifting provision.

**COUNT II**
**VIOLATIONS OF THE COLORADO CONSUMER CREDIT CODE**
**C.R.S. § 5-3-101 (Disclosure)**

272.    The Plaintiffs repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

273.    The Unison transaction is a "consumer credit transaction" under the UCCC because it meets all the requirements of a "consumer loan" as defined in C.R.S. § 5-1-301(15):

> a.    There are hundreds of Unison Agreements in Colorado, and therefore Unison is regularly engaged in the business of making loans;
>
> b.    The Plaintiffs and the Class are all natural persons;
>
> c.    The Plaintiffs and the Class incurred the debt for personal, family, or household purposes;
>
> d.    The debt was by written agreement in which a finance charge was made; and
>
> e.    The debt was secured by an interest in land.

274.    The Unison transaction creates a debt because homeowners are obligated to repay Unison at the conclusion of the Agreement, including upon termination or an exercise event. The Unison product is designed to ensure that, at least most of the time, the homeowner will have to make a payment to Unison at the conclusion of the Agreement.

275.    The UCCC requires that a "creditor shall disclose to the consumer to whom credit is extended with respect to a consumer credit transaction the information, disclosures, and notices required by the federal 'Truth in Lending Act,' the federal 'Consumer Leasing Act', and any regulation thereunder." C.R.S.§ 5-3-101(2).

276.    Unison is a "creditor" as defined under the UCCC because the Company "arranges … consumer credit transaction[s]" (*i.e.*, the Unison Agreement) and is "initially payable" under that Agreement.  C.R.S.§ 5-1-301(17).

277.    The Unison transaction is "credit" under the UCCC because Unison grants the homeowners the right to defer their payment of debt. C.R.S.§ 5-1-301(16).

278.    Under the UCCC, the "information, disclosures, and notices required by [the Truth in Lending Act, the Consumer Leasing Act, and the regulations thereunder] must be provided if the transaction is a consumer credit transaction under this code, even though the transaction is one of a class of credit transactions exempted by [the aforementioned laws]." C.R.S.§ 5-3-101(3).

279.    Under the Truth in Lending Act (TILA), creditors must disclose, among other things, the finance charge and annual percentage rate of a loan. 15 U.S.C. §§ 1638(a)(3), (4).

280.    Because Unison is a creditor and the Unison Agreement is a consumer credit transaction and credit under the UCCC, Unison is required to make disclosures as required by TILA and its accompanying regulations.

281.    Unison does not make the required TILA disclosures.

282.    Therefore, the Unison Agreements violate Section 5-3-101 of the UCCC.

### COUNT III
### VIOLATIONS OF THE COLORADO CONSUMER CREDIT CODE
### C.R.S. § 5-3-110 (Advertising)

283.    The Plaintiffs repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

284.    The Unison transaction is a "consumer credit transaction" under the UCCC because it meets all the requirements of a "consumer loan" as defined in C.R.S.§ 5-1-301(15):

    a.    There are hundreds of Unison Agreements in Colorado, and therefore Unison is regularly engaged in the business of making loans;

    b.    The Plaintiffs and the Class are all natural persons;

    c.    The Plaintiffs and the Class incurred the debt for personal, family, or household purposes;

    d.    The debt was by written agreement in which a finance charge was made; and

    e.    The debt was secured by an interest in land.

285.    The Unison transaction creates a debt because homeowners are obligated to repay Unison at the conclusion of the Agreement, including upon termination or an exercise event. The Unison product is designed to ensure that, at least most of the time, the homeowner will have to make a payment to Unison at the conclusion of the Agreement.

286.    The UCCC states that a "creditor may not advertise, print, display, publish, distribute, broadcast, transmit, or cause to be advertised, printed, displayed, published, distributed, broadcast, or transmitted in any manner any false, misleading, or deceptive statement or representation with regard to the rates, terms, or conditions of credit of a consumer credit transaction."  C.R.S. § 5-3-110.

287.    Unison is a "creditor" as defined under the UCCC because the Company "arranges … consumer credit transactions" (*i.e.*, the Unison Agreement) and is "initially payable" under that Agreement.  C.R.S.§ 5-1-301(17).

288.    The Unison transaction is "credit" under the UCCC because Unison grants the homeowners the right to defer their payment of debt.

289.    As alleged here, Unison advertises, prints, displays, publishes, distributes, broadcasts, or transmits false, misleading, or deceptive statements or representations regarding the rates, terms, and/or conditions of the Unison Agreement and therefore violates this provision of the UCCC, including through statements that its product is interest free, that the product does not create debt, that the product is not a loan, and that Unison is a partner in the transaction.

**COUNT IV**
**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**
**C.R.S. §§ 6-1-101 *et. seq.***

290.    The Plaintiffs repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

291.    The Colorado Consumer Protection Act prohibits "persons" from engaging in myriad of unfair or deceptive trade practices in the course of business. C.R.S. § 6-1-105.

292.    Unison is a person as defined by C.R.S. § 6-1-102(6) because it is a corporation and/or other legal or commercial entity.

293.    As alleged herein, Unison engaged in unfair and/or deceptive trade practices, including but not limited to:

    a.    Advertising and providing misleading representations regarding the rates, terms, and conditions of its product;

    b.    Failing to provide homeowners with the underlying Agreement documents prior to signing the Offer Package unless the

homeowner explicitly requests them; and routinely failing to provide the Agreement documents before signing.

c.     Providing false and misleading statements in the transaction documents, including false statements that product "is not a loan" and that the Agreement has "no interest;"

d.     Extending loans that are highly likely to exceed a finance charge of 12% without obtaining the licensing approval necessary to do so, while also characterizing the product as one with no interest;

e.     Extending loans that carry any effective interest amount or finance charge, despite marketing its product as "interest-free;"

f.     Mischaracterizing the transaction as an "option" rather than a credit product, loan, and/or mortgage product;

g.     Representing itself as a "partner" with the homeowner during marketing, even though it expressly disclaims its role as a partner in the Agreement, and includes numerous provisions in the Agreement that are contrary to a partnership, such as placing all costs of the transaction on consumers while ensuring Unison reaps the benefits;

h.     Failing to maintain appropriate licensure or otherwise comply with lending laws;

i.     Structuring the Agreement over the course of 100 pages, at least eight different documents, and using complex formulas, cross-references, and definitions to prevent consumers from understanding the terms, costs, and consequences of the transaction;

j.     Using tactics to obscure the true cost of the product in advertising, at the time of signing, and throughout the course of the Agreement;

k.     Leading homeowners to believe that they will receive a second payment from Unison, called the Unison Purchase Price Balance that is often hundreds of thousands of dollars, even though the Unison Purchase Price Balance is merely an offset to the amount of money Unison will receive from the sale of a home and is not deposited into homeowners' bank accounts;

l.     Continuing to describe itself in quarterly billing statements as an "equity-sharing agreement" rather than a loan, and a "financial

90

partner" despite explicit language in the Agreement disclaiming partnership status and the fact that the transaction is designed to Unison's benefit;

m. Providing homeowners with confusing and misleading payment estimates in the Offer Package and in Quarterly Statements throughout the course of Agreement;

n. Placing restraints on consumers' use of their homes, including restrictions on renting out the home during the term, imposing a maximum debt amount, restricting homeowners' ability to obtain refinancing and other mortgage products, and imposing a penalty for the sale of the home during the Restriction Period or a Special Termination buyout;

o. Otherwise placing the Plaintiffs and the Class in a highly lopsided and unfair transactions that benefits Unison while placing the costs and risks on consumers, including through a fee-shifting provision.

294. Unison's conduct constitutes violations of the Consumer Protection Act by:

a. Making false representations of the characteristics and benefits of the transaction, in violation of C.R.S. § 6-1-105(1)(e);

b. Advertising goods, services, or property with intent not to sell them as advertised, C.R.S. § 6-1-105(1)(i);

c. Making false or misleading representations of fact concerning the price of their services in violation of C.R.S. § 6-1-105(1)(l);

d. Failing to meaningfully or effectively disclose material information about the transaction to induce consumers to enter into the transaction in violation of C.R.S. § 6-1-105(1)(u);

e. Failing to obtain necessary governmental licenses and permits, namely, the failure to obtain licenses required for supervised lenders, C.R.S. §§ 5-1-301(2), 5-1-301(46), 5-2-301, and for mortgage companies and mortgage loan originators, C.R.S. § 12-10-704, 705, in violation of C.R.S. § 6-1-105(1)(z);

f. Violating C.R.S. § 38-40-105 in violation of C.R.S. § 6-1-105(1)(uu);

g. Violating C.R.S. § 12-10-713 in violation of C.R.S. § 6-l-105(1)(bbb);

h.  Knowingly or recklessly engaging in unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent acts or practices in violation of C.R.S. § 6-1-105(1)(rrr).

295.  Unison's acts occurred in the course of their business activities.

296.  Unison's acts significantly impact the public, including by:

a.  Originating at least hundreds of Agreements throughout Colorado while obscuring the nature, risk, and cost of the transaction;

b.  Using highly sophisticated modeling that allows Unison to target consumers whose homes are most likely to benefit Unison;

c.  Advertising and marketing to consumers who have no particular expertise or sophistication in complex financial products;

d.  Recording at least hundreds of liens that unlawfully encumber consumers' properties;

e.  Placing restraints on the sale and financing of real property, thereby impacting liquidity in the real estate market;

f.  Drafting form contracts that are offered on a take-it-or-leave-it basis;

297.  Unison's acts caused the Plaintiffs' and the Class injury, including by:

a.  Misrepresenting the true costs, nature, and risks of their product, which prevented the Plaintiffs and the Class from being able to accurately assess whether to enter into the transaction; and continuing to obscure the true cost and nature of the product during the Agreement;

b.  Failing to obtain requisite licensing, such that Unison was prohibited in the first instance from extending the transaction;

c.  Recording liens that unlawfully encumber consumers' property, thereby impacting consumers' ability to sell their homes.

298.  The Plaintiffs and the Class are thus entitled to and seek all available

remedies under the Colorado Consumer Protection Act.

**COUNT V**
**VIOLATIONS OF THE MORTGAGE LENDING REQUIREMENTS**
**C.R.S. §§ 38-40-101 *et seq.***

299.    The Plaintiffs repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

300.    Under Colorado's mortgage laws, a "residential mortgage loan" is "a loan that is primarily for personal, family, or household use and that is secured by a mortgage, deed of trust, or other equivalent, consensual security instrument on a dwelling." C.R.S. §§ 12-10-702(21), 38-40-103.5(1)(d).

301.    The Unison transaction is a residential mortgage loan because it provides homeowners an upfront payment that at least most of the time, the homeowner will have to repay to Unison. The loan is to be used primarily for personal, family or household use, and Unison secures the upfront payment by a deed of trust.

302.    Unison is a mortgage company, mortgage lender and/or mortgage loan originator. C.R.S. §§ 12-10-702(12), (13), (14), C.R.S. §§ 38-40-105(7)(d), (e).

303.    Colorado law proscribes mortgage lenders and mortgage loan originators from engaging in a number of prohibited acts, including:

a.    Knowingly advertising, displaying, distributing, or broadcasting false, deceptive, or misleading statements with regard to rates, terms, or conditions of a mortgage loan, as prohibited by C.R.S. § 38-40-105(1)(a);

b.    Making false promises or misrepresentations or concealing essential or material facts to entice borrowers to enter into a mortgage transaction when under the terms of the transaction, the mortgage lender or mortgage loan originator, knew or reasonably should have known, of the falsity, misrepresentation, or concealment, as prohibited by C.R.S. § 38-40-105(1)(b);

93

c.    Facilitating the consummation of a mortgage loan agreement that is unconscionable, as prohibited by C.R.S. §§ 38-40-105(1)(d), (2);

d.    Knowingly facilitating the consummation of a mortgage loan transaction that violates C.R.S. § 12-10-713, by among other things, knowingly making misrepresentations or knowingly making false or misleading advertisements, as prohibited by C.R.S. § 38-40-105(1)(e).

304.    Unison engages in these prohibited acts by, *inter alia*,

a.    Knowingly advertising, displaying, distributing, or broadcasting false, deceptive, or misleading statements with regard to the Unison Agreement, including during advertising, consummation of the Agreement, and throughout the term of the Agreement;

b.    Making false promises or misrepresentations or concealing essential or material facts to entice borrowers to enter into the Unison Agreement, when Unison knew or reasonably should have known, of the falsity, misrepresentation, or concealment; and

c.    Facilitating unconscionable Agreements.

305.    Therefore, Unison engages in prohibited acts enumerated in Paragraph 303 and thereby violates C.R.S. § 38-40-105.

## COUNT VI
## VIOLATIONS OF REVERSE MORTGAGE REQUIREMENTS
### C.R.S §§ 11-38-101 *et. seq.*

306.    The Plaintiffs repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

307.    A "reverse mortgage" is defined as "a written instrument evidencing or creating a nonrecourse loan secured by real property which … provides cash advances[;] … requires no partial or other payment of principal or interest until the entire loan becomes due and payable; and is made by any lender."  C.R.S. § 11-38-102(4).

94

308.    A "lender" includes persons who regularly make loans or advances

secured by interests in residential real property. C.R.S. § 11-38-102(3).

309.    Reverse mortgages may become due and payable upon the occurrence of

any one of the following events

> (a) The home securing the reverse mortgage is sold.
> (b) The borrower ceases to occupy the home as a principal residence.
> (c) Any fixed maturity date agreed to by the lender and the borrower is reached.
> (d) An event occurs which is specified in the terms of the reverse mortgage and which jeopardizes the lender's security.
> (e) Upon death of the borrower.

C.R.S. § 11-38-107(1).

310.    The Unison Agreement is a reverse mortgage because it provides a lump

sum cash advance to homeowners and does not require (or even allow) pre or partial

payments until the Agreement terminates. The Agreement is non-recourse because

Unison's recovery is limited by the value of the property at the time the Agreement

terminates. Unison is a lender because it regularly makes loans or advances secured by

an interest in real property, as evidenced by land records reflecting hundreds of

Agreements in Colorado.

311.    Moreover, the Unison Agreement becomes due and payable upon (a) the

sale or transfer of the property by the owner, (b) death of the last surviving owner, (c)

expiration of the Agreement term, (d) a material and uncured event of default by the

homeowner or (e) any other termination event specified in the Agreement.

95

312.    Colorado law has a number of requirements governing reverse mortgages that serve to protect consumers against predatory practices and inform consumers of the risk of entering into a reverse mortgage transaction, including:

a.    Permitting payment of a reverse mortgage, in whole or in part, without penalty at any time during the period of the reverse mortgage, as required by C.R.S. § 11-38-103;

b.    Receipt of an attestation in writing, that the applicant has been advised by the lender to obtain independent counseling regarding the advisability of entering into a reverse mortgage transaction and that the applicant has either obtained counseling or waived counseling in writing, as required by C.R.S. § 11-38-111. The statute states that "no reverse mortgage shall be made by a lender" unless such attestation is received. C.R.S. § 11-38-111.

313.    Unison penalizes consumers if they sell their homes within Restriction Period, or if they end the Agreement via a Special Termination, in violation of C.R.S. § 11-38-103.

314.    Unison extends reverse mortgages without advising applicants to obtain independent counseling, and therefore, it does not receive an attestation in writing that the applicant has obtained or waived counseling, in violation of C.R.S. § 11-38-111.

315.    Therefore, Unison violates the statutory requirements applicable to reverse mortgages.

**COUNT VII**
**DECLARATORY JUDGMENT**
**28 U.S.C. §§ 2201, 2202 and Federal Rule of Civil Procedure 57**

316.    The Plaintiffs repeat and reallege the paragraphs above and hereby incorporate the same as if set forth in full.

317.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights or legal relations of any party in a case of actual controversy.

318.    The declaratory relief requested clarifies the rights, status, and obligations of the parties.

319.    An actual controversy exists between the Class and Unison because Unison has initiated and continues to initiate Agreements that violate the Colorado Uniform Consumer Credit Code, Colorado Consumer Protection Act, the Colorado Mortgage Lending Laws and/or Reverse Mortgage Laws.

320.    The Agreements impose financial obligations on the Plaintiffs and the Class and encumber their property.

321.    The Plaintiffs and the Class seek a declaration as to the validity of the Agreements, as well as their rights and duties under the Agreements.

322.    The Plaintiffs and the Class seek a declaration that their rights and duties under those contracts are void, voidable, invalid, and/or otherwise unenforceable in whole or in part.

323.    The Plaintiffs and the Class seek a declaratory judgment from this Court as follows:

> a.    Defendants' contracts are void, unconscionable, invalid, and/or unenforceable, and that no amounts are owed, C.R.S. §§ 5-5-109, 6-1-113(2.9), and 38-40-105(2);
>
> b.    that Defendants cannot impose a finance charge or interest on the Plaintiffs or similarly situated consumers, C.R.S. §§ 5-5-109, 6-1-113(2.9), 38-40-105(2); and/or

97

c.    in the event the payment due at the conclusion of any Unison Agreement includes a finance charge that exceeds 12%, homeowners are not obligated to pay the finance charge unless Unison has obtained a license to operate as a supervised lender prior to the Agreement being originated pursuant to C.R.S. §§ 5-1-301(2), (46), 5-2-301, 5-5-201; and/or

d.    the fee-shifting provision in the Agreement is invalid and unenforceable because it violates public policy and is unconscionable.

## JURY TRIAL DEMAND

324.    Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

325.    WHEREFORE, the Plaintiffs individually and on behalf of the members of the proposed Class, respectfully request this Court enter judgment in their favor and against Defendants as follows:

a.    Certify the case as a class action pursuant to Federal Rule of Civil Procedure 23, and appoint Plaintiffs and their attorneys as class representatives and class counsel, respectively;

b.    Declare the Defendants jointly and severally liable;

c.    Issue an Order providing for any and all injunctive, equitable, or declaratory relief the Court deems appropriate, including but not limited to declaring void, rescinding, terminating, voiding and or reformulating the Agreements;

d.    Declare that the transactions at issue are residential mortgage loans, consumer loans and/or reverse mortgages and that the Defendants are mortgage companies, mortgage lenders and/or mortgage loan originators;

e.    Declare that Defendants are creditors;

f.    Declare that Defendants cannot impose a finance charge or interest on the Plaintiffs or the Class;

g.     Declare that in the event the amount due at the conclusion of any Unison Agreement includes a finance charge that exceeds 12%, homeowners are not obligated to pay the finance charge unless Unison has obtained a license to operate as a supervised lender prior to the Agreement being originated pursuant to C.R.S. §§ 5-1-301(2), (46), 5-2-301, 5-5-201;

h.     Declare that the fee-shifting provision in Unison's Agreement is unenforceable;

i.     Permanently enjoin Defendants from enforcing or selling the HomeBuyer and HomeOwner Agreement products, at least in the form and manner currently in use;

j.     Order that all documents related to the HomeBuyer and HomeOwner products that Defendants recorded with Clerk and Recorder's Offices throughout Colorado are void and must be released;

k.     Award monetary damages, including but not limited to any statutory, compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

l.     Award reasonable attorneys' costs and fees for Plaintiffs' investigation into and prosecution of this action;

m.     Grant additional declaratory, injunctive, and equitable relief as the Court may deem just and proper;

n.     Award additional relief as this Court may deem just and proper.

Respectfully Submitted,

Dated:  June 8, 2026                    **SINGLETON SCHREIBER, LLP**

                                        */s/  Elizabeth Aniskevich*
                                        Elizabeth Aniskevich (DC Bar No. 994603)
                                        Jennifer Yadoo (DC Bar No. 1780435)
                                        SINGLETON SCHREIBER, LLP
                                        650 Massachusetts Ave. NW, Suite 600
                                        Washington, DC 20001
                                        Telephone:  (619) 771-3473
                                        eaniskevich@singletonschreiber.com
                                        jyadoo@singletonschreiber.com

                                        *Attorneys for Plaintiffs and Proposed Class*

## <u>CERTIFICATION</u>

Pursuant to D.Colo.LAttyR 5(a)(3)(C), the undersigned hereby certifies that

she is a member in good standing of the bar of this Court.

*/s/  Elizabeth Aniskevich*
Elizabeth Aniskevich (DC Bar No. 994603)